**Exhibit A**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                                        )
In re:                                                  )        Chapter 11
                                                        )
PQ New York, Inc., *et al.*,[1]                         )        Case No. 20-11266 (JTD)
                                                        )
            Debtors.                                    )        (Jointly Administered)
                                                        )
_____                )

### ORDER (I) AUTHORIZING AND APPROVING PRIVATE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion [Docket No. ___] (the "Sale Motion") of the above captioned debtors and debtors-in-possession (collectively, the "Debtors") for, among other things, entry of an order (this "Order") pursuant to §§ 105, 362, 363, and 365 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as amended, the "Local Bankruptcy Rules"), authorizing the Debtors to: (a) enter into an asset purchase agreement with the Buyer[2] with respect to the sale, transfer, and assignment of the Purchased Assets and Assumed Liabilities; (b)

---

[1] The last four digits of PQ New York, Inc.'s federal tax identification number are 1022. The mailing address for the debtors is 50 Broad Street, New York, New York 10004. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at *www.donlinrecano.com/pqny*.

[2] Unless otherwise stated herein, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement (the "Agreement"), by and among the Debtors (as "Sellers"), and LPQ USA, LLC (as "Buyer"). All "Section" and "Schedule" references, unless otherwise stated herein, shall be to the Agreement. For all purposes in this Order, "Buyer" shall include all of Buyer's permitted assigns or designees, pursuant to the Agreement.

sell the Purchased Assets, which include substantially all of the Debtors' assets relating to the Continuing Restaurants, free and clear of all Liens (as defined herein), with such sale to be in accordance with the terms and conditions of the Agreement; (c) assume and sell and assign certain executory contracts and unexpired leases; and (d) obtain related relief from this Court; and the Debtors having determined in their sound business judgment that the Buyer presents the highest and/or best bid for the Purchased Assets under the circumstances; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the relief requested in the Sale Motion being a core proceeding in accordance with 28 U.S.C. § 157(b); and the Court having conducted a hearing on the Sale Motion on June __, 2020 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and upon the record of the Sale Hearing and all other pleadings and proceedings in these Chapter 11 Cases; and notice of the Sale Motion and the Sale Hearing being just and proper under the circumstances and no further notice being deemed necessary or required; and all objections to the Sale Motion being resolved, withdrawn or overruled; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, their employees (both current and recently terminated), their other stakeholders, and all other parties in interest; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT**:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the Agreement, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

E.      The statutory bases for the relief requested in the Sale Motion and for the approvals and authorizations herein are (i) Bankruptcy Code §§ 105, 362, 363 and 365, (ii) Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, and (iii) Local Bankruptcy Rule 6004-1.

F.      On May 27, 2020 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued in possession and management of their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

G.      As evidenced by the certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object and/or be heard

- 3 -

regarding, the Sale Motion, the transactions contemplated by the Agreement (the "Transactions"), and the Sale Hearing have been provided in accordance with Bankruptcy Code §§ 102(1) and 363(b), the applicable Bankruptcy Rules, and the applicable Local Bankruptcy Rules, and the procedural due process requirements of the United States Constitution.  The Debtors also gave due and proper notice of the potential assumption, sale, and assignment of each contract or lease listed on Schedule 2.6(a) of the Agreement to each non-debtor counterparty under each such contract or lease by serving on all such non-debtor counterparties a notice substantially in the form attached as Exhibit B to the Sale Motion.  Such notice was good, sufficient, appropriate, and proper under the particular circumstances.  No other or further notice of the Sale Motion, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all Liens, the Transactions, the assumption and assignment of the Assumed Contracts, or of the entry of this Order is necessary or shall be required.

H.    The Debtors have demonstrated a sufficient basis and the existence of reasonable and appropriate circumstances, including the outbreak and persistence of the global COVID-19 pandemic, requiring them to enter into the Agreement, sell the Purchased Assets, and assume and assign the Assumed Contracts under Bankruptcy Code §§ 363 and 365, and such actions are appropriate exercises of the Debtors' sound and reasonable business judgment, are consistent in all respects with the Debtors' fiduciary duties, and are in the best interests of the Debtors, their estates, their creditors, their employees (both current and recently terminated), their other stakeholders, and all other parties in interest.  Such circumstances include, but are not limited to, the fact that (i) there is a substantial risk of deterioration of the value of the Purchased Assets if the Transactions are not consummated quickly, (ii) the Agreement and the Closing present the best opportunity to realize the value of the Purchased Assets on a going concern basis, to avoid a

permanent shutdown of the Debtors' businesses, (iii) the successful going concern sale of the Purchased Assets to the Buyer will maximize the opportunity for the reinstatement of jobs, (iv) the Agreement constitutes the highest and best offer for the Purchased Assets, and (v) unless the sale of the Purchased Assets is concluded expeditiously as provided for in the Sale Motion and the Agreement, then stakeholders' recoveries will likely be diminished.

I.      The Debtors and their advisors engaged in a robust and extensive prepetition marketing and sale process, that was fair and open; the sale process was non-collusive, duly noticed, and provided a full, fair, reasonable and adequate opportunity for any entity that either expressed an interest in acquiring the Purchased Assets, or who the Debtors believed may have had an interest in acquiring the Purchased Assets, to make an offer to purchase the Debtors' assets, including, the Purchased Assets; and the Debtors and Buyer have negotiated the terms of the Agreement in a diligent, non-collusive, fair, reasonable and good-faith manner.

J.      The offer of the Buyer, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement, (i) is the highest or best offer received by the Debtors, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' estates, creditors, stakeholders, and parties in interest, (iv) constitutes full and fair consideration and reasonably equivalent value for the Purchased Assets, and (v) will provide a greater recovery for the Debtors' creditors, stakeholders and other interested parties than would be provided by any other practically available alternative under the circumstances.

K.      The Buyer is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code.  The Buyer is a purchaser in "good faith," as that term is used in the Bankruptcy Code, is an assignee in good faith of the Assumed Contracts, and is, therefore,

- 5 -

together with the Debtors, entitled to the protection of Bankruptcy Code § 363(m) with respect to the Purchased Assets (including the Assumed Contracts).  The Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind.  Neither the Debtors nor the Buyer have engaged in any conduct that would prevent the application of Bankruptcy Code § 363(m) or cause the application of, or implicate, Bankruptcy Code § 363(n) to the Agreement or to the consummation of the Transactions and transfer of the Purchased Assets and Assumed Contracts to the Buyer.  Additionally, the Buyer otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) all consideration to be paid by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the sale have been disclosed, (iii) the Buyer has not violated Bankruptcy Code § 363(n) by any action or inaction, and (iv) the negotiation and execution of the Agreement and any other agreements or instruments related thereto was in good faith.

L.      The Sellers have full corporate authority to execute the Agreement (and all other documents contemplated thereby) and to consummate the Transactions, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate, limited liability partnership and other actions on the part of the Sellers.  No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Sellers to consummate such Transactions.

M.      The Debtors have advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and sell and assign the Purchased Assets, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise

- 6 -

of the Debtors' business judgment to sell the Purchased Assets and to consummate the Transactions contemplated by the Agreement. Notwithstanding any requirement for approval or consent by any Person, the transfer of the Purchased Assets to the Buyer and the assumption and assignment of the Assumed Contracts is a legal, valid, and effective transfer of the Purchased Assets (including the Assumed Contracts).

N.      The terms and conditions of the Agreement, including the total consideration to be realized by the Sellers pursuant to the Agreement, are fair and reasonable, and the Transactions contemplated by the Agreement are in the best interests of the Debtors' estates.

O. The Purchased Assets shall be sold free and clear of any and all liens, Claims (as defined in Bankruptcy Code § 101(5)), liabilities (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, encumbrance and interest of any kind or nature whatsoever, including, without limitation, all liens, mechanics' liens, materialmens' liens, consensual liens, non-consensual liens, statutory liens, hypothecations, encumbrances, security interests, mortgages, security deeds, deeds of trust, debts, levies, indentures, pledges, restrictions (whether on voting, sale, transfer, disposition or otherwise), charges, leases, licenses, easements, rights of way, encroachments, instruments, preferences, priorities, security agreements, conditional sales agreements, title retention contracts and other title retention agreements and other similar impositions, options, judgments, offsets, rights of recovery, rights of pre-emption, rights of setoff, rights of first refusal, other third party rights, other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever, claims for reimbursement, claims for contribution, claims for indemnity, claims for exoneration, products liability claims,

- 7 -

alter-ego claims, successor-in-interest claims, successor liability claims, substantial continuation claims, COBRA claims, withdrawal liability claims (including under any Employee Benefit Plan), environmental claims, claims under or relating to any Employee Benefit Plan, ERISA affiliate plan, or ERISA (including any pension or retirement plan), WARN claims or any claims under state or other laws of similar effect, Tax claims (including claims for any and all foreign, federal, state and local Taxes), PACA or PASA claims, escheatment claims, reclamation claims, obligations, liabilities, demands, and guaranties, whether any of the foregoing are known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, secured or unsecured, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, successor-in-interest liability, continuation liability or substantial continuation liability including, without limitation, that the Buyer is in any way a successor, successor-in-interest, continuation or substantial continuation of the Debtors or their businesses (collectively, the "Liens"), other than the Permitted Liens, the Assumed Liabilities or other claims to the extent expressly provided for in the Agreement (including any of Related Agreements).  The Buyer would not have entered into the Agreement and would not have agreed to purchase and acquire the Purchased Assets, if the sale of the Purchased Assets was not free and clear of any and all Liens (other than Permitted Liens, Assumed Liabilities and other amounts expressly provided for in the Agreement).

P.      Liens (other than the Permitted Liens, the Assumed Liabilities and other amounts expressly provided for in the Agreement) shall attach to the consideration to be received by the

- 8 -

Sellers in the same priority and subject to the same defenses and avoidability, if any, as before the Closing.

Q.      The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest of the Sellers to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens, the Assumed Liabilities and other amounts expressly provided for in the Agreement).  Except as specifically provided in the Agreement (including the Related Agreements), the Buyer shall not assume or become liable for any Liens other than the Permitted Liens and Assumed Liabilities.

R.      The Agreement is a valid and binding contract between the Sellers and the Buyer and shall be enforceable pursuant to its terms.  From and after the Closing Date, the Agreement and the Transactions and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 11 trustee appointed in these Chapter 11 Cases, or in the event the Chapter 11 Cases are converted to a case under chapter 7 of the Bankruptcy Code, a chapter 7 trustee, and shall not be subject to rejection or avoidance by any Person.

S.      The transfer of the Purchased Assets to the Buyer free and clear of all Liens (other than the Permitted Liens, the Assumed Liabilities and any other amounts expressly provided for in the Agreement) will not result in any undue burden or prejudice to any holders of any Liens, because all such Liens of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets received by the Sellers in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto.  All

Persons having Liens of any kind or nature whatsoever against or in any of the Debtors or the Purchased Assets are and shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens (other than the Assumed Liabilities, the Permitted Liens and other amounts expressly provided for in the Agreement) against the Buyer, any of its assets, property, successors or assigns, or the Purchased Assets.

T.      The Sellers may sell the Purchased Assets free and clear of all Liens of any kind or nature whatsoever (other than the Permitted Liens, the Assumed Liabilities and other amounts expressly provided for in the Agreement) because, in each case, one or more of the standards set forth in Bankruptcy Code § 363(f) has been satisfied.  Those (i) holders of Liens in or with respect to the Purchased Assets and (ii) non-debtor parties to the Assumed Contracts, who did not object, or who withdrew their objections, or whose objections were overruled, with respect to the sale of the Purchased Assets and the Sale Motion are deemed to have consented pursuant to Bankruptcy Code § 363(f)(2).  All objections to the Sale Motion have been withdrawn, overruled or resolved.  Those holders of Liens in or with respect to the Purchased Assets who did object fall within one or more of the other subsections of Bankruptcy Code § 363(f) and are adequately protected by having their Liens, if any, attach to the proceeds of the sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Liens, with such Liens being subject to treatment as may be prescribed in the Debtors' chapter 11 plan or by separate order of this Court.

U.      Not selling the Purchased Assets free and clear of all Liens (other than the Permitted Liens, the Assumed Liabilities and other amounts expressly provided for in the Agreement) would adversely impact the Debtors' estates, and the sale of Purchased Assets other

RLF1 23474151v.4

than one free and clear of all Liens (other than the Permitted Liens and Assumed Liabilities) would be of substantially less value to the Debtors' estates.

V.    The Sellers and the Buyer have, to the extent necessary, satisfied the requirements of Bankruptcy Code § 365, including Bankruptcy Code §§ 365(b)(1)(A), (B) and 365(f), in connection with the sale and the assumption and assignment of the Assumed Contracts.  The Buyer has demonstrated adequate assurance of future performance with respect to the Assumed Contracts pursuant to Bankruptcy Code § 365(b)(1)(C).  The assumption and assignment of the Assumed Contracts, pursuant to the terms of this Order, are integral to the Agreement and are in the best interests of the Debtors, their estates, their creditors, their employees (both current and recently terminated), their stakeholders and all other parties in interest, and represent the exercise of sound and prudent business judgment by the Debtors.  Specifically, the assumption and assignment of the Assumed Contracts (i) are necessary to sell the Purchased Assets to Buyer, (ii) limit the losses suffered by counterparties to the Assumed Contracts, and (iii) maximize the recoveries to other creditors of the Debtors by limiting the number and amount of claims against the Debtors' estates by avoiding the rejection of the Assumed Contracts.

W.    The Assumed Contracts are assignable notwithstanding any provisions contained therein to the contrary.  In accordance with the Agreement, the Buyer shall have the sole responsibility for paying all Cure Amounts required to assume and assign the Assumed Contracts to the Buyer.

X.    The Buyer has acted in good faith, pursuant to Bankruptcy Code § 363(m), and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

Y.    The Transactions do not amount to or constitute a consolidation, merger, or *de*

- 11 -

*facto* merger of the Buyer and the Debtors or the Debtors' estates, there is not substantial continuity between the Buyer and the Debtors or the Debtors' estates, there is no continuity of enterprise between the Buyer and the Debtors or the Debtors' estates, the Buyer is not a continuation or substantial continuation of the Debtors or their estates, the Buyer is not a successor or successor-in-interest to the Debtors or their estates, and the Buyer is not an alter ego of any of the Debtors or their estates.

Z.      The total consideration provided by the Buyer for the Purchased Assets was the highest or best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

AA.      Time is of the essence in consummating the sale.  There is no credible basis for concluding that a delay in the sale of the Purchased Assets would result in a higher or better offer for the Purchased Assets than the offer reflected in the Agreement.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d).

BB.      At and effective as of the Closing, the Buyer shall assume responsibility for paying and satisfying the Assumed Liabilities as provided in the Agreement.  For the avoidance of doubt, nothing in this Order (including, without limitation, any provisions in this Order regarding the sale, transfer or conveyance of the Purchased Assets free and clear of Liens) nor in the Agreement shall be construed to mean that the Buyer is not assuming from the Debtors and

- 12 -

thereafter becoming responsible for the payment, performance and discharge of the Assumed Liabilities as provided in the Agreement.  After the Closing, the Debtors shall have no liability whatsoever with respect to the Assumed Liabilities except to the extent set forth in the Agreement.   Except as otherwise provided in the Agreement (including any Related Agreements), the Buyer shall have no obligations or responsibility whatsoever with respect to any claims against the Debtors (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Sale Motion is granted as set forth herein, and the Agreement and the provisions thereof and the Transactions contemplated therein are approved in their entirety, subject to the terms and conditions contained herein.

2.      All objections, responses, reservations of rights, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response, reservation of rights, or request for continuance was not otherwise withdrawn, waived, settled, or resolved, such is hereby overruled and denied on the merits.

3.      Notice of the Sale Motion, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all Liens, the Transactions, and the assumption and assignment of the Assumed Contracts was reasonable, fair and equitable under the circumstances and complied in all respects with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

4.      The sale of the Purchased Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), and the Transactions are hereby authorized

- 13 -

and approved in all respects.

5.      The sale of the Purchased Assets and the consideration provided by the Buyer under the Agreement are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable Law.

6.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith purchaser under Bankruptcy Code § 363(m), including, without limitation, with respect to all of the Transactions (including the transfer of the Assumed Contracts as part of the sale of the Purchased Assets pursuant to Bankruptcy Code § 365 and this Order).

7.      The Debtors shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement the terms of the Agreement together with any and all additional instruments and documents that may be necessary or desirable in connection with implementing and effectuating the terms of the Agreement, this Order, and/or the sale of the Purchased Assets including, without limitation, bills of sale, certificates, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, any or all of the Purchased Assets or Assumed Contracts, as may be necessary or appropriate to the performance of the Sellers' obligations as contemplated by the Agreement, without any further corporate, limited liability partnership, or other action or orders of this Court.

8.      The Sellers and each other Person having duties or responsibilities under the Agreement, any agreements or instruments related thereto or this Order, and their respective directors, officers, employees, members, managers, partners, agents, representatives, and

- 14 -

attorneys, are authorized and empowered, subject to the terms and conditions contained in the Agreement and this Order, to carry out all of the provisions of the Agreement and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement and any related agreements or instruments; to take any and all actions contemplated by the Agreement, any related agreements or instruments, or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, termination statements, indentures, mortgages, quitclaim deeds, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements or instruments, this Order and the Transactions, all without further application to, or order of, the Court or further action by their respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys of such entities. The secretary or any assistant secretary of each Debtor (or any comparable officer) shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Sellers are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Entity any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transactions and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable Laws of all applicable Governmental Entities or as any

- 15 -

of the officers of the Sellers may determine are necessary, desirable or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the applicable state's corporate laws and all other applicable business, corporation, non-profit, limited liability partnership, trust, and other Laws of the applicable Governmental Entities with respect to the implementation and consummation of the Agreement, any related agreements or instruments, this Order, and the Transactions.

9.      Effective as of the Closing, (a) the sale of the Purchased Assets by the Sellers to the Buyer shall constitute a legal, valid, and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Buyer with good, valid and marketable title in and to the Purchased Assets, free and clear of any and all Liens of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities) pursuant to Bankruptcy Code § 363(f), and (b) the assumption of the Assumed Liabilities by the Buyer shall constitute a legal, valid and effective delegation and assignment of all Assumed Liabilities to the Buyer and shall divest the Sellers of all liability with respect to any Assumed Liabilities.

10.     The sale of the Purchased Assets is not subject to avoidance by any Person or for any reason whatsoever, including, without limitation, pursuant to Bankruptcy Code § 363(n).

11.     At the Closing, the Sellers shall be, and hereby are, authorized, empowered, and directed, pursuant to Bankruptcy Code §§ 105, 363(b), 363(f) and 365, to take any and all actions necessary or appropriate to sell the Purchased Assets and to assume and assign the Assumed Contracts to the Buyer.  The sale of the Purchased Assets shall vest the Buyer with all right, title

and interest of the Sellers to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens, the Assumed Liabilities and other amounts expressly provided for in the Agreement), with all such Liens to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Purchased Assets, subject to all claims and defenses the Sellers and their estates may possess with respect thereto.  Following the Closing Date, no holder of any Liens in the Purchased Assets (other than the Permitted Liens, the Assumed Liabilities and other amounts expressly provided for in the Agreement) shall interfere with the Buyer's use and enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Debtors may take in the Chapter 11 Cases.

12.     The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Liens (other than the Permitted Liens and Assumed Liabilities) shall be self-executing, and neither the Sellers nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.  However, the Sellers and the Buyer, and each of their respective officers, employees, and agents, are hereby authorized and empowered to take all actions and to execute and deliver any and all documents and instruments that either the Sellers or the Buyer deem necessary, desirable or appropriate to implement and effectuate the terms of the Agreement and this Order.

13.     On or before the Closing Date, the Sellers' creditors are authorized to execute such documents and take all other actions as may be necessary to release any Liens (other than the Permitted Liens) of any kind against the Purchased Assets, as such Liens may have been recorded or may otherwise exist and deliver such executed documents to the Sellers' counsel to be held in escrow.  If any Person that has filed financing statements, mortgages or other

- 17 -

documents, instruments or agreements evidencing any Liens in or against the Purchased Assets (other than the Permitted Liens) shall not have delivered to the Sellers' counsel prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens that the Person has with respect to the Purchased Assets, the Debtors and each of the Debtors' officers and agents are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to such Purchased Assets at Closing, and the Buyer and each of the Buyer's officers and agents are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to such Purchased Assets after the Closing.  In addition, after Closing, the Buyer and the Sellers and their respective agents are authorized to file a copy of this Order in the appropriate real estate records, the secretary of state records and any other filing location selected by the Buyer or the Sellers and, once filed, this Order shall constitute conclusive evidence of the release of all Liens (other than Permitted Liens) from the Purchased Assets.

14.     To the greatest extent available under applicable Law, (a) the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, approval, certificate of occupancy, certificate of need, authorization, accreditation, operating permit, registration, plan and the like of any Governmental Entity relating to the Purchased Assets (collectively, the "Permits"), (b) all such Permits are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date, and (c) each Governmental Entity that has issued or granted a Permit to, or for the benefit of, the Sellers shall be deemed to have consented to the transfer of such Permit to the Buyer as of the Closing Date.

- 18 -

15.     All of the Sellers' interests in the Purchased Assets to be acquired by the Buyer under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Order shall be considered and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets acquired by the Buyer under the Agreement and/or a bill of sale, deed, or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Buyer.

16.     Except as expressly provided in the Agreement (including any Related Agreements), the Buyer is not assuming nor shall it or any Affiliate of the Buyer be in any way liable or responsible, as a successor, successor-in-interest, continuation, substantial continuation, alter ego or otherwise, for any claims, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the consummation of the Transactions, or any claims or liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to consummation of the Transactions, which liabilities, claims, debts, and obligations are hereby completely and utterly extinguished insofar as they may give rise to any liability, whether successor, successor-in-interest, continuation, substantial continuation, alter ego or otherwise, against the Buyer or any of the Buyer's current and former shareholders, members, managers, officers, directors, attorneys, employees, partners, Affiliates, financial advisors, agents or representatives, to the greatest extent permitted by applicable law.

17.     Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the Assumed Contracts and the sale and assignment of such agreements and unexpired leases to the Buyer, as provided for or contemplated by the

- 19 -

Agreement, be, and hereby are, authorized and approved pursuant to Bankruptcy Code §§ 363 and 365.

18.     The Assumed Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and sold and assigned to the Buyer at the Closing, pursuant to Bankruptcy Code §§ 363 and 365, subject only to the payment of the Cure Amounts.

19.     Upon the Closing, in accordance with Bankruptcy Code §§ 363 and 365, the Buyer shall be fully and irrevocably vested in all right, title, and interest in and to each Assumed Contract.  The Sellers shall reasonably cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

20.     All defaults or other obligations under the Assumed Contracts arising prior to the Closing (without giving effect to any acceleration clauses, assignment fees, increases, advertising rates, or any other default provisions of the kind specified in Bankruptcy Code § 365(b)(2)) shall be deemed cured by payment of the related Cure Amounts unless such constitutes an Assumed Liability under the terms of the Agreement.

21.     Any provision in any Assumed Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Assumed Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amounts, if any.  No sections or provisions of any Assumed Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor party to the Assumed Contract shall have any force and effect with respect to the Transactions and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Bankruptcy Code § 365(f) and/or are otherwise unenforceable under Bankruptcy Code § 365(e) and no assignment of any

- 20 -

Assumed Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Assumed Contract.  The non-debtor party to each Assumed Contract shall be deemed to have consented to such assignment under Bankruptcy Code § 365(c)(1)(B), and the Buyer shall enjoy all of the Debtors' rights and benefits under each such Assumed Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's consent, written or otherwise, to the assumption or assignment thereof.

22.    The Buyer has satisfied all requirements under Bankruptcy Code §§ 365(b)(1)(C) and 365(f)(2)(b) to provide adequate assurance of future performance under the Assumed Contracts.

23. The Debtors and their estates shall be relieved of any liability under the Assumed Contracts occurring from and after the Closing, pursuant to and in accordance with Bankruptcy Code § 365(k), and the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assumed Contracts.

24. Pursuant to Bankruptcy Code §§ 105(a), 363, and 365, all parties to the Assumed Contracts are forever barred from raising or asserting against the Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities being assumed by the Buyer under the Agreement.

25.    As set forth in Section 2.6 of the Agreement, any Contract or Lease listed on Schedule 2.6(a) of the Agreement shall be assumed and assigned to the Buyer on and as of the Closing, provided that, until two (2) Business Days prior to the Sale Hearing, the Buyer may, in its sole discretion, designate a Contract or Lease listed on Schedule 2.6(a) of the Agreement for rejection by moving it to Schedule 2.6(b) of the Agreement.   Any Contracts and Leases

remaining on Schedule 2.6(a) of the Agreement shall be assumed and assigned to Buyer in at Closing accordance with the terms of the Agreement.

26.     In connection with the assumption by and assignment to the Buyer of any Assumed Contracts pursuant to <u>Section 2.6</u> of the Agreement, (i) the amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (collectively, such amounts, the "<u>Cure Amounts</u>"), in each case as of the Petition Date and to the extent required by Bankruptcy Code §§ 365(b)(1)(A) and (B) and any order of the Bankruptcy Court, shall be paid by the Buyer at the Closing, except as provided below with respect to any Disputed Cure Amounts (as defined herein), and (ii) the Buyer has provided sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in Bankruptcy Code §§ 365(b)(1)(C) and 365(f) with respect to Assumed Contracts.  In the event of a dispute between the Debtors and a non-Debtor Contract or Lease counterparty as to a proposed Cure Amount (a "Disputed Cure Amount"), the Debtors, with the consent of the Buyer, shall either settle the objection of such party or litigate such objection under procedures established by the Bankruptcy Court.  In no event shall the Debtors settle a Disputed Cure Amount without the express written consent of the Buyer.  In the event that a Disputed Cure Amount has not been resolved as of the Closing, the Debtors and the Buyer shall nonetheless remain obligated to consummate the Contemplated Transactions, provided all conditions precedent to the effectiveness of the Contemplated Transactions are satisfied.  Upon entry of an order of the Bankruptcy Court resolving a Disputed Cure Amount (a "Disputed Contract Order"), the Buyer shall have five (5) days from the entry of the Disputed Contract Order to confirm whether such Contract or Lease will be assumed and assigned in accordance with the Agreement; provided, however, that if Buyer does not designate

- 22 -

such Contract or Lease for assumption within five (5) days from the entry of the Disputed Contract Order, such Contract or Lease shall automatically be deemed an Excluded Contract for all purposes under the Agreement.

27.     Payment of the Cure Amounts as set forth in the forgoing paragraph shall be in full satisfaction and cure of any and all defaults under the Assumed Contracts, whether monetary or non-monetary.   Upon the payment of the relevant Cure Amounts in accordance with the Agreement, the Debtors and their estates shall have no further liabilities to the non-debtor parties to the Assumed Contracts that accrue and become due and payable on or after the Closing except as provided in the Agreement.   Each non-debtor party to an Assumed Contract is forever barred and estopped from asserting against the Sellers, their estates or the Buyer, their successors or assigns, or their property, any default existing as of the date of the Sale Hearing if such default was not timely raised or asserted prior to or at the Sale Hearing.   Except as expressly set forth herein, to the extent a counterparty to an Assumed Contract failed to timely object to the Cure Amounts prior to the Sale Hearing, such Cure Amounts have been and shall be deemed to be fully determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amounts and/or the assumption and assignment of the Assumed Contract at any time.

28.     Notwithstanding the foregoing, but subject to <u>Section 5.1</u> of the Agreement, a Contract shall not be an Assumed Contract and shall not be assigned to, or assumed by, the Buyer to the extent that such Contract (i) is rejected by the Sellers or terminated by the Sellers in accordance with the terms of the Agreement or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) subject to <u>Section 2.7</u> of the Agreement, requires a Consent of any

Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to the Buyer of the Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) relates solely to the Excluded Assets. In addition, a Permit shall not be assigned to, or assumed by, the Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to the Buyer of the Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

29.    Upon the Sellers' assignment of the Assumed Contracts to the Buyer, no default shall exist under any Assumed Contract, and no counterparty thereof shall be permitted to declare a default by any Debtor or the Buyer, or otherwise take any action against the Buyer, as a result of any Debtors' financial condition, bankruptcy, or failure to perform its obligations under the relevant Assumed Contract. Any provision in an Assumed Contract that prohibits or conditions the assignment or sublease of such Assumed Contract or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect, but only in connection with the assumptions and assignments authorized by the Buyer in accordance with this Order.

30.    Each and every federal, state, and local governmental agency or department (including each Governmental Entity) is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement and this Order. This Order and the Agreement shall govern the acts of all such federal, state, and local governmental agencies and departments, including any filing agents,

- 24 -

filing officers, title agents, recording agencies, secretaries of state, and all other Persons and entities who may be required by operation of Law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets, and each such entity is hereby authorized to accept this Order for recordation as conclusive evidence of the free, clear, and unencumbered transfer of title to the Purchased Assets conveyed to the Buyer pursuant to the Agreement.

31.     To the maximum extent permitted by Bankruptcy Code § 525, no Governmental Entity may revoke or suspend any Permit relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Transactions.

32.     The Buyer is not a "successor," "successor-in-interest," "continuation," "alter ego" or "substantial continuation" to or of the Debtors or their estates by reason of any theory of Law or equity whatsoever, and the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability, claim or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales Law, successor liability, successor-in-interest liability, substantial continuation liability, alter ego liability, or similar liability except to the extent expressly included in the Assumed Liabilities or provided in the Agreement . (including any Related Agreements).  Neither the purchase of the Purchased Assets by the Buyer, nor the fact that the Buyer is using any of the Purchased Assets previously operated by the Debtors, will cause the Buyer or any of its Affiliates to be deemed a successor, successor-in-interest, continuation, alter ego, or substantial continuation in any respect to the Debtors' business within the meaning of any foreign, federal, state or local law, rule, doctrine or regulation, including,

- 25 -

without limitation, revenue, pension, ERISA, COBRA coverage, Family Medical Leave Act of 1933, Worker Adjustment and Retraining Notification of 1988 ("<u>WARN</u>"), IRC, Tax, labor, employment, environmental, or other Law, rule or regulation (including, without limitation, filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to the Debtors' liability under such Law, rule or regulation or doctrine to the greatest extent under applicable law, except to the extent expressly included in the Assumed Liabilities or provided in the Agreement.

33.    For the avoidance of doubt, transfer of title and possession of the Purchased Assets shall be free and clear of any claims and other Liens pursuant to any successor, successor-in-interest, continuation, alter ego or substantial continuation theory, including, without limitation, the following:  (a) any employment or labor agreements, (b) any deeds of trust, security deeds, mortgages, liens, and security interests, (c) any pension or medical benefit plan of the Debtors, compensation or other Employee Benefit Plan of the Debtors, welfare, agreements, practices and programs, (d) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims and other Liens that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act of 1938, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act of 1935, (vi) WARN or any state or other Law of similar effect, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act of 1967 (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state discrimination Laws, (xi) state unemployment compensation Laws or any other similar state Laws, or (xii) any other state or federal benefits or claims and other Liens relating to any employment with the

RLF1 23474151v.4

Debtors or any predecessors (each of (d)(i)-(xii) as amended or may be amended from time to time), (e) environmental or other claims and other Liens arising from existing conditions on or prior to the Closing (including, without limitation, the presence of a Hazardous Substance) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (as amended, "CERCLA") or any other state or federal statute, (f) any bulk sales or similar Law, (g) any Tax statutes or ordinances, including, without limitation, the IRC, as amended, and (h) any and all theories of successor liability, including any theories on successor products liability grounds or otherwise, to the greatest extent under applicable law.

34.     Except to the extent expressly included in the Assumed Liabilities or provided in the Agreement, the Buyer and its Affiliates shall have no liability, obligation, or responsibility under WARN or any state or other Law of similar effect or CERCLA, or any foreign, federal, state or local labor, employment, or environmental Law by virtue of the Buyer's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

35.     Without limiting the generality of the foregoing, the Buyer shall not assume or be obligated to pay, perform or otherwise discharge any workers' compensation debts, obligations, and liabilities of the Debtors arising pursuant to state Law or otherwise.  This Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination, or other incidents, acts, or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation claims filed or to be filed, or reopenings of those claims, by or on behalf of any of the Debtors' current or former employees, persons on

- 27 -

laid-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments, or other obligations of any nature whatsoever of the Debtors relating in any way to workers' compensation liability.

36.    Subject to the terms of the Agreement, the Agreement and any related agreements and/or instruments may be waived, modified, amended, or supplemented without further action or order of the Court; provided, that any modifications or amendments are non-material.

37.    The failure specifically to include any particular provisions of the Agreement or any related agreements or instruments in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, the Debtors, and the Buyer that the Transactions, the Agreement and any related agreements and instruments are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing.

38.    No bulk sale Law or any similar Law of any state or other jurisdiction shall apply in any way to the sale and the Transactions contemplated by the Agreement.

39.    Nothing in this Order shall alter or amend the Agreement or the obligations of the Sellers and the Buyer thereunder.

40.    This Order and the Agreement shall be binding upon and govern the acts of all Persons including, without limitation, the Debtors, the Debtors' estates, the Buyer, and each of their respective directors, officers, employees, agents, successors, and permitted assigns, any chapter 11 trustee hereinafter appointed for the Debtors' estates, any trustee appointed in a chapter 7 case if these Chapter 11 Cases are converted from chapter 11, any chapter 11 plan agent or trustee, liquidating agent or trustee, or any other agent or trustee charged with administering any assets of the Debtors or their estates, all creditors of each Debtor (whether

known or unknown), the Committee and its professionals, holders of Liens in or with respect to the Purchased Assets, filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of Law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

41.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in these Chapter 11 Cases, or in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order and the terms of this Order shall remain in full force and effect in the event of dismissal of these Chapter 11 Cases or conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

42.     The stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 are hereby waived, and this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any Person obtaining a stay pending appeal, the Debtors and the Buyer are free to close under the Agreement at any time, subject to the terms of the Agreement.  In the absence of any Person obtaining a stay pending appeal, if the Debtors and the Buyer close under the Agreement, the Buyer shall be deemed to have acted in "good faith" up through the Sale Hearing and shall be entitled to the protections of Bankruptcy Code § 363(m) as to all aspects of the Transactions if this Order or any authorization contained herein is reversed or modified on appeal.

43.     The sale of the Purchased Assets to the Buyer outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors

- 29 -

nor impermissibly dictates the terms of a liquidating plan or plan of reorganization of the Debtors.  The Transactions do not constitute a *sub rosa* chapter 11 plan.

44.     The automatic stay provisions of Bankruptcy Code § 362 are vacated and modified to the extent necessary to implement the terms and conditions of the Agreement and the provisions of this Order, and the stay imposed by Bankruptcy Rule 4001(a)(3) is hereby waived with respect thereto.

45.     This Court shall retain jurisdiction to enforce the terms and provisions of this Order and the Agreement (including, without limitation, all Related Agreements and all documents and instruments executed in connection with the Closing) in all respects and to decide any disputes concerning this Order, the Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Assumed Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of any and all Liens (except Permitted Liens and Assumed Liabilities).

46.     The provisions of this Order are non-severable and mutually dependent.  The terms and conditions of the Agreement (including all schedules and exhibits thereto) constitute a single, integrated transaction and are mutually dependent and non-severable.

RLF1 23474151v.4

47.     As soon as practicable after the Closing, the Debtors shall file a report of sale in accordance with Bankruptcy Rule 6004(f)(1)

**<u>Exhibit 1</u>**

**Agreement**

# ASSET PURCHASE AGREEMENT

by and among

## PQ NEW YORK, INC.,

## EACH OF THE OTHER SELLERS PARTY HERETO

and

## LPQ USA, LLC

May 26, 2020

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................ 2
ARTICLE II PURCHASE AND SALE ............................................. 2
2.1    Purchase and Sale of Purchased Assets ............................ 2
2.2    Excluded Assets ................................................................ 2
2.3    Assumption of Assumed Liabilities .................................. 3
2.4    Excluded Liabilities .......................................................... 3
2.5    Consideration .................................................................... 3
2.6    Assumption and Assignment of Contracts ....................... 3
2.7    Schedule Updates .............................................................. 5
2.8    Closing .............................................................................. 6
2.9    Deliveries at Closing ........................................................ 6
2.10   Allocation ......................................................................... 7
2.11   Excluded Locations and Purchased Assets ....................... 7
ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ............ 8
3.1    Organization of Sellers; Good Standing ........................... 8
3.2    Authorization of Transaction ........................................... 8
3.3    Noncontravention; Consents and Approvals ..................... 8
3.4    Compliance with Laws ...................................................... 9
3.5    Title to Purchased Assets ................................................. 9
3.6    Contracts ......................................................................... 10
3.7    Intellectual Property ....................................................... 10
3.8    Litigation ........................................................................ 11
3.9    Employees and Employment Matters .............................. 11
3.10   Real Property .................................................................. 12
3.11   Tangible Personal Property ............................................. 13
3.12   Permits ........................................................................... 13
3.13   Purchased Inventory ....................................................... 13
3.14   Environmental Matters .................................................... 14
3.15   Financial Statements ....................................................... 14
3.16   Brokers' Fees .................................................................. 15
3.17   No Other Agreements to Purchase .................................. 15
3.18   Taxes .............................................................................. 15
3.19   Suppliers ......................................................................... 16
ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ............ 16
4.1    Organization of Buyer ..................................................... 16
4.2    Authorization of Transaction ......................................... 16
4.3    Noncontravention ............................................................ 17
4.4    Litigation ........................................................................ 17
4.5    Adequate Assurances Regarding Executory Contracts .... 17
4.6    Brokers' Fees .................................................................. 17
ARTICLE V PRE-CLOSING COVENANTS .................................. 18
5.1    Notices and Consents ...................................................... 18
5.2    Bankruptcy Actions ........................................................ 19

| | | |
|---|---|---|
| 5.3 | Conduct of Business | 20 |
| 5.4 | Notice of Developments | 22 |
| 5.5 | Access | 22 |
| 5.6 | Press Releases and Public Announcements | 23 |
| 5.7 | Bulk Transfer Laws | 23 |
| **ARTICLE VI OTHER COVENANTS** | | **24** |
| 6.1 | Cooperation | 24 |
| 6.2 | Further Assurances; Power of Attorney | 24 |
| 6.3 | Availability of Business Records | 25 |
| 6.4 | Employee Matters | 25 |
| 6.5 | Transfer Taxes; Tax Refunds | 25 |
| 6.6 | Collection of Accounts Receivable | 25 |
| 6.7 | Use of Name and Marks | 26 |
| 6.8 | Applicable Duties; Break-up Fee and Expense Reimbursement | 26 |
| 6.9 | Powers of Attorney Indemnification | 27 |
| 6.10 | Adequate Assurance Utility Deposit Administration | 27 |
| **ARTICLE VII CONDITIONS TO CLOSING** | | **27** |
| 7.1 | Conditions to Buyer's Obligations | 27 |
| 7.2 | Conditions to Sellers' Obligations | 28 |
| 7.3 | No Frustration of Closing Conditions | 29 |
| 7.4 | Waiver of Conditions | 29 |
| **ARTICLE VIII TERMINATION** | | **29** |
| 8.1 | Termination of Agreement | 29 |
| 8.2 | Procedure upon Termination | 31 |
| 8.3 | Effect of Termination | 31 |
| **ARTICLE IX MISCELLANEOUS** | | **31** |
| 9.1 | Remedies | 31 |
| 9.2 | Expenses | 31 |
| 9.3 | Entire Agreement | 31 |
| 9.4 | Incorporation of Schedules, Exhibits and Disclosure Schedule | 32 |
| 9.5 | Amendments and Waivers | 32 |
| 9.6 | Succession and Assignment | 32 |
| 9.7 | Notices | 32 |
| 9.8 | Governing Law; Jurisdiction | 33 |
| 9.9 | Consent to Service of Process | 34 |
| 9.10 | Waivers of Jury Trial | 34 |
| 9.11 | Severability | 34 |
| 9.12 | No Third Party Beneficiaries | 34 |
| 9.13 | No Survival of Representations, Warranties and Agreements | 34 |
| 9.14 | Non-Recourse | 35 |
| 9.15 | Construction | 35 |
| 9.16 | Computation of Time | 35 |
| 9.17 | Mutual Drafting | 36 |
| 9.18 | Disclosure Schedule | 36 |
| 9.19 | No Waiver or Release | 36 |
| 9.20 | Headings; Table of Contents | 36 |

Page

9.21     **Counterparts; Email and Electronic Signatures**........................................ 36
9.22     **Sellers' Rep** ................................................................................................. 37
9.23     **Time of Essence** ........................................................................................... 37
9.24     **Buyer's Non-Reliance on Additional Representations and Warranties** .. 37
9.25     **Additional Liability Limitations** ............................................................... 38
9.26     **Setoff Right** .................................................................................................. 39
9.27     **Privileged Communications.** ........................................................................ 39


## ANNEXES

Annex I              -          Sellers


## EXHIBITS

Exhibit A            -          Purchased Assets
Exhibit B            -          Excluded Assets
Exhibit C-1          -          Form of Unit Franchise Agreement
Exhibit C-2          -          US Master Franchise Agreement
Exhibit D            -          Form of Assignment and Assumption Agreement
Exhibit E            -          Form of Bill of Sale
Exhibit F            -          Form of Domain Name Assignment
Exhibit G            -          DIP Budget


## SCHEDULES

Schedule I           -          Definitions
Schedule 2.1(t)      -          Assets with Certificates of Title
Schedule 2.2         -          Certain Excluded Assets
Schedule 2.6(a)      -          Potential Assumed Contracts and Leases
Schedule 2.6(b)      -          Post-Petition Rejected Contracts
Schedule 2.6(c)      -          Excluded Contracts and Leases
Schedule 5.3         -          Conduct of Business

Disclosure Schedules

144305281v10

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of May 26, 2020, by and among PQ NEW YORK, INC., a Delaware corporation ("PQ NY"), and the parties set forth on Annex I hereto, (PQ NY and each Person set forth on Annex I, may hereinafter be referred to, individually, as a "Seller" and sometimes collectively, the "Sellers" or individually a "Debtor" or collectively the "Debtors") and LPQ USA, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

**WHEREAS**, Sellers are in the business of operating restaurants in the United States of America, including in the States of California, Illinois, New York, Connecticut and Florida, the Commonwealth of Pennsylvania and the Washington DC metro area (collectively, the "Business");

**WHEREAS**, it is expected that on or about May 27, 2020 Sellers will file voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, upon the filings of such Chapter 11 Cases, Sellers continued in possession of their assets and were authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

**WHEREAS**, Sellers entered into a Secured Promissory Note dated as of May 13, 2020, as amended on May 21, 2020 (the "Bridge Loan") with a total principal amount of $522,000.00 (the "Bridge Loan Amount") payable to the order to Buyer.

**WHEREAS**, subject to Bankruptcy Court approval, the Debtors entered into that superpriority debtor-in-possession financing in the amount of $3,000,000 (inclusive of a "roll-up" of the Bridge Loan) in connection with such Chapter 11 Cases (Buyer, in capacity as the lender thereunder, the "DIP Lender") pursuant to the DIP Order and the DIP Loan Documents (such credit facility, as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "DIP Facility");

**WHEREAS**, on May 13, 2020, the Buyer and PQ Licensing SA, a Belgian public limited liability company, having its registered office at 11 rue des Colonies, 1000 Brussels, Belgium, and registered with the Companies Register under number 0453.869.136 (RPM Brussels) ("PQL") entered into that certain Term Sheet in Relation to a US Master Franchise Agreement (the "Term Sheet"), and on the date hereof, the Buyer and PQL entered into the US Master Franchise Agreement.

**WHEREAS**, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the

Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

**WHEREAS**, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

**WHEREAS**, the board of directors or other applicable governing body of each Seller has determined that it is advisable and in the best interests of each such Seller's estate and the beneficiaries of such estates to consummate the Contemplated Transactions provided for herein pursuant to the Sale Order and has approved this Agreement; and

**WHEREAS**, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used herein, but not otherwise defined in this Agreement shall have the terms set forth on Schedule I.

## ARTICLE II
## PURCHASE AND SALE

2.1     **Purchase and Sale of Purchased Assets**.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Seller's right, title and interest in, to and under the Purchased Assets, as provided for in the Sale Order free and clear of all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities), for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the, direct or indirect, right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing, including those set forth on Exhibit A.

2.2     **Excluded Assets**.  Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the assets, properties and rights of Sellers set forth on Exhibit B (the "Excluded Assets").

2

2.3    **Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume from Sellers, and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities of the Business solely in respect of the Continuing Restaurants arising from or relating to the conduct of the Business solely in respect of the Continuing Restaurants, without duplication and only to the extent not paid prior to the Closing and no others (collectively, the "Assumed Liabilities"):

(a)    all Cure Amounts under any and all Assumed Contracts (except to the extent otherwise negotiated by Buyer and non-Debtor third-parties);

(b)    Liabilities under the Assumed Contracts and Assumed Permits arising from and after the Closing Date as well as any Liabilities to the extent arising out of the Purchased Assets or the operation of the Business solely in respect of the Continuing Restaurants, in each case, arising from and after the Closing Date;

(c)    Transfer Taxes in accordance with Section 6.5; and

(d)    (i) all unpaid and outstanding ad valorem Taxes on the personal property that constitutes a part of the Purchased Assets and (ii) to the extent required to be paid or assumed in connection with the assumption of any Lease for a Continuing Restaurant included in the Assumed Contracts, unpaid and outstanding ad valorem Taxes on the real property at the Continuing Restaurant.

2.4    **Excluded Liabilities**.  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").

2.5    **Consideration**.  The aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be $3,000,000 (the "Base Purchase Price"), plus the Adequate Assurance Deposit Amount plus the Assumed Liabilities.  The Purchase Price shall be satisfied at the Closing by (i) paying, by wire transfer of immediately available funds, an amount equal to the Base Purchase Price plus the Adequate Assurance Deposit Amount minus the Credit Bid (the "Closing Date Cash Payment"); (ii) assuming the Assumed Liabilities described in Section 2.3, by assuming such Assumed Liabilities through the Assignment and Assumption Agreement or as otherwise permitted by an Order of the Bankruptcy Court; and (iii) Buyer acknowledging the satisfaction of the DIP Obligations (including all Liabilities to the DIP Lenders that are contemplated by the DIP Loan Agreement to be included in the Lender Expense Cap (as defined in the DIP Loan Agreement)) and the release of all guarantees of the security interests and liens on the Purchased Assets securing the DIP Obligations (the "Credit Bid and Release").

2.6    **Assumption and Assignment of Contracts**.

(a)    Schedule 2.6(a) sets forth a list of all Contracts and Leases (the "Potential Assumed Contracts and Leases") to which a Seller is a party (other than such Contracts and Leases that are the subject of a pending motion to reject *nunc pro tunc* to the Petition Date, which Buyer

3

shall identify on Schedule 2.6(c)), together with estimated Cure Amounts for each such Contract or Lease.  For any Contracts or Leases to which a Seller is a party and that are not identified on Schedule 2.6(a) as of the date hereof, such Contracts or Leases shall be deemed to have been included on Schedule 2.6(c) as an Excluded Contract whether or not such Contracts or Leases are identified on Schedule 2.6(c).

(b)      From the date hereof until two (2) Business Days prior to the Sale Hearing, Buyer may, in its sole discretion, designate any of the Potential Assumed Contracts and Leases for rejection and termination by removing them from Schedule 2.6(a) and adding them to Schedule 2.6(b) (the "Post-Petition Rejected Contracts").  Any Potential Assumed Contracts and Leases not removed from Schedule 2.6(a) and added to Schedule 2.6(b) no later than two (2) Business Days prior to the Sale Hearing shall be assumed by and assigned to Buyer, effective on and as of the Closing as provided for in the Sale Order or as otherwise provided for by an Order of the Bankruptcy Court (such Contracts and Leases, the "Assumed Contracts").

(c)      Buyer shall provide to Sellers at least one (1) Business Day prior to the Petition Date a list of Contracts and Leases that are to be included on Schedule 2.6(c) as of the Petition Date.  Schedule 2.6(c) sets forth a list of Contracts and Leases that are to be terminated and rejected as of the Petition Date as authorized by an Order of the Bankruptcy Court approving the Petition Date Contract and Lease Rejection Motion.  Buyer cannot remove from Schedule 2.6(c) any Contracts and Leases identified on such schedule on the Petition Date.  Any Contracts and Leases on Schedule 2.6(c) as of the Petition Date shall not be Post-Petition Rejected Contracts.  On the Petition Date, Sellers shall file a motion, in form and substance reasonably acceptable to Buyer to establish expedited procedures for the rejection of any Contract or Lease identified on Schedule 2.6(c) as of the Petition Date (the "Petition Date Contract and Lease Rejection Motion").  Notwithstanding anything herein to the contrary, the Parties acknowledge and agree that the Buyer may enter into new agreements with any third party, including landlords, even if an agreement with such third party is otherwise set forth on Schedule 2.6(c).

(d)      On the Petition Date, Sellers shall file a motion, in form and substance reasonably acceptable to Buyer, which shall be noticed for the Sale Hearing and shall seek to approve the rejection of any Contract or Lease that is on Schedule 2.6(a) on the date hereof and added to Schedule 2.6(b) no later than two (2) Business Days prior to the Sale Hearing (in accordance with the procedures set forth in this Section 2.6) (the "Post-Petition Contract and Lease Rejection Motion"), provided that for any Lease subject to the Post-Petition Contract and Lease Rejection Motion, the Sellers shall request that the effective date of rejection be the date that Sellers provide notice of their intent to unconditionally surrender possession of the premises to the Lease counterparty.

(e)      In connection with the assumption by and assignment to Buyer of any Assumed Contracts pursuant to this Section 2.6,  the amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (collectively, such amounts, the "Cure Amounts"), in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Order of the Bankruptcy Court, shall be paid by Buyer at the Closing, and neither the Cure Amounts paid by Buyer nor any other expense or obligation set forth in this Section 2.6(e) shall reduce, directly or indirectly, any consideration payable to Sellers hereunder.  Buyer shall provide

4

sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Potential Assumed Contracts and Leases.

(f)    Sellers shall use their respective commercially reasonable efforts to obtain an Order of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an Order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts, provided, however, Sellers shall be under no obligation to pay any amounts to any Governmental Entity or third party for any Consents, and any amounts paid to any Governmental Entity or third party for any such Consents shall be paid by Buyer.

(g)    Notwithstanding the foregoing, but subject to Section 5.1, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) subject to Section 2.7, requires a Consent of any Governmental Entity or other third party that is not provided for by the Sale Order in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) relates solely to Excluded Assets. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party that is not provided for by the Sale Order in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

(h)    Sellers shall not terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any of the Potential Assumed Contracts or Leases, or take any affirmative action not required thereby, without the prior written consent of Buyer (not to be unreasonably withheld or delayed) unless Buyer has provided written notice to Sellers designating such Contract or Lease for rejection pursuant to this Section 2.6.

(i)    From the Petition Date through the date of the Sale Hearing, in accordance with this Section 2.6 Buyer shall direct the Sellers to assume and reject any Contract or Lease in Buyer's sole discretion.

(j)    From and after the date hereof until the Sale Hearing, Buyer may, in its sole discretion, designate a Contract or Lease listed on Schedule 2.6(a) for assumption and assignment to any Affiliate of Buyer, effective on and as of the Closing, provided, however, no such designation shall relieve Buyer of its obligations under this Agreement.

2.7    **Schedule Updates**.

(a)    Until the date that is ten (10) days after the date hereof, Sellers shall be permitted to deliver and/or update the Disclosure Schedules and Schedule 2.6(a).  For the

avoidance of doubt, other than Schedule 2.6(a), no Schedules to this Agreement may be amended, updated or otherwise altered without the prior written consent of the Buyer.  Any Schedule and/or Disclosure Schedule updated in accordance with this Section 2.7(a), is a "Schedule Update."

(b)     Any Schedule Updates to the Disclosure Schedules or Schedule 2.6(a) shall be deemed to have cured any inaccuracy in or breach of any representation or warranty made in this Agreement as of the date hereof, and for avoidance of doubt, such Schedule Update shall be deemed to have qualified such representation or warranty as of the date hereof (unless such representation or warranty is as of a specific time, in which case the representation and warranty is made as of such date), or as such Disclosure Schedule is supplemented, as of the Closing Date, including for purposes of the conditions to Closing set forth in Section 7.1(a).

2.8     **Closing**.  The Closing shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. Eastern Time on the Closing Date.

2.9     **Deliveries at Closing**.

(a)     At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

(i)     all Bills of Sale reasonably requested by Buyer in form and substance reasonably acceptable to Buyer and Sellers, duly executed by the applicable Seller or Sellers;

(ii)     all Assignment and Assumption Agreements reasonably requested by Buyer in form and substance reasonably acceptable to Buyer and Sellers, duly executed by the applicable Seller or Sellers;

(iii)     a Domain Name Assignment in form and substance reasonably acceptable to Buyer and Sellers, duly executed by the applicable Seller or Sellers;

(iv)     a non-foreign affidavit from the regarded owner of the Sellers for U.S. federal income Tax purposes, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such owner is not a "foreign person" as defined in Section 1445 of the IRC;

(v)     the officer's certificates required to be delivered pursuant to Section 7.1(i);

(vi)     originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Buyer through the Data Room; and

(vii)     certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets.

(b)     At the Closing, Buyer shall deliver to Sellers the following documents and other items, duly executed by Buyer, as applicable:

(i)     the Closing Date Cash Payment by wire transfer of immediately available funds;

(ii)    the Credit Bid and Release;

(iii)   any and all Assignment and Assumption Agreement to which Buyer is a party; and

(iv)    the officer's certificates required to be delivered pursuant to Section 7.2(f).

2.10    **Allocation**.  Within forty-five (45) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other amounts treated as purchase price for U.S. federal income Tax purposes) among the Purchased Assets and the Assumed Liabilities in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate).  Sellers shall have thirty (30) calendar days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith.  Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule, and Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation.  Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation; provided that nothing contained herein shall prevent Buyer or Sellers from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of such allocation, and neither Buyer nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging the allocation.

2.11    **Excluded Locations and Purchased Assets**.  All of Sellers' restaurant locations whose associated Leases are not Assumed Contracts in accordance with Section 2.6 shall be classified as Excluded Restaurants.  To the extent that assets located in the Excluded Restaurants are removed by Buyer pursuant to the Asset Removal and Indemnity Agreement prior to rejection of such Lease, such assets shall be deemed to be Purchased Assets.  Notwithstanding any other provision contained in this Agreement, with respect to any Purchased Assets that are not located the Continuing Restaurants (i.e., primarily furniture, fixtures, equipment and inventory located at the Excluded Restaurants), Buyer shall be permitted, at its sole cost and expense, to obtain possession of the such Purchased Assets by the Closing in accordance with the Asset Removal and Indemnity Agreement, and Sellers shall cooperate with such efforts in accordance therewith.  In addition, so long as Sellers have complied with the Asset Removal and Indemnity Agreement, Sellers shall not be in breach of this Agreement for Sellers' failure to deliver to Buyer at the Closing such Purchased Assets that are not located the Continuing Stores.  If prior to the Closing Buyer obtains possession of the Purchased Assets that are not located at the Continuing Restaurants, Buyer shall hold such Purchased Assets pursuant to the terms of the Asset Removal and Indemnity Agreement.

7

144305281v10

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"), each of the Sellers jointly and severally represent and warrant to Buyer as of the date hereof and, as supplemented by any Schedule Update, as of the Closing Date in each case, unless otherwise specified in the representations and warranties below, in which case the representation and warranty is made as of such date, that the statements contained in this Article III are true and correct.

3.1     **Organization of Sellers; Good Standing**.

(a)     Each Seller is duly incorporated or organized, as the case may be, and validly existing and in good standing under the Laws of its state of incorporation or formation. Sellers have made available to Buyer each Seller's Organizational Documents that set forth the state of incorporation or formation for each Seller. Each Seller has all necessary power and authority to own, lease and operate its properties and to conduct its business in all jurisdictions in which such Seller conducts business (or conducted business prior to the Business Cessation Event) and in the manner in which its business is currently being conducted (or was conducted prior to the Business Cessation Event) and has historically been conducted.

(b)     None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

3.2     **Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)     each Seller has all requisite applicable corporate or limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller and no other corporate or company action, as applicable, on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)     This Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Each Related Agreement to which any Seller is a party, when executed and delivered, will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

3.3     **Noncontravention; Consents and Approvals**.

(a)     Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), subject to

8

the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) will conflict with or result in a breach of the Organizational Documents of any Seller, (ii) will violate any Law to which any Seller is, or its respective assets or properties are, subject, (iii) will conflict with any Assumed Contract or Assumed Permit, or (iv) will conflict with, or result in any violation of or constitute a breach or default under, any Order of any Governmental Entity applicable to the Sellers or any of the Purchased Assets, and, in the case of <u>clauses (ii)</u>, <u>(iii)</u> and <u>(iv)</u> for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice, would not, individually or in the aggregate, have a Material Adverse Effect.

(b)      Subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing) and compliance with any requirements of the Bankruptcy Code, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such Consent would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect.

(c)      After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of the Assumed Contracts, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to (y) have a Material Adverse Effect or (z) prevent or materially impair or delay the Sellers' ability to consummate the Contemplated Transactions on a timely basis.

3.4      **Compliance with Laws**.  Sellers are, and have been since January 1, 2020, in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects. To the Knowledge of Sellers, as of the date hereof, Sellers have not received any written notice of violation of any Law with respect to any Seller, the Business or the Purchased Assets and there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.

3.5      **Title to Purchased Assets**.  Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under <u>Section 2.6</u>, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens that are not extinguished, released or otherwise terminated as provided for in the Sale Order), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code. The Purchased Assets constitute substantially all of the furniture, fixtures and equipment used by the Sellers to conduct and operate

the Business at the Continuing Restaurants in all material respects as conducted and operated by the Sellers prior to the Business Cessation Event. To the knowledge of Sellers, all of the furniture, fixtures and equipment at the Continuing Restaurants that are Purchased Assets are in good order and repair (ordinary wear and tear excepted) for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business to operate the Business substantially as currently conducted and operated by the Sellers. Except as contemplated by the DIP Loan Documents and the Asset Removal and Indemnity Agreement, no Person other than Sellers are engaged in the operation of, or hold rights, title and interest in (except for Permitted Liens), the Purchased Assets. No Seller owns any fee interest in real property.

3.6    **Contracts**. Schedule 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material executory Contracts generating revenue for the Sellers or liability of the Sellers for the twelve months ending March 31, 2020 in excess of $100,000 and relating to the Continuing Restaurants, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof, to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available, or within fifteen (15) days of the date hereof shall make available, to Buyer true and complete copies of all such Contracts). Except as set forth in Schedule 3.6 of the Disclosure Schedule, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any Assumed Contract. The Potential Assumed Contracts and Leases include all Contracts material to the ownership and/or operation of the Business at the Continuing Restaurants. Sellers have not, and, to Sellers' Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any material default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts, assuming entry of the Sale Order. Except as set forth on Schedule 3.6, to Sellers' Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms except where such failure would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect. LPQ or one of its Affiliates (other than the Sellers) maintains insurance policies on any of the Purchased Assets.

3.7    **Intellectual Property**.

(a)    Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller, (ii) all executory Contracts pursuant to which any Seller obtains the right to use any Intellectual Property (other than commercially available, "off-the-shelf" software or technology application licenses or the US master franchise agreement, area development agreement or related Contracts with PQL pursuant to which Sellers have a license to use PQL's Intellectual Property), and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property. Sellers own all Registered Intellectual Property set forth on Schedule 3.7(i) of the Disclosure Schedule free and clear of all Liens (except for Permitted Liens), and all such Registered Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Order adversely affecting Sellers' use thereof or rights thereto.

(b)    To Sellers' Knowledge, and except as set forth on Schedule 3.7 of the Disclosure Schedule or except as would not reasonably be expected to have a Material Adverse

144305281v10

Effect, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as conducted prior to the Business Cessation Event (except with respect solely to the Excluded Restaurants), nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith (except with respect solely to the Excluded Restaurants), infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets, except as would not reasonably be expected to have a Material Adverse Effect.

3.8    **Litigation**.   Other than the Chapter 11 Cases, <u>Schedule 3.8 of the Disclosure Schedule</u> sets forth, as of the date hereof, all unresolved Litigation brought or threatened in writing by or against any Seller which if resolved against the Sellers would reasonably be expected to have a Material Adverse Effect, and to Sellers' Knowledge, there is no other Litigation threatened in writing against any Seller which would affect the ability of any Seller to enter into this Agreement, any Related Agreement, or to consummate the Contemplated Transactions.

3.9    **Employees and Employment Matters**.

(a)    No Seller has any employees.  The Sellers' Recent Employees that have been engaged as independent contractors are set forth on <u>Schedule 3.9 of the Disclosure Schedule</u>.

(b)    No Seller is a party to or bound by any collective bargaining agreement covering the Former Employees (as determined as of the date of this Agreement), nor to Sellers' Knowledge, has there been in the last three (3) years any ongoing strike, walkout, work stoppage, or other material collective dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Recent Employees (as determined as of the date of this Agreement), nor has there been in the last three (3) years. No later than ten (10) Business Days following the date hereof, Sellers shall make available to Buyer a list of all Former Employees who were employed by any Seller as of March 31, 2020 (such Former Employees, "<u>Recent Employees</u>"), including such individual's name; title or position; status (part-time, full-time, exempt, non-exempt, etc.); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; other incentive or non-incentive based compensation; start date; service reference date (if different from the start date); work location; vacation entitlement formula; and an indication of whether or not any Recent Employee is on leave of absence or furlough (the "<u>Employee Roster</u>"). To Sellers' Knowledge, all Recent Employees were, authorized to work in the United States.

(c)    Sellers are, and have been since January 1, 2020, in compliance in all material respects with all applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been

11

incurred in the Ordinary Course of Business of the Seller), or any Taxes or penalties for failure to comply with any of the foregoing, including, any of the foregoing arising out of other otherwise in connection with the Business Cessation Event, except as would not reasonably be expected to have a Material Adverse Effect.

(d)     Except as set forth on <u>Schedule 3.9(d) of the Disclosure Schedule</u>, there is no employment or labor-related claim, complaint, demand for arbitration, or administrative charge pending against any Seller brought by or on behalf of any Recent Employee or any Governmental Entity with respect to a Recent Employee, and to Sellers' Knowledge, no such claim is threatened. Except as disclosed to Buyer confidentially, since January 1, 2020, there have been no allegations of sexual or other unlawful harassment or discrimination made against any Former Employee at the management level or higher.  There are no grievances or unfair labor practice complaints pending against any Seller before the National Labor Relations Board or any other Governmental Entity with respect to any Recent Employees.

(e)     Sellers have not made application to receive or otherwise sought Relief Proceeds.

    3.10    **Real Property**.

(a)     Sellers do not own any fee interest in real property.

(b)     <u>Schedule 3.10(b) of the Disclosure Schedule</u> sets forth the address of each Leased Real Property related to the Continuing Restaurants, and a true and complete list of all Leases that are Assumed Contracts (including the date and name of the parties to such Lease document). Sellers have made available to Buyer a true and complete copy of all Leases that are Assumed Contracts (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property, as amended through the date hereof. Except as set forth in <u>Schedule 3.10(b) of the Disclosure Schedule</u>, with respect to each of the Leases that are Assumed Contracts: (i) to Sellers' Knowledge and subject to the effect on enforceability of (A) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), except for potential or alleged defaults arising from Sellers failure or alleged failure to pay amounts owed under the Leases prior to the Petition Date, such Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (ii) except as related to the COVID-19 pandemic and related Orders, Sellers' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to Sellers' obligations under such Lease that will not be satisfied by the Sale Order (or other Order of the Bankruptcy Court) and the payment by Buyer of the Assumed Liabilities; (iii) to Sellers' Knowledge, no other party to a Lease is in material breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or default; (iv) the other party to such Lease is not an affiliate of, and otherwise does not have any economic interest in, Sellers; (v) the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased

Real Property or any portion thereof; and (vi) there are no liens or encumbrances (other than Permitted Liens) on the estate or interest created by such Lease.

(c)    Schedule 3.10(c) of the Disclosure Schedule sets forth a description of all material Leasehold Improvements with outstanding commitments in excess of $25,000 for each Leased Real Property related to the Continuing Restaurants.

(d)    The Leased Real Property identified in Schedule 3.10(b) of the Disclosure Schedule and the Leasehold Improvements comprise all of the real property used in or otherwise related to the operation by Sellers prior to the Business Cessation Event of, the Business, with respect to the Continuing Restaurants.

(e)    To Sellers' Knowledge, Sellers have received no written notice of any condemnation, expropriation or other proceeding in eminent domain pending or, to Sellers' Knowledge, which is threatened, affecting any real property underlying the Leased Real Property related to the Continuing Restaurants or any portion thereof or interest therein.

3.11    **Tangible Personal Property**.  Schedule 3.11 of the Disclosure Schedule sets forth all material Personal Property Leases with annual payments in excess of $25,000, related to the Continuing Restaurants, and, to Sellers' Knowledge, except for potential or alleged defaults arising from Sellers failure or alleged failure to pay amounts owed under the Personal Property Leases prior to the Petition Date each such material Personal Property Lease is valid and enforceable, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

3.12    **Permits**.  As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Continuing Restaurant or Continuing Restaurants that operate under such Permit. To Sellers' Knowledge, all required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed.

3.13    **Purchased Inventory**.

(a)    To Sellers' Knowledge, no Inventory that is Purchased Inventory is damaged in any way or subject to a current or past product recall, except for any such damage or any such recall which would not be material to the Purchased Inventory taken as a whole;

(b)    To Sellers' Knowledge, the Purchased Inventory is in material compliance with United States federal and applicable state guidelines for such products as of the date hereof; and

(c)    To Sellers' Knowledge, the Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be.

3.14    **Environmental Matters**.  Except as set forth in <u>Schedule 3.14 of the Disclosure Schedule</u>, to Sellers' Knowledge:

(a)    Each Seller is, and has been since January 1, 2020, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws;

(b)    No Seller has received since January 1, 2020 written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws;

(c)    no Hazardous Substance has been released at any current or former Leased Real Property, or other real property, by Sellers in violation of any Environmental Law that would be reasonably likely to result in a Material Adverse Effect; and

(d)    Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in its possession relating any actual or potential Liabilities under Environmental Laws with respect to any current Leased Real Property that would be reasonably likely to result in a Material Adverse Effect .

3.15    **Financial Statements**.  Sellers have made available to Buyer true and correct copies of (i) the audited consolidated balance sheets of Sellers as of the fiscal year ended December 31, 2018 and December 31, 2017 and the related audited consolidated statements of income and of cash flows of Sellers for the years then ended, (ii) the unaudited consolidated balance sheet of the Sellers for the fiscal year ended on or about December 31, 2019, and the related consolidated statement of income and cash flows of Sellers for the twelve (12) months then ended, and (iii) the unaudited consolidated balance sheet of the Sellers for the fiscal quarter ended on or about March 31, 2020, and the related consolidated statement of income and cash flows of Sellers for the three (3) months then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "<u>Financial Statements</u>").  Each of the Financial Statements has been prepared in accordance with GAAP consistently applied and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements. Other than with respect to Excluded Liabilities as to which the Sellers do not provide any representations and warranties, no Seller has any Liabilities that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of the Sellers, except for liabilities and obligations (a) reflected on the Sellers' consolidated balance sheet for the period ended on March 31, 2020 (or the notes thereto) included in the Financial Statements, (b) incurred in the Ordinary Course of Business since March 31, 2020, (c) incurred pursuant to the Contemplated Transactions, or (d) obligations under Assumed Contracts (other than liabilities or obligations related to or arising out of breaches of such Assumed Contracts to the extent arising prior to the Closing Date).  Since December 31, 2019, to Sellers' Knowledge, as of the date hereof, no Seller has received any written complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls with respect to the Business.

3.16    **Brokers' Fees**.  Except for amounts due to SSG Capital Advisors, LLC (or one of its affiliates) (which amounts are to be paid by the Sellers), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

3.17    **No Other Agreements to Purchase**.  Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option to purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business or the DIP Loan Documents.

3.18    **Taxes**.  Except as provided for on <u>Schedule 3.18 of the Disclosure Schedule</u>,

(a)    each Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects. All material Taxes owed by the Sellers and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid. To Seller's Knowledge, in the last one (1) year, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Sellers do not file Tax Returns that the Sellers or the Business is or may be subject to taxation by that jurisdiction;

(b)    there is no audit, dispute, claim or controversy concerning any Tax Liability or Tax Return of Sellers or with respect to the Business in progress or pending by any taxing authority. No Seller has knowingly waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on Buyer, its direct or indirect equityholders, or their Affiliates;

(c)    there are no Liens for Taxes on any of the Purchased Assets, other than Permitted Liens;

(d)    no Seller is party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for (i) any such agreement solely between the Sellers (ii) customary gross-up or indemnification provisions in commercial agreements entered into in the Ordinary Course of Business, the primary subject matter of which is not related to Taxes, or (iii) any real or personal property leases, in each case that would be binding on Buyer;

(e)    no Seller has participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b);

(f)    each Seller has collected or withheld all material Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been or will be duly paid to the proper Governmental Entity, and to Sellers' Knowledge, each of the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements;

(g)    each Seller has collected all material amounts of sales and use Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the

appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations; and

(h)    each Seller and each of its Affiliates (if any) which has filed a voluntary petition for relief pursuant to the Bankruptcy Code in connection with the Chapter 11 Cases is classified as an entity disregarded from its owner or a partnership for U.S. federal income Tax purposes, and has been so classified since the date of its formation. No Seller nor any such Affiliate has filed any election or taken any other action to be classified as an association taxable as a corporation for U.S. federal income Tax purposes.

3.19    **Suppliers**. Schedule 3.19 of the Disclosure Schedule lists the ten (10) largest suppliers (measured by invoiced dollars) of the Continuing Restaurants collectively for the fiscal year ended December 31, 2019 ("Major Suppliers") and the amount of business done with each Major Supplier in such period. As of the date of this Agreement, except as set forth on Schedule 3.19 of the Disclosure Schedule, to Sellers' Knowledge, (a) there has not been a material dispute with, or actual or potential material and adverse change in the business relationship of, any Seller with any Major Supplier since December 31, 2018, and (b) no Seller is in material breach of or in material default of any agreement with any of its Major Suppliers, and to the Sellers' Knowledge, no Major Supplier is in material breach or in default of any agreements with any Seller.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date that the statements contained in this Article IV are true and correct:

4.1    **Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware and has all requisite company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

4.2    **Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and

delivered by Buyer. This Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. To the extent each Related Agreement constitutes a valid and legally-binding obligation of each Seller party thereto, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

4.3    **Noncontravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in <u>Section 2.6</u>) will (i) conflict with or result in a breach of the certificate of incorporation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which it is bound, except, in the case of either <u>clause (ii)</u> or <u>(iii)</u>, for such conflicts, breaches, defaults, accelerations or rights as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the Contemplated Transactions or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the Contemplated Transactions or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4    **Litigation**.  There is no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the Contemplated Transactions.

4.5    **Adequate Assurances Regarding Executory Contracts**.  Buyer will be capable of satisfying as of the Sale Hearing the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

4.6    **Brokers' Fees**.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which any Seller could become liable or obligated to pay.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

5.1    **Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that neither Seller nor Buyer shall be required to incur any Liabilities or provide any financial accommodation, in order to obtain any such third party Consent with respect to the transfer or assignment of any Purchased Asset.

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)    To the extent permitted by applicable Law and the terms of the Purchased Assets, in the event any third party Consent has not been obtained by the Closing, at Buyer's request, the Party contemplated to be transferring such Purchased Asset under this Agreement (the "Transferring Party") shall, at Buyer's cost and expense, hold in trust for Buyer, as applicable, the relevant Purchased Asset until the earlier of such time as (i) the third party Consent is obtained, (ii) the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset. During such time period, Buyer shall comply with all applicable covenants and obligations under the Purchased Assets, including the payment of any costs or expenses in connection therewith. Buyer shall be entitled to receive all of the benefits of the Transferring Party under the Purchased Asset. Buyer shall satisfy all Liabilities with respect to such Purchased Assets until the earlier of such time as (i) the third party Consent is obtained, (ii) the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset, and shall indemnify and hold Sellers harmless with respect to any such reasonable out-of-pocket expenses arising in the Ordinary Course of Business pursuant to a budget to be reasonably agreed to by the Parties in good faith arising or otherwise relating to such period; provided that, each Seller covenants and agrees that in the event of clause (iii), it will wind down such Purchased Asset as soon as commercially reasonable and shall take all commercially reasonable measures to avoid or mitigate any losses, expenses and Liabilities.

(d)    Subject to the terms and conditions set forth in this Agreement and applicable Law or as otherwise required in the Chapter 11 Cases, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated

Transactions, and (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the Contemplated Transactions and consider in good faith the other Party's reasonable comments. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any commercially or competitively sensitive material provided to the other under this Section 5.1(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be).

       5.2    **Bankruptcy Actions**.

       (a)    The Chapter 11 Cases shall be filed within two (2) Business Days of the execution of this Agreement.

       (b)    The Sellers shall have filed the Sale Motion, which motion shall seek the Bankruptcy Court's entry of the Sale Order by no later than the Sale Order Deadline that provides the parties, inter alia, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than three (3) Business Days following (i) the entry of the Sale Order if any stay period applicable to the Sale Order has been waived as approved by the Bankruptcy Court or (ii) the expiration of any stay period applicable to the Sale Order shall have expired, subject to the satisfaction of all conditions to the obligations of Sellers and Buyer as set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

       (c)    Sellers will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the Contemplated Transactions prepared by Sellers or any Affiliates (including forms of Orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the Contemplated Transactions, Contracts or Leases to be filed on behalf of Sellers after the date hereof must be approved in form and substance by Buyer, such approval not unreasonably withheld or delayed.

       (d)    Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

       (e)    Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(f)     The Sellers and Buyer agree, and the Sale Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to Buyer to enter into this Agreement and are the highest and best offer for the Purchased Assets.

(g)     Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(h)     Sellers shall serve a cure notice by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as set forth in the Sale Motion and provide a copy of the same to Buyer.

5.3     **Conduct of Business**.  Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the DIP Loan Documents and the DIP Budget, and except as expressly set forth on <u>Schedule 5.3</u>, or required under the Bankruptcy Code or other applicable Law or an Order of the Bankruptcy Court and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed), Seller shall operate the Business in the Ordinary Course of Business.  Without limiting the generality of the foregoing, except as expressly set forth on <u>Schedule 5.3</u>, or required under the Bankruptcy Code or other applicable Law or an Order of the Bankruptcy Court, and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed) until the earlier of the termination of this Agreement and the Closing:

(a)     Sellers shall not permit or suffer to exist any event of default under the DIP Loan Documents and shall comply with the DIP Order in all material respects;

(b)     Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they existed immediately prior to the Business Cessation Event, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business and shall maintain insurance coverage through PQL or one of PQL's Affiliates with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by PQL or PQL's Affiliates for the Business and the Sellers on the Petition Date;

(c)     Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(d)     Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business or except to the extent permitted by the DIP Loan Documents or as contemplated by the Asset Removal and Indemnity Agreement;

144305281v10

(e)    No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens or except to the extent permitted by the DIP Loan Documents or as a result of Buyer taking actions under the Asset Removal and Indemnity Agreement;

(f)    No Seller shall assume, reject or assign any Contract or Lease that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer;

(g)    No Seller shall (i) enter into new Contracts or amend or modify Contracts, (ii) amend, modify, extend, renew or terminate any Lease, (iii) enter into any new lease, or (iv) make an application to receive or otherwise seek and/or obtain any Relief Proceeds;

(h)    Except as directed by Buyer or in connection with the Asset Removal and Indemnity Agreement, no Seller shall remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory;

(i)    No Seller shall return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

(j)    No Seller shall (i) enter into any commitment for any expenditures in excess of $5,000 for any individual commitment and $20,000 for all commitments in the aggregate or (ii) enter into any commitment with respect to remodeling for Leased Real Property;

(k)    Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(l)    No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes an Purchased Asset;

(m)    Sellers shall use commercially reasonable efforts to maintain in full force and effect each Assumed Permit held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall in all material respects comply with the terms of each such Permit and the Sellers shall use commercially reasonable efforts to not permit any such Permit to terminate, expire or lapse other than in the Ordinary Course of Business;

(n)    Subject to the consequences of the Business Cessation Event, Sellers shall (i) use commercially reasonable efforts to preserve (A) the existing business organization as it existed on the Petition Date and (B) its relationship with Recent Employees that are independent contractors of PQ NY as of the Petition Date and (ii) use commercially reasonable efforts to maintain the existing relations (as they existed on the Petition Date) with customers, carriers, suppliers, creditors, business partners, Recent Employees, and others having business dealings with the Business, to the extent reasonably feasible;

(o)    No Seller shall file any Tax election or take any other action which, in each case, could cause such Seller to be classified as an association taxable as a corporation for U.S. federal income Tax purposes;

(p)    Other than as required by applicable Law, no Seller shall (i) re-hire any Recent Employees, (ii) grant any loan to or pay any bonus to any Former Employee, (iii) grant or increase any other severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Recent Employee, (iv) recognize any union or other collective employee representative, (v) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any Employee Benefit Plan, or (vi) take any action to accelerate the vesting of, or payment of, any compensation or benefit under any Employee Benefit Plan;

(q)    Sellers shall, at all times use commercially reasonable efforts, to maintain the retention of the current advisors and independent director on terms, scope and conditions identical to the terms scope and conditions existing on the date of this Agreement; and

(r)    Except as agreed to by Buyer, no Seller may resume business operations at any restaurant locations.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

5.4    **Notice of Developments**.  From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an Schedule Update, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants or agreements to be complied with or satisfied by it under this Agreement in any material respect to the extent Buyer or Sellers, as applicable, do not already have actual knowledge of any such failure; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

5.5    **Access**.  Sellers acknowledge and agree that solely in connection with the potential operation of the Business after the Closing, Buyer and Buyer's agents shall be entitled to enter into, and Sellers shall facilitate from the date hereof until the earlier of the Closing Date or the termination of this Agreement, any discussions or negotiations with any Recent Employee, Former Employee or any of Sellers' landlords.  To facilitate the foregoing, until the earlier of the Closing and the termination of this Agreement, Sellers shall permit Buyer and its Representatives to have reasonable access to, and make reasonable investigation of, during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal or current business operations of Sellers, to all of the books and records, premises, properties, personnel, Records, Contracts, businesses, assets, accountants, auditors, counsel and operations of the Sellers related to the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require Sellers to disclose any information that is subject to any attorney-client privilege or any similar doctrine or privilege, or Sellers to take any action that may result in any waiver of, or to waive, its attorney-client privilege or any similar doctrine or privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable

Law or Order (including any Orders related to the COVID-19 pandemic). Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in connection with such investigation and examination, and Buyer and its Representatives shall cooperate with Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business.

5.6    **Press Releases and Public Announcements**.  After notice to and consultation with Buyer, Sellers shall be entitled to disclose this Agreement and all information provided by Buyer in connection herewith. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Seller shall not issue (prior to the Closing) any press release or make any public announcement without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed.  Notwithstanding anything contained in this Agreement or any contractual confidentiality obligation of Buyer to the contrary, Buyer may disclose the Agreement and all information provided by Sellers in connection herewith: (a) to its Affiliates and to its and their Related Parties, (b) to the extent required or requested by, or required to be disclosed to, any regulatory or similar authority purporting to have jurisdiction over such Person or its Related Parties, (c) to the extent required by applicable Law or in any legal, judicial, administrative or other compulsory process, (d) to any other party hereto, (e) in connection with the exercise of any remedies under this Agreement, the DIP Facility, any other DIP Loan Document, or any action or proceeding relating to this Agreement, the DIP Facility, any other DIP Loan Document, or the enforcement of rights hereunder or thereunder, (f) to (i) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights and obligations under the DIP Facility or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the borrowers and their obligations, the DIP Facility or payments thereunder, (g) with the consent of Sellers, (h) to Former Employees, (i) to any non-debtor counterparty to a Contract or Lease, (j) to the extent such information (A) becomes publicly available other than as a result of a breach of this Agreement or any contractual confidentiality obligation or (B) becomes available to any agent or lender under the DIP Facility, or any of their respective Affiliates, from a third party that is not, to such Person's knowledge, subject to confidentiality obligations to Sellers,  or (k) to governmental regulatory authorities in connection with any regulatory examination of any agent or lender under the DIP Facility or in accordance with any such agent's or lender's regulatory compliance policy if such agent or such lender deems necessary for the mitigation of claims by those authorities against such agent or such lender or any of its subsidiaries or Affiliates.  Following the Petition Date, the Buyer shall be permitted to make any public statement regarding this Agreement and the transactions contemplated hereby.  Notwithstanding the foregoing, Buyer shall not make any statement to any Person with the intent to disparage the Sellers or any of its Affiliates or any of their Representatives; provided, that truthful statements shall not be deemed to be disparaging.

5.7    **Bulk Transfer Laws**.  Each of the Parties hereto acknowledges that no Party shall be required to comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Contemplated Transactions, and hereby waive all claims against any Party related to the non-compliance therewith. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code and to the extent provided for in the Sale Order, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens that are not extinguished, released or otherwise terminated as provided for in the Sale Order),

including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

# ARTICLE VI
# OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing; <u>provided</u> that (i) Sellers shall not incur any costs, associated with the obligation hereunder, other than such ordinary and necessary professional fees as are required for Sellers to comply with the obligations hereunder (unless otherwise expressly provided in a specific section of this Article VI) and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed, dismissed or converted to Chapter 7 cases under the Bankruptcy Code:

6.1    **Cooperation**.  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.  Sellers shall use their reasonable best efforts to obtain entry of the Sale Order on a date not later than the Sale Order Deadline.

6.2    **Further Assurances; Power of Attorney**.

(a)    In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and the requesting Party's sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this <u>Section 6.2</u>, to the extent that either Buyer or Sellers discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

(b)    Effective as of the Closing, Sellers hereby appoint Buyer as their respective attorney-in-fact, to exercise all of the powers conferred upon Seller pursuant to any Assumed Permit (or Permit that would be an Assumed Permit but for the execution of documentation or provision of notices or consents with respect to such Permit).  The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate such appointment or the authority and agency of the Buyer provided pursuant to this <u>Section 6.2(b)</u>.  The power-of-attorney granted in this <u>Section 6.2(b)</u> is coupled with an interest and is irrevocable.

(c)    To the extent any of the Sellers' Permits are "liquor licenses" or any other Permit that allows for the sale or distribution of liquor, then the Sellers' acknowledge and agree

that they will for the first forty-five (45) days after the date hereof, at the sole cost and expense of Buyer, take any commercially reasonable action requested by Buyer to allow for the transfer (directly or indirectly) of such Permits to the Buyer (including by way of establishing holding companies and transferring ownership of such holding companies at the Closing).

6.3 **Availability of Business Records**. Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

6.4 **Employee Matters**. Sellers shall provide, to the extent it does not violate any applicable Law, reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Former Employee.

6.5 **Transfer Taxes; Tax Refunds**. To the extent not exempt under Section 1146 of the Bankruptcy Code, Buyer shall pay all Transfer Taxes. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. Sellers agree to promptly pay to Buyer any and all out-of-pocket expenses of Buyer or an Affiliate of Buyer related to any assistance provided to Sellers related to the Sellers' receipt of any tax refunds.

6.6 **Collection of Accounts Receivable**.

(a) As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to accounts receivable relating to work performed by Buyer after the Closing, but that is made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b) As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to accounts receivable relating to work performed by Buyer after the Closing, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments.

(c) For a period of one (1) year following the Closing, Buyer agrees that, it shall hold in trust for the applicable Seller's benefit and account and shall promptly (but in any event within five (5) Business Days of such receipt) transfer, pay over and deliver to PQ NY, from time

to time as and when received by Buyer or its Affiliates, any monies, cash, checks or negotiable instruments with appropriate endorsements, or other property that Buyer or its Affiliates may receive or hold on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets (including any Accounts Receivables that are not Purchased Assets).

(d)     As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable relating to work performed by Buyer after the Closing.

6.7    **Use of Name and Marks**.  Neither Sellers nor any of their Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Purchased Assets.  In furtherance of the forgoing, the Sellers shall not, at any time following the closing, use the name "Le Pain Quotidien" or any derivative thereof, either as a formal legal name, assumed name, fictious name, tradename, "doing business as" or any other use, *provided, however,* nothing in this Agreement, including Section 6.7 shall require Sellers to change its name or make any filings with any Governmental Authority to modify or cancel any "fictitious", "doing business as," trade name, qualification to do business or foreign qualification filings or registrations in any jurisdiction so long as the Sellers do not, after the Closing, conduct any business other than in connection with winding-up their estates or businesses.  Without limiting the foregoing, effective as of the Closing the Sellers hereby appoint Buyer as their respective attorney-in-fact, to execute any documentation necessary to modify, cancel or terminate any "fictitious", "doing business as," trade name, qualification to do business or foreign qualification filings or registrations in any jurisdiction following the Closing.  The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate such appointment or the authority and agency of the Buyer provided pursuant to this Section 6.7.  The power-of-attorney granted in this Section 6.7 is coupled with an interest and is irrevocable.

6.8    **Applicable Duties; Break-up Fee and Expense Reimbursement**.

(a)     Sellers shall not, and shall not authorize or permit any of their Affiliates or any of its or their representatives to, directly or indirectly, encourage, solicit, initiate, or facilitate any inquiries regarding an Acquisition Proposal; *provided*, *however*, Sellers shall be entitled to consider an inbound Acquisition Proposal and discuss and negotiate any such inbound Acquisition Proposal with the Person (and its advisors) making the inbound Acquisition Proposal if the Sellers' reasonably determine that doing so is required under the Bankruptcy Code or other applicable Law or is necessary for any director, officer or representative of the Sellers to carry out any their fiduciary duties to the Sellers or their estates, and nothing in this Agreement, including this Section 6.8(a) shall prohibit providing notice of the Sale Motion to any Person that signed a non-disclosure agreement or confidentiality agreement in connection with the Prepetition Marketing Process.

(b)     In the event that the Sellers enter into an Alternate Transaction, prior to closing such Alternate Transaction, Sellers will expeditiously seek approval from the Bankruptcy Court of the Breakup Fee and Expense Reimbursement.  Sellers shall only be required to pay the Breakup Fee and Expense Reimbursement to the extent authorized by the Bankruptcy Court and the Alternate Transaction closes.  If a Breakup Fee is authorized by the Bankruptcy Court as provided for in this Section 6.8(b), such Breakup Fee shall be paid from the proceeds of Alternate Transaction and shall be equal $180,000 or such lesser amount otherwise authorized by the

144305281v10

Bankruptcy Court (the "Breakup Fee").  If an Expense Reimbursement is authorized by the Bankruptcy Court as provided for in this Section 6.8(b), such Expense Reimbursement shall be paid from the proceeds of Alternate Transaction and shall be for all of the Buyer's reasonable and documented out-of-pocket expenses (including of counsel and any other advisors) not to exceed $500,000 or such lesser amount otherwise authorized by the Bankruptcy Court (the "Expense Reimbursement").  Other than the payment of the Breakup Fee and Expense Reimbursement to the extent it is approved by the Bankruptcy Court, Sellers shall not have any Liability to Buyer as a result of a termination of the Agreement as a result of entering into an Alternate Transaction.

6.9     **Powers of Attorney Indemnification**.  Buyer shall indemnify the Sellers and their Affiliates, officers, managers, partners, members, employees, representatives and agents (collectively, the "Seller Indemnified Parties") against any and all, and reimburse the Seller Indemnified Parties for any and all, Losses incurred or sustained by, or imposed upon, any of the Seller Indemnified Parties based upon, arising out of, with respect to Buyer's exercise or use of the powers of attorney granted by any Seller under this Agreement.  Notwithstanding the foregoing, there will be no indemnification provided under this Section 6.9 to the extent any of the Losses suffered by a Seller Indemnified Party was caused in whole or in part by such Seller Indemnified Party's gross negligence or willful misconduct.

6.10    **Adequate Assurance Utility Deposit Administration**.    As the Adequate Assurance Deposit is a Purchased Asset, the Buyer shall comply with the Sellers obligations under the Utility Motion and the Utility Motion Order following the Closing.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     **Conditions to Buyer's Obligations**.  Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

(a)     as of the date hereof and as of the Closing (in each case, except to the extent (1) for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date, (2) subject to any Schedule Update), each of the representations or warranties contained in Article III shall be true and correct in all respects, except where the failure of such representations and warranties to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; *provided*, *however*, that for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects;

(c)     with respect to the Leases for at least thirty-five (35) of the restaurant locations, (i) Seller and/or Buyer shall have entered into amendments, modifications, waivers or

similar agreements (in each case, in form and substance acceptable to Buyer) pursuant to which the landlords for such Leased Real Property have provided reduced rent, rent deferral, rent forgiveness, or other similar concessions acceptable to Buyer in its sole discretion, and (ii) Buyer (or its Affiliate) and PQL shall have entered into Unit Franchise Agreements for such restaurant locations;

(d)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(e)    the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal;

(f)    the Final Order shall have been entered by the Bankruptcy Court on a final, non-appealable basis and in form and substance acceptable to the Buyer;

(g)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(h)    Buyer shall have received all of the deliverables pursuant to Section 2.9(a);

(i)    Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(g) has been satisfied.

7.2    **Conditions to Sellers' Obligations**.  Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), each representation or warranty contained in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)     no Governmental Entity of competent jurisdiction shall have (i) enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal;

(e)     Sellers shall have received all of the deliverables pursuant to Section 2.9(b); and

(f)     Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

7.3     **No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.  Notwithstanding the forgoing, Buyer shall be deemed to have used its commercially reasonably efforts in respect of the satisfaction of Section 7.1(c) to the extent Buyer has (y) directly, or through its agents, contacted and engaged sixty (60) landlords in discussions for modification to the Leases that provide for reduced rent, rent deferral, rent forgiveness, or other similar concessions, and (z) promptly and diligently pursued PQL in connection with having, and used its commercially reasonable efforts to have, PQL execute and deliver the Unit Franchise Agreements contemplated by Section 7.1(c).

7.4     **Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

## ARTICLE VIII
## TERMINATION

8.1     **Termination of Agreement**.  This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "Termination Event"):

(a)     by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)     by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Order restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Order having become final, binding and non-appealable;

144305281v10

provided that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)　　by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date;

(d)　　by Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court on or before the Sale Order Deadline or (ii) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(e)　　by Buyer if (i) PQL has terminated the US Master Franchise Agreement due to Buyer's material breach of the US Master Franchise Agreement, (ii) PQL has terminated the US Master Franchise Agreement for any reason other than Buyer's material breach of the US Master Franchise Agreement or (iii) Buyer has terminated the US Master Franchise Agreement due to PQL's material breach of US Master Franchise Agreement;

(f)　　by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in <u>Sections 7.1(a)</u> and <u>7.1(b)</u> hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Buyer have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(g)　　by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in <u>Section 7.1(c)</u>, <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u>, as the case may be, would not then be satisfied at the time of such breach, Sellers have notified Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Sellers have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition contemplated by <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> is not waived by Sellers or such condition contemplated by <u>Section 7.1(c)</u> is not waived by the Buyer; and

(h)　　By Buyer or Sellers if one or more Sellers enter into an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, (i) in no event may Buyer terminate this Agreement under <u>Section 8.1(f)</u> on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this <u>Article VIII</u> if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

8.2    **Procedure upon Termination**.  In the event of termination by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to <u>Section 8.1</u>, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

8.3    **Effect of Termination**.

(a)    In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Buyer or the Sellers (other than Liability for any breach of this Agreement prior to any such termination, to pay the Breakup Fee and Expense Reimbursement as provided for in <u>Section 6.8</u>, or Buyer's obligation to pay amounts under the Letter Agreement (to the extent provided for in the Letter Agreement)); provided, however, that <u>Section 6.8</u>, <u>Section 8.1</u>, <u>Section 8.2</u>, this <u>Section 8.3</u>, and <u>Article IX</u> shall survive any such termination and shall be enforceable hereunder.  In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

# ARTICLE IX
# MISCELLANEOUS

9.1    **Remedies**.  The Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries. The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

9.2    **Expenses**.  Except as otherwise provided in this Agreement, the DIP Order, the DIP Loan Documents or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

9.3    **Entire Agreement**.  This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein), the Related Agreements and the Supplemental Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

144305281v10

9.4    **Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

9.5    **Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

9.6    **Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an Order of the Bankruptcy Court.

9.7    **Notices**.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller or Sellers' Rep, then to:

PQ New York, Inc.
50 Broad Street
New York, NY 10004
Attention:          Peter Noyes, Esquire
Email:               Peter.Noyes@lepainquotidien.com

with copies (which shall not constitute notice) to:

Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, Delaware 19801
Attention:         Mark D. Collins
                   Michael J. Merchant
                   Mark A. Kurtz
Telephone No:      (302) 651-7700
E-mail:            collins@rlf.com;
                   merchant@rlf.com;
                   kurtz@rlf.com

If to Buyer, then to:

LPQ USA, LLC
c/o Aurify Brands
56 West 22nd St, 2nd Fl.
New York, NY 10010,
Attention:         Andrew Stern
                   John Rigos
E-mail:            andy@aurifybrands.com and
                   john@aurifybrands.com

with copies (which shall not constitute notice) to:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022-2585
Attention:         Steven J. Reisman, Esquire
                   Cindi M. Giglio, Esquire
Telephone No.:     212-940-8776
Email:             sreisman@katten.com
                   cgiglio@katten.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

9.8     **Governing Law; Jurisdiction**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court

(and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

9.9    **Consent to Service of Process**.  Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.7</u>.

9.10    **Waivers of Jury Trial**.  EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

9.11    **Severability**.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the Contemplated Transactions is not affected in a manner adverse to any Party. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

9.12    **No Third Party Beneficiaries**.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

9.13    **No Survival of Representations, Warranties and Agreements**.  Except for the representations and warranties contained in <u>Section 3.15</u>, <u>Section 4.5</u> and <u>Section 4.6</u> which shall survive the Closing for six (6) months, each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought by any Party (with any such claim for breach being hereby expressly, knowingly and voluntarily waived by each Party) with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates

34

performance after the Closing and the representations and warranties contained in <u>Section 3.15</u>, <u>Section 4.5</u> and <u>Section 4.6</u>, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for six (6) months following the later of (i) the Closing Date or the date by which such covenant or agreement is required to be or should have been performed, and nothing in this <u>Section 9.13</u> (other than the period for which a claim may be brought for a breach of a surviving covenant or breach) will be deemed to limit any rights or remedies of any Person for breach of any such surviving representation, warranty, covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer that the agreements contained in this <u>Section 9.13</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing and (b) are an integral part of the Contemplated Transactions and that, without the agreements set forth in this <u>Section 9.13</u>, none of the Parties would enter into this Agreement.

9.14   **Non-Recourse**.  This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

9.15   **Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.  Where used with respect to information, the phrases "delivered" or "made available" means that the information referred to has been physically or electronically delivered (including the Data Room) no later five (5) calendar days prior to the date hereof.

9.16   **Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

9.17  **Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

9.18  **Disclosure Schedule**.  The disclosure of any fact or item in any numbered and lettered section of the Disclosure Schedule shall, should the existence of such fact or item be relevant to any other section of the Disclosure Schedule, be deemed to be disclosed with respect to such other section of the Disclosure Schedule only to the extent the relevance of such disclosure to such other section of the Disclosure Schedule is readily apparent.  Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party of any third party of any matter whatsoever, including any violation of Law or breach of contract.

9.19  **No Waiver or Release**.  Notwithstanding anything herein to the contrary, all terms, conditions, covenants, representations and warranties contained in the DIP Order and the DIP Loan Documents, and all rights, powers and remedies of the DIP Lenders and all of the obligations of the Sellers thereunder (including the obligation to reimburse the DIP Lenders for fees and expenses to the extent set forth in the DIP Loan Documents), are reserved and are not amended, modified, limited or otherwise affected by the terms and conditions of this Agreement.

9.20  **Headings; Table of Contents**.  The section headings and the table of contents contained in this Agreement, the Schedules and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

9.21  **Counterparts; Email and Electronic Signatures**.  This Agreement may be executed in one or more counterparts (whether by hand, electronically or otherwise), each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by email with scan attachment copies, each of which shall be deemed an original.

144305281v10

9.22    **Sellers' Rep**.

(a)    Sellers hereby appoint PQ NY as the representative of Sellers (the "Sellers' Rep") to act in each Seller's name, place and stead, as such Seller's attorney-in-fact, to exercise all of the powers conferred upon it pursuant to this Agreement, for and on behalf of such Seller and without any act of such Seller. PQ NY as Sellers' Rep hereby accepts such appointment. The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate such appointment or the authority and agency of the Sellers' Rep. The power-of-attorney granted in this Section 9.22(a) is coupled with an interest and is irrevocable. Buyer may conclusively rely upon, without independent verification or investigation, all decisions, statements or communications made by Sellers' Rep on behalf of Sellers.

(b)    From and after the date hereof, any notice given to the Sellers' Rep shall constitute notice to each and all of the Sellers at the time notice is given to the Sellers' Rep (other than notice for service of process relating to any Litigation before a court or other tribunal of competent jurisdiction, which notice must be given to each Seller individually, as applicable). Any action taken or foregone by, or notice or instruction received from, the Sellers' Rep shall be deemed to be action or inaction by, or notice or instruction from, each and all Sellers.

(c)    PQ NY shall serve as the Sellers' Rep until its resignation or it is otherwise unable to continue to serve. Upon the resignation of PQ NY or if it is not able to continue to serve for any reason, Sellers by a majority vote shall select a new Sellers' Rep by written consent signed by such majority. No resignation or replacement of the Sellers' Rep shall become effective unless and until written notice of the replacement or resignation of such Sellers' Rep shall be provided to Buyer. Each time a new Sellers' Rep is appointed pursuant to this Agreement, such Person, as a condition precedent to the effectiveness of such appointment, shall accept such position in writing.

(d)    Notwithstanding any other provision of this Agreement, (i) each Seller shall remain in good standing in its state of formation through (and including) the Closing Date and (ii) nothing in this this Agreement shall require any Seller to (y) remain a validly existing entity beyond the Closing Date or (z) to take any action, perform any obligations, or comply with any terms or covenants set forth in this Agreement after such Seller's entity existence has ceased or has been cancelled.

9.23    **Time of Essence**.  Time is of the essence of this Agreement.

9.24    **Buyer's Non-Reliance on Additional Representations and Warranties**. NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, BUYER ACKNOWLEDGES AND AGREES THAT NO SELLER IS MAKING ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN BY THE SELLERS IN ARTICLE III (AS MODIFIED BY THE DISCLOSURE SCHEDULES, AS SUPPLEMENTED OR AMENDED), AND BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE III, THE PURCHASED ASSETS ARE BEING TRANSFERRED BY SELLERS ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS AND WITHOUT REPRESENTATIONS, WARRANTIES OR GUARANTEES, EXPRESS, IMPLIED OR STATUTORY, WRITTEN OR ORAL, OF ANY KIND, NATURE OR

DESCRIPTION, BY ANY SELLER, ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES. ANY CLAIMS BUYER MAY HAVE FOR BREACH OF REPRESENTATION OR WARRANTY SHALL BE BASED SOLELY ON THE REPRESENTATIONS AND WARRANTIES OF SELLERS SET FORTH IN <u>ARTICLE III</u> (AS MODIFIED BY THE DISCLOSURE SCHEDULES, AS SUPPLEMENTED OR AMENDED). BUYER FURTHER REPRESENTS AND AGREES THAT IT BUYER HAS NOT RELIED ON ANY REPRESENTATIONS OR WARRANTIES NOT EXPRESSLY SET FORTH IN <u>ARTICLE III</u> (AS MODIFIED BY THE DISCLOSURE SCHEDULES, AS SUPPLEMENTED OR AMENDED). IN ADDITION, BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED TO ITS SATISFACTION ITS OWN INDEPENDENT INVESTIGATION OF THE BUSINESS AND THE PURCHASED ASSETS AND IN MAKING THE DETERMINATION TO PROCEED WITH THE CONTEMPLATED TRANSACTIONS, BUYER HAS RELIED ON THE RESULTS OF ITS OWN INDEPENDENT INVESTIGATION AND THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE III</u> AND NOT ON ANY OTHER REPRESENTATIONS OR WARRANTIES OF SELLERS, ANY OF THEIR AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES NOT SET FORTH HEREIN.

9.25 **Additional Liability Limitations**.

(a) *Limitations on Damages.* NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES (INCLUDING LOSS OF REVENUE, INCOME OR PROFITS BUT ONLY TO THE EXTENT THE SAME ARE NOT DIRECT DAMAGES), DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY OF ANY OTHER PARTY OR ANY OF SUCH PARTY'S AFFILIATES, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT SUCH LIMITATIONS SHALL NOT LIMIT ANY PARTY'S RIGHT TO RECOVER CONTRACT DAMAGES IN CONNECTION WITH THE OTHER PARTY'S FAILURE TO CLOSE IN VIOLATION OF THIS AGREEMENT.

(b) *Maximum Liability.* NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, IF THE CLOSING OCCURS AND THE PURCHASE PRICE IS PAID BY THE BUYER TO THE SELLERS, IN NO EVENT SHALL ANY PARTY'S AGGREGATE LIABILITY FOR LOSSES ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS, WHETHER RELATING TO A BREACH OF A REPRESENTATION AND WARRANTY, COVENANT, AGREEMENT OR OBLIGATION IN THIS AGREEMENT AND WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAWS OR OTHERWISE, EXCEED THE LIABILITY CAP; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT, SUCH LIMITATION ON LIABILITY SHALL NOT APPLY TO ANY SUCH LOSSES RESULTING FROM, ARISING OUT OF OR RELATING TO (I) ANY FEES AND EXPENSES OWED TO ANY PERSON WHO HAS ACTED, DIRECTLY OR INDIRECTLY, AS A BROKER, FINDER OR FINANCIAL ADVISOR TO SELLERS IN CONNECTION WITH THE TRANSACTIONS (WHICH LOSSES SHALL BE LIMITED TO THE ACTUAL DOLLAR AMOUNT OF SUCH FEES AND EXPENSES), (II) ANY FAILURE OF THE BUYER TO SATISFY AND DISCHARGE THE ASSUMED LIABILITIES, OR (III) ANY LIABILITY OF, OR ANY AMOUNTS OWED TO,

ANY PARTY ARISING UNDER ARTICLE VI, INCLUDING AS A RESULT OF COMPLIANCE WITH OR BREACH OF ANY OF THE PROVISIONS SET FORTH IN ARTICLE VI (INCLUDING THE EXERCISE OF ANY POWERS OF ATTORNEY GRANTED UNDER ARTICLE VI). THE PARTIES AGREE THAT THE LIABILITY CAP IS AN AMOUNT THAT IS REASONABLE IN LIGHT OF THE ANTICIPATED OR ACTUAL HARM CAUSED BY ANY SUCH BREACH CONTEMPLATED ABOVE, THE DIFFICULTIES OF PROOF OF LOSS ARISING FROM SUCH BREACH, AND THE INCONVENIENCE OR INFEASIBILITY OF OTHERWISE OBTAINING AN ADEQUATE REMEDY FOR SUCH BREACH.

9.26    **Setoff Right.**  In the event Buyer breaches this Agreement, Sellers shall be entitled to set off any amounts payable to the Sellers as Losses as a result of Buyer's breach of this Agreement against amounts that would otherwise be payable by the Sellers under the DIP Loan Documents or that certain pre-petition Bridge Loan entered into by the Sellers and the LPQ USA, LLC, lender and secured party.  In the event any Seller breaches this Agreement, Buyer shall be entitled to set off any amounts payable to Buyer as Losses as a result of a Seller's breach of this Agreement against amounts that would otherwise be payable by Buyer to a Sellers.

9.27    **Privileged Communications.**

(a)    Sellers and Buyer hereby acknowledge and agree that notwithstanding any provision of this Agreement, neither Buyer nor any of its Affiliates shall have access to (and each hereby waives any right of access it may otherwise have with respect to) any Privileged Communications, whether or not the Closing occurs and no Privileged Communications (or any rights therein) shall be a Purchased Asset.  Without limiting the generality of the foregoing, Buyer hereby acknowledges and agrees, upon and after the Closing: (i) neither Buyer nor any of its Affiliates shall be a holder of, or have any right, title or interest to the Privileged Communications, (ii) only Sellers shall hold property or other rights in the Privileged Communications and shall have the right to waive or modify such rights and (iii) Sellers shall have no duty whatsoever to reveal or disclose any Privileged Communications to Buyer or any of its Affiliates.

(b)    To the extent that any Privileged Communications are disclosed or made available to Buyer, the Parties hereby agree (i) that the disclosure, receipt and/or review of such Privileged Communication is entirely inadvertent and shall not waive, modify, limit or impair in any form or fashion the protected nature of the Privileged Communications, (ii) it is their desire, intention and mutual understanding that the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, common interest privilege, work product doctrine or other applicable privilege and (iii) Sellers shall have the right in its sole discretion and at any time to require the return and/or destruction of the Privileged Communications.

**[SIGNATURE PAGES TO FOLLOW]**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

**LPQ USA, LLC**

By: _____
Name: _____ John Rigos _____
Title: _____ Co-CEO _____

**PQ NY:**

**PQ NEW YORK, INC.**

By: _____
Name: _____
Title: _____

Aurlly/PQ New York – APA

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first above written.

<u>**BUYER**</u>:

**LPQ USA, LLC**

By: _____
Name: _____
Title: _____

<u>**PQ NY**</u>:

**PQ NEW YORK, INC.**

By: _Bruce Revzin_____
   170607E275EE4A2...
Name: _Bruce Revzin_____
Title: _Authorized Person_____

**SELLERS:**

33RD STREET BAKERY, INC.
FLORENCE BAKERY, INC.
LPQ 14TH & K STREET, INC.
LPQ 205 BLEECKER, INC.
LPQ 85 BROAD, INC.
LPQ AVENTURA, INC.
LPQ CABIN JOHN, INC.
LPQ CLAREMONT, INC.
LPQ COCONUT GROVE, INC.
LPQ GARDEN CITY, INC.
LPQ KING & HUDSON, INC.
LPQ N. WELLS ST, INC.
LPQ NAPERVILLE, INC.
LPQ NORTH MICHIGAN, INC.
LPQ PASADENA, INC.
LPQ RESTON, INC.
LPQ SAILBOAT POND, INC.
LPQ SOUTH END AVE, INC.
LPQ SOUTH GAYLEY, INC.
LPQ SOUTH LASALLE, INC.
LPQ TOLUCA LAKE, INC.
LPQ WEST 55TH & 8TH ST, INC.
LPQ WOODBURY, INC.
PQ 17TH STREET, INC.
PQ 44TH & MADISON, INC.
PQ 44TH STREET, INC.
PQ 53RD STREET, INC.
PQ 550 HUDSON, INC.
PQ 55TH & 1ST, INC.
PQ 6TH & OLIVE, INC.
PQ 6TH AVE., INC.
PQ 8TH & WALNUT, INC.
PQ 8TH STREET, INC.
PQ 933 BROADWAY, INC.
PQ 97TH STREET, INC.
PQ ALEXANDRIA, INC.
PQ AMERICANA, INC.
PQ BAKERY, LLC
PQ BATTERY PARK, INC.
PQ BETHESDA, INC.
PQ BEVERLY HILLS, INC.
PQ BLAINE MANSION, INC.
PQ BLEECKER, INC.
PQ BRENTWOOD, INC.
PQ BRYANT PARK, INC.
PQ CALABASAS, INC.
PQ CAPITOL HILL, INC.
PQ CARNEGIE HILL, INC.
PQ CARROLL SQUARE, INC.
PQ CENTRAL PARK, INC.
PQ CHELSEA, INC.
PQ CHEVY CHASE, INC.
PQ CLARENDON, INC.
PQ CULVER PLAZA, INC.
PQ EAST 65TH ST, INC.

PQ EAST 77TH, INC.
PQ EAST 83RD ST, INC.
PQ ENCINO BAKERY, INC.
PQ FIRST INC.
PQ FRENCH MARKET, INC.
PQ GEORGETOWN, INC.
PQ GOLD COAST, INC.
PQ GRANARY, INC.
PQ GREENWICH, INC.
PQ HARBOR POINT, INC.
PQ LARCHMONT, INC.
PQ LEXINGTON, INC
PQ LINCOLN PARK, INC.
PQ LINCOLN SQUARE, INC.
PQ MANHATTAN BEACH, INC.
PQ MEATPACKING DISTRICT, INC.
PQ MELROSE, INC.
PQ MERRIFIELD, INC.
PQ MINERAL SPRINGS, INC.
PQ MONTAGUE, INC.
PQ MT. VERNON, INC.
PQ NEW CANAAN, INC.
PQ NEW YORK, INC.
PQ NEWPORT BEACH BAKERY, INC.
PQ OPERATIONS, INC.
PQ PARK & 33RD, INC.
PQ PARK SLOPE, INC.
PQ ROBERTSON, INC.
PQ RYE, INC.
PQ SAN VICENTE, INC.
PQ SANTA MONICA, INC.
PQ SOHO, LLC
PQ SPRING VALLEY, INC.
PQ STUDIO CITY, INC.
PQ THE VILLAGE AT TOPANGA, INC.
PQ TRIBECA, INC.
PQ TYSONS CORNER, INC.
PQ UN, INC.
PQ UNION SQUARE, INC.
PQ UNION STATION, INC.
PQ UPPER WEST, INC.
PQ VILLA MARINA, INC.
PQ WALNUT STREET, INC.
PQ WAYNE, INC.
PQ WEST 72ND, INC.
PQ WEST 84TH, INC.
PQ WESTLAKE, INC.
PQ WILDWOOD, INC.
TUXEDO BAKERY, INC.
WALNUT ST. BAKERY, INC.

By: _Bruce Revzin_
Name: Bruce Revzin
Title: Authorized Person
of each of the foregoing

## SCHEDULE I

## DEFINITIONS

"<u>Accounts Receivable</u>" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers and (b) any security interest, claim, remedy or other right related to any of the foregoing; in each case, as they exist prior to the Closing.

"<u>Acquisition Proposal</u>" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning a transaction or series of related transactions regarding (i) a merger, consolidation, recapitalization, share exchange or other business combination transaction involving any of the Sellers; (ii) the issuance or acquisition of shares of capital stock or other equity securities of any of any of the Sellers; or (iii) the sale, lease, exchange or other disposition of the Purchased Assets or assets related to the Business.

"<u>Adequate Assurance Deposit</u>" has the meaning set forth in the Utility Motion.

"<u>Adequate Assurance Deposit Amount</u>" means an amount equal to the balance in Utility Deposit Account on the day immediately prior to the Closing Date.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means, when used with reference to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Alternate Transaction</u>" means a transaction or series of related transactions pursuant to which Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer, but does not mean the sale of assets to customers conducted in the Ordinary Course of Business.

"<u>Asset Removal and Indemnity Agreement</u>" means that that certain Asset Removal and Indemnity Agreement, dated May 22, 2020, among the Buyer and the Sellers.

"<u>Assignment and Assumption Agreement</u>" means a duly executed assignment and assumption agreement, substantially in the form attached as <u>Exhibit D</u> hereto.

"<u>Assumed Contracts</u>" has the meaning set forth in <u>Section 2.6(b)</u> and shall include, for the avoidance of doubt, the Contracts and Leases identified on <u>Schedule 2.6(b)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Base Purchase Price" has the meaning set forth in Section 2.5.

"Bill of Sale" means a duly executed bill of sale, substantially in the form attached as Exhibit E hereto.

"Breakup Fee" has the meaning set forth in Section 6.8(b).

"Business" has the meaning set forth in the recitals.

"Business Cessation Event" means Sellers' cessation of its ongoing business on or about March 22, 2020 as the result of the COVID-19 outbreak.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the Contemplated Transactions, which shall be deemed to have occurred at 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

"Closing Date" means the second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Continuing Restaurant" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts pursuant to Section 2.6(b).

"Contract" means any written agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement,  or partnership agreement that, in each case, is legally-binding.

"COVID-19" means the novel coronavirus disease 2019 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

"Credit Bid" means a bid by Buyer pursuant to Section 363(k) of the Bankruptcy Code equal to the full amount of the outstanding DIP Obligations as of the Closing Date.

"Credit Bid And Release" has the meaning set forth in Section 2.5.

"Credit Card Liabilities" means all Liabilities to and other rights of credit card processors or other Persons for amounts payable by any Seller (whether current or non-current) in connection with any customer purchases made with credit or debit cards from any restaurants operated by Sellers.  Credit Card Liabilities are Excluded Liabilities.

"Credit Card Receivables" means all accounts receivable and other rights of Sellers for amounts owed to any Seller (whether current or non-current) from credit card processors in connection with any customer purchases made with credit or debit cards or any other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) at any restaurants operated by Sellers; in each case, as they exist prior to the Closing.

"Cure Amounts" has the meaning set forth in Section 2.6(e).

"Data Room" means that certain online accessible Intralinks deal room for Project Monte Cristo and Dropbox files maintained or established by SSG Capital Advisors, LLC for the Contemplated Transactions and the Prepetition Marketing Process.

"Debtors" has the meaning set forth in the preamble.

"Domain Name Assignment" means a duly executed domain name assignment, substantially in the form attached as Exhibit E hereto.

"DIP Budget" shall mean the DIP budget attached hereto as Exhibit G.

"DIP Facility" has the meaning set forth in the recitals.

"DIP Lenders" shall have the same meaning given such term in the DIP Order.

"DIP Loan Agreement" shall have the same meaning as the term "DIP Credit Agreement" as defined in the DIP Order.

"DIP Loan Documents" shall have the meaning given such term in the DIP Order, and for the avoidance of doubt shall include all guarantees, all other security agreements, pledge agreements, notes, guarantees, mortgages, certificates, Uniform Commercial Code financing statements and all other related agreements, instruments and other documents, in each case relating to the DIP Obligations, and executed and/or delivered in connection therewith by the Sellers.

"DIP Obligations" means the "DIP Obligations" as defined under the DIP Order.

"DIP Order" means the Order of the Bankruptcy Court approving the DIP Facility.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement, and (c) any other benefit or compensation plan, program, agreement or arrangement of any kind, providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case, maintained or contributed to or required to be contributed to by any Seller or any entity that together with any Seller is, or at any time was, treated as a single employer under Section 414 of the Code or Title IV of ERISA ("ERISA Affiliate") or in which any Seller or any ERISA Affiliate participates or participated, or with respect to which any Seller or any ERISA Affiliate may have any liability, contingent or otherwise.

"Employee Roster" has the meaning set forth in Section 3.9(a).

"Environmental Laws" all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts and Leases listed on Schedule 2.6(c) as of the date hereof and all other Contracts and Leases that Buyer has not designated as Assumed Contracts prior to the date that is two (2) Business Days prior to the Sale Hearing.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as an Excluded Contract or Post-Petition Rejected Contract pursuant to Section 2.6(b), which shall include any restaurants that do not become Continuing Restaurants because their associated Leases have been designated by Buyer as Post-Petition Rejected Contract pursuant to Section 2.6(b).

"Expense Reimbursement" has the meaning set forth in Section 6.8(b).

"Final Order" has the meaning set forth in the definition of "DIP Order".

"Financial Statements" has the meaning set forth in Section 3.15.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Recent Employees.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, brand names, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights and slogans, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in electronic data processing systems, information management systems, recordkeeping systems, communications and telecommunications systems, networking systems, account management systems, Internet websites and related content, inventory management systems and other such applications, software, source code, digital assets (*e.g.,* local websites, domain names, servers, social media accounts, email accounts, etc. (and related login credentials and passwords)), hardware, equipment and services (including all firmware, applications and software installed on such hardware and equipment, and all associated databases, and related documentation); (e) trade secrets and proprietary or confidential information relating to the Business (including recipes, procedures, food and beverage preparation instructions, menu formulation processes, operation manuals, specifications, pictures, drawings, mock-ups, prototypes, processes, ideas, formulae, compositions, know-how, discoveries, inventions, designs, plans, proposals, technical data,

46

financial, business and marketing plans, and customer and supplier lists and related information); and (f) all other intellectual property rights and licenses related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a).

"Inventory" means all of Sellers' now or hereafter (prior to the Closing) acquired inventory and goods, wherever located, including consumable food, beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, Order, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

"Leased Real Property" means all (i) leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used in or otherwise related to the Business, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Sellers thereunder, and (ii) any buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property ("Leasehold Improvements").

"Leasehold Improvements" has the meaning set forth in the definition of "Leased Real Property".

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Letter Agreement" means that certain Letter Agreement, dated on or about the date hereof, sent by Buyer to PQ NY, and agreed to by PQ NY and the other Sellers.

"Liability" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or

144305281v10

unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Liability Cap" means an amount not to exceed five percent (5.0%) of the Base Purchase Price.

"Lien" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law or equity).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, arbitration, audit, grievance, demand, hearing, proceeding or investigation, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity, arbitrator or mediator.

"Loss" means any actual losses, liabilities, claims, damages or expenses (excluding any costs of investigation or defense, attorneys' fees and expenses) of a Party arising from or in connection with a breach or alleged breach by the other Party of this Agreement or the Related Agreements, or other claim arising out of or in connection with this Agreement or the Related Agreements.

"Major Suppliers" has the meaning set forth in Section 3.19.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) any effect resulting from the filing, announcement, or pendency of the Chapter 11 Cases, including (1) any Seller's inability to pay certain prepetition obligations as a result of the commencement of such Chapter 11 Cases, (2) any Order of the Bankruptcy Court (including any action or omission of any Seller taken or not taken to avoid violation of any such Order), or (3) any other effect, directly or indirectly, related thereto; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreements, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which

the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God; (v) changes in Law or in GAAP or interpretations thereof; or (vi) the Business Cessation Event; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the Contemplated Transactions or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Order" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Ordinary Course of Business" means the ordinary and usual course of business of Sellers taken as a whole consistent with past custom and practice and taking into account (x) the commencement of the Chapter 11 Cases, the (y) Debtors' current distressed financial condition and the Business Cessation Event and (z) all applicable Laws in effect including those related to the COVID-19 pandemic (including applicable "stay-at-home" orders and related "social distancing" guidelines).

"Organizational Documents" means, with respect to any entity, the certificate of incorporation, articles of incorporation, certificate of formation, articles of organization, by-laws, partnership agreement, limited liability company agreement, formation agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outside Date" means July 10, 2020.

"Parties" has the meaning set forth in the preamble.

"Permit" means any and all franchise, approval, permit (including environmental, construction and operation permits), license, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) mechanics liens, warehouse liens, materialman, repairmen, supplier, construction, carrier liens and similar liens for labor, materials, services or supplies provided with respect to real property or personal property incurred in the Ordinary Course of Business which are being contested in good faith by appropriate proceedings or that arise by operation of law; (b) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business; (c) with respect to Leasehold Improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable Lease; (d) all Liens of landlords arising

49

under real property leases to which any of the Sellers are a party so long as such Liens only secure amounts owed by a Seller under any such lease and do not encumber property of any Seller other than the real property that is the subject of such leases and personal property at the real property that is the subject of any such lease, (e) Liens for Taxes in respect of periods prior to the Petition Date that are not yet payable or not yet subject to penalties for non-payment or are being contested in good faith by appropriate proceedings, (f) all Liens of lessors or licensors under personal property leases or Intellectual Property licenses incurred in the Ordinary Course of Business arising under personal property leases or Intellectual Property licenses to which any of the Sellers are a party, and (g) Liens that will be released or removed by operation of the Sale Order (including Liens under the DIP Loan Documents).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Personal Property Leases" means all leases of personal property relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.

"Petition Date" means the date of the filing of the Chapter 11 Cases.

"Prepetition Marketing Process" means the process undertaken by SSG Capital Advisors, LLC prior to the Petition Date for a possible negotiated sale or other transaction involving any of the Sellers and a third party, state or federal bankruptcy or insolvency proceedings, an out-of-court restructuring and/or any financing transaction.

"Privileged Communications" means any attorney-client communications, confidences, files, work product or other communications related to the Seller Engagements.

"Post-Petition Rejected Contracts" has the meaning set forth in Section 2.6(b).

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets.

"Purchased Actions" means all causes of action, lawsuits, Claims, rights of recovery and other similar rights of any Seller, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, in equity or otherwise (including any derivative Claims asserted or that may be asserted on behalf of any Seller), (i) arising under Chapter 5 of the Bankruptcy Code, whether relating to the Business and the Purchased Assets or otherwise or (ii) against any current or former officer or director of any Seller or any shareholder of any Seller or the Related Parties of any Seller.

"Purchased Inventory" means Inventory that is part of the Purchased Assets as set forth in Section 2.1.

144305281v10

"Recent Employee" has the meaning set forth in Section 3.9(a).

"Recipes" has the meaning set forth in on Exhibit A.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Rejection Date" means, with respect to any Post Rejected Contracts, the effective date as provided for by the Bankruptcy Court that such Post-Petition Rejected Contract is rejected under the Bankruptcy Code.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments, and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer, and each of the officer certificates required by this Agreement to be delivered pursuant to Section 7.1(k) and Section 7.2(f) as conditions to Closing; *provided*, that in no instance shall the US Master Franchise Agreement or the Unit Franchise Agreement be deemed to be Related Agreements.

"Related Parties" means, with respect to any Person, such Person's Affiliates, successors and assigns and the partners, shareholders, members, investors and potential investors, parents, predecessors, subsidiaries, controlling persons, current and former directors, current and former officers, employees, agents, trustees, administrators, managers, advisors, attorneys and representatives of such Person and of such Person's Affiliates, successors and assigns.

"Relief Proceeds" means, all rights of, or on behalf of, any Seller in respect of any current or future disaster relief or other similar assistance program of any Governmental Entity in respect of, or enacted in response to, the COVID-19 pandemic (including, funds available under the Paycheck Protection Program).

"Representative" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

"Restaurant Petty Cash" means any petty cash of Sellers on the premise of any Continuing Restaurant or Excluded Restaurant.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"Sale Motion" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer consistent with the terms of this Agreement and otherwise in form and substance satisfactory to Buyer.

"Sale Order Deadline" means thirty (30) days after the Petition Date.

"Schedule Update" has the meaning set forth in Section 2.7(a).

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Engagements" means any matters for which any Seller has engaged Richards, Layton & Finger, P.A., PriceWaterhouseCoopers LLP or SSG Capital Advisors, LLC (or any of their affiliates) in connection with a possible negotiated transaction involving any of Sellers and a third party, state or federal bankruptcy or insolvency proceeding, an out-of-court restructuring and/or any financing transaction.

"Seller Indemnified Parties" has the meaning set forth in Section 6.9.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge, after due inquiry, of each officer and director of each Seller.

"Sellers' Rep" has the meaning set forth in Section 9.22(a).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Supplemental Agreements" means the Asset Removal and Indemnity Agreement and the Letter Agreement.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however

52

denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Termination Event</u>" has the meaning set forth in <u>Section 8.1</u>.

"<u>Transfer Tax</u>" means any stamp, documentary, registration, transfer, sales and use, added-value or similar Tax imposed under any applicable Law in connection with the Contemplated Transactions.

"<u>Transferring Party</u>" has the meaning set forth in <u>Section 5.1(c)</u>.

"<u>Treasury Regulations</u>" means regulations promulgated by the United States Department of Treasury under the IRC.

"<u>Unit Franchise Agreement</u>" means a Unit Franchise Agreement, substantially in the form attached as <u>Exhibit C-1</u> hereto.

"<u>US Master Franchise Agreement</u>" means that certain Area Development Agreement, dated as of the date hereof, entered into by the Buyer and PQL attached hereto as <u>Exhibit C-2</u> hereto.

"<u>Utility Deposit Account</u>" has the meaning set forth in the Utility Motion.

"*Utility Motion*" means that certain *Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies Adequately Assured of Future Performance and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance*, as filed by the Sellers with the Bankruptcy Court on or about the Petition Date.

"<u>Utility Motion Order</u>" means that certain Order of the Bankruptcy Court entered in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Buyer, approving the Utility Motion.

## ANNEX I

## SELLERS

| Sellers organized in the State of California | Sellers organized in the District of Columbia |
|---|---|
| LPQ Claremont, Inc. | PQ Georgetown, Inc. |
| LPQ Pasadena, Inc. | |
| PQ Larchmont, Inc. | |
| PQ Manhattan Beach, Inc. | |
| PQ San Vicente, Inc. | |
| PQ Studio City, Inc. | |

| Sellers organized in the State of New York | |
|---|---|
| PQ 44th & Madison, Inc. | PQ Lincoln Square, Inc. |
| PQ 44th Street, Inc. | PQ Meatpacking District, Inc. |
| PQ 53rd Street, Inc. | PQ Mineral Springs, Inc. |
| PQ 550 Hudson, Inc. | PQ Montague, Inc. |
| PQ 55th & 1st, Inc. | PQ Park & 33rd, Inc. |
| PQ 6th Ave., Inc. | PQ Park Slope, Inc. |
| PQ 933 Broadway, Inc. | PQ Robertson, Inc. |
| PQ 97th Street, Inc. | PQ Rye, Inc. |
| PQ Battery Park, Inc. | PQ Tribeca, Inc. |
| PQ Bleecker, Inc. | PQ UN, Inc. |
| PQ Bryant Park, Inc. | PQ Union Square, Inc. |

| | |
|---|---|
| PQ Carnegie Hill, Inc. | PQ Upper West, Inc. |
| PQ Chelsea, Inc. | PQ West 84th, Inc. |
| PQ East 65th St, Inc. | PQ Soho, LLC |
| PQ East 77th, Inc. | PQ Bakery, LLC |
| PQ East 83rd St, Inc. | |

| Sellers organized in the State of Delaware | |
|---|---|
| 33rd Street Bakery, Inc. | PQ Central Park, Inc. |
| Florence Bakery, Inc. | PQ Chevy Chase, Inc. |
| LPQ 14th & K Street, Inc. | PQ Clarendon, Inc. |
| LPQ 205 Bleecker, Inc. | PQ Culver Plaza, Inc. |
| LPQ 85 Broad, Inc. | PQ Encino Bakery, Inc. |
| LPQ Aventura, Inc. | PQ First Inc. |
| LPQ Cabin John, Inc. | PQ French Market, Inc. |
| LPQ Coconut Grove, Inc. | PQ Gold Coast, Inc. |
| LPQ Garden City, Inc. | PQ Granary, Inc. |
| LPQ King & Hudson, Inc. | PQ Greenwich, Inc. |
| LPQ N. Wells St, Inc. | PQ Harbor Point, Inc. |
| LPQ Naperville, Inc. | PQ Lexington, Inc |
| LPQ North Michigan, Inc. | PQ Lincoln Park, Inc. |
| LPQ Reston, Inc. | PQ Melrose, Inc. |
| LPQ Sailboat Pond, Inc. | PQ Merrifield, Inc. |
| LPQ South End Ave, Inc. | PQ Mt. Vernon, Inc. |
| LPQ South Gayley, Inc. | PQ New Canaan, Inc. |

144305281v10

| Sellers organized in the State of Delaware | |
|---|---|
| LPQ South Lasalle, Inc. | PQ Newport Beach Bakery, Inc. |
| LPQ Toluca Lake, Inc. | PQ New York, Inc. |
| LPQ West 55th & 8th St, Inc. | PQ Operations, Inc. |
| LPQ Woodbury, Inc. | PQ Santa Monica, Inc. |
| PQ 17th Street, Inc. | PQ Spring Valley, Inc. |
| PQ 6th & Olive, Inc. | PQ The Village at Topanga, Inc. |
| PQ 8th & Walnut, Inc. | PQ Tysons Corner, Inc. |
| PQ 8th Street, Inc. | PQ Union Station, Inc. |
| PQ Alexandria, Inc. | PQ Villa Marina, Inc. |
| PQ Americana, Inc. | PQ Walnut Street, Inc. |
| PQ Bethesda, Inc. | PQ Wayne, Inc. |
| PQ Beverly Hills, Inc. | PQ West 72nd, Inc. |
| PQ Blaine Mansion, Inc. | PQ Westlake, Inc. |
| PQ Brentwood, Inc. | PQ Wildwood, Inc. |
| PQ Calabasas, Inc. | Tuxedo Bakery, Inc. |
| PQ Capitol Hill, Inc. | Walnut St. Bakery, Inc. |
| PQ Carroll Square, Inc. | |

**EXHIBIT A**

**PURCHASED ASSETS**

1.      all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order to the Continuing Restaurants or Excluded Restaurants as of the Closing;

2.      all deposits (including deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of Sellers, in each case to the extent related to a Continuing Restaurant;

3.      all Assumed Contracts;

4.      all Intellectual Property owned by Sellers (if any) including the rights the Sellers have to any "fictitious", "doing business as," trade name, qualification to do business or foreign qualification filings or registrations in any jurisdiction;

5.      all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of Sellers' rights to any Leasehold Improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing;

6.      all Records, including Records related to (i) Taxes paid or payable by any Seller related to the Business or the Purchased Assets (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding any materials exclusively related to any Excluded Assets; (ii) payroll recipients and amounts with respect to the Business for the past three (3) years; and (iii) utility expenses for the past three (3) years.

7.      all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

8.      all rights of Sellers under nondisclosure or confidentiality, noncompete, or nonsolicitation agreements with Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

9.      all of the Assumed Permits (if any);

10.     the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

11.     unless expressly provided for as Excluded Assets, all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights

in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or noncontingent), other than against Sellers;

12.     all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of setoff, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including the Purchased Actions;

13.     all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

14.     all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Continuing Restaurants;

15.     all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth on Schedule 2.1(t);

16.     all rights arising from or related to the ability to apply for or otherwise receive any and all applicable Relief Proceeds;

17.     all of Sellers' recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages, or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "Recipes") to the extent owned by Sellers;

18.     all originals and/or copies of all customer, mailing and supplier lists and other books, records, reports, studies, files, advertising materials and documents of Seller other than incorporation documents and corporate minute books;

19.     the Adequate Assurance Deposit, all other amounts in the Utility Deposit Account, and to the extent transferrable, the Utility Deposit Account; and

20.     all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**EXHIBIT B**

**EXCLUDED ASSETS**

1.      all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity;

2.      all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

3.      all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts;

4.      any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

5.      all Permits other than the Assumed Permits;

6.      all directors' and officers' liability Insurance Policies, including any tail insurance policies, including the rights of the directors and officers thereunder for coverage (i.e., advancement of expenses and liability coverage with respect to claims made against such officers and directors);

7.      all Employee Benefit Plans;

8.      the Excluded Restaurants and those assets set forth on Schedule 2.2; and

9.      the rights of Sellers under this Agreement and the Related Agreements and all consideration payable or deliverable to Sellers under this Agreement.

10.     all cash, cash equivalents, bank deposits and similar cash items of Sellers, including Restaurant Petty Cash;

11.     all bank accounts of Sellers;

12.     all Accounts Receivable of Sellers as of the Closing;

13.     all Credit Card Receivables;

14.     without duplication of the above, all deposits (including deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of Sellers, to the extent related to Excluded Restaurants;

15.     the right to receive and retain mail relating to, Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

16.     all rights arising from or related to any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers; and

17.     all Privileged Communications.

144305281v10

**ARTICLE IIEXHIBIT C-1**

**FORM OF UNIT FRANCHISE AGREEMENT**

[*see* attached]

**EXHIBIT C-2**

**US MASTER FRANCHISE AGREEMENT**

[*see* attached]

**EXHIBIT D**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

[*see* attached]

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is entered into as of [_____], 2020, by and among each of the undersigned parties identified as a "Seller" on the signature pages hereto (collectively, the "Sellers" and each a "Seller"), and LPQ USA, LLC, a Delaware limited liability company ("Buyer"). Capitalized terms, used herein and not defined shall have the meaning set forth in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, Buyer and the Sellers have entered into that certain Asset Purchase Agreement, dated as of May 26, 2020 (the "Purchase Agreement"), which provides, among other things, for the sale and assignment of the Purchased Assets by the Sellers to Buyer and the assumption by Buyer of the Assumed Liabilities;

**WHEREAS**, the Purchased Assets include, without limitation, the Assumed Contracts and the Assumed Permits;

**WHEREAS**, Pursuant to the Purchase Agreement, Buyer has agreed to acquire all of the Assumed Contracts and the Assumed Permits and assume all of the Assumed Liabilities; and

**WHEREAS**, Buyer and the Sellers desire to enter into this Assignment to effect the assignment by the Sellers and the acceptance and assumption by Buyer of each of the Assumed Contracts, Assumed Permits and Assumed Liabilities.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, such parties agree as follows:

1.    **Assignment of Assumed Contracts and Assumed Permits**. In partial consideration for entering into the Purchase Agreement, as provided for in the Sale Order and the Purchase Agreement, each Seller hereby sells, conveys, transfers, assigns and delivers to Buyer the Assumed Contracts to which such Seller is a party and the Assumed Permits which such Seller holds, and Buyer hereby accepts such sale, transfer, conveyance, assignment and delivery of the Assumed Contracts and the Assumed Permits.

2.    **Assumption of Assumed Liabilities**. Buyer hereby assumes and agrees to discharge in accordance with their terms (subject to Buyer's right to dispute amounts owed in good faith) the Assumed Liabilities and no other Liabilities of any Seller.

3.    **Miscellaneous**. This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such

Laws.  This Assignment is subject in all respects to the terms of the Purchase Agreement and all of the representations and warranties, covenants and agreements contained in the Purchase Agreement, all of which shall survive the execution and delivery of this Assignment in accordance with the terms of the Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, diminish, enlarge or modify any provision or any of the obligations, agreements, covenants, or representations and warranties of any of the parties to the Purchase Agreement as contained in the Purchase Agreement and if any conflict exists between the terms of this Assignment and the Purchase Agreement, then the terms of the Purchase Agreement shall govern and control. This Assignment may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument. The exchange of copies of this Assignment and of signature pages by reliable electronic means (including .pdf) shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Assignment for all purposes. Signatures of the parties hereto transmitted by reliable electronic means (including .pdf) shall be deemed to be original signatures for all purposes.

4.    **Entire Agreement**. This Assignment, the Purchase Agreement, the Bill of Sale and the other Related Agreements contain the entire agreement of the parties hereto with regard to the matters set forth herein.

**[SIGNATURE PAGES TO FOLLOW]**

2

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment or caused this Assignment to be executed by their duly authorized representatives.

**BUYER:**

LPQ USA, LLC

By: _____
Name: _____
Title: _____

**SELLERS:**

33RD STREET BAKERY, INC.
FLORENCE BAKERY, INC.
LPQ 14TH & K STREET, INC.
LPQ 205 BLEECKER, INC.
LPQ 85 BROAD, INC.
LPQ AVENTURA, INC.
LPQ CABIN JOHN, INC.
LPQ CLAREMONT, INC.
LPQ COCONUT GROVE, INC.
LPQ GARDEN CITY, INC.
LPQ KING & HUDSON, INC.
LPQ N. WELLS ST, INC.
LPQ NAPERVILLE, INC.
LPQ NORTH MICHIGAN, INC.
LPQ PASADENA, INC.
LPQ RESTON, INC.
LPQ SAILBOAT POND, INC.
LPQ SOUTH END AVE, INC.
LPQ SOUTH GAYLEY, INC.
LPQ SOUTH LASALLE, INC.
LPQ TOLUCA LAKE, INC.
LPQ WEST 55TH & 8TH ST, INC.
LPQ WOODBURY, INC.
PQ 17TH STREET, INC.
PQ 44TH & MADISON, INC.
PQ 44TH STREET, INC.
PQ 53RD STREET, INC.
PQ 550 HUDSON, INC.
PQ 55TH & 1ST, INC.
PQ 6TH & OLIVE, INC.
PQ 6TH AVE., INC.

[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION AGREEMENT]

PQ 8TH & WALNUT, INC.
PQ 8TH STREET, INC.
PQ 933 BROADWAY, INC.
PQ 97TH STREET, INC.
PQ ALEXANDRIA, INC.
PQ AMERICANA, INC.
PQ BAKERY, LLC
PQ BATTERY PARK, INC.
PQ BETHESDA, INC.
PQ BEVERLY HILLS, INC.
PQ BLAINE MANSION, INC.
PQ BLEECKER, INC.
PQ BRENTWOOD, INC.
PQ BRYANT PARK, INC.
PQ CALABASAS, INC.
PQ CAPITOL HILL, INC.
PQ CARNEGIE HILL, INC.
PQ CARROLL SQUARE, INC.
PQ CENTRAL PARK, INC.
PQ CHELSEA, INC.
PQ CHEVY CHASE, INC.
PQ CLARENDON, INC.
PQ CULVER PLAZA, INC.
PQ EAST 65TH ST, INC.
PQ EAST 77TH, INC.
PQ EAST 83RD ST, INC.
PQ ENCINO BAKERY, INC.
PQ FIRST INC.
PQ FRENCH MARKET, INC.
PQ GEORGETOWN, INC.
PQ GOLD COAST, INC.
PQ GRANARY, INC.
PQ GREENWICH, INC.
PQ HARBOR POINT, INC.
PQ LARCHMONT, INC.
PQ LEXINGTON, INC
PQ LINCOLN PARK, INC.
PQ LINCOLN SQUARE, INC.
PQ MANHATTAN BEACH, INC.
PQ MEATPACKING DISTRICT, INC.
PQ MELROSE, INC.
PQ MERRIFIELD, INC.
PQ MINERAL SPRINGS, INC.
PQ MONTAGUE, INC.
PQ MT. VERNON, INC.
PQ NEW CANAAN, INC.

[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION AGREEMENT]

RLF1 23473442v.1
144567921v3

PQ NEW YORK, INC.
PQ NEWPORT BEACH BAKERY, INC.
PQ OPERATIONS, INC.
PQ PARK & 33RD, INC.
PQ PARK SLOPE, INC.
PQ ROBERTSON, INC.
PQ RYE, INC.
PQ SAN VICENTE, INC.
PQ SANTA MONICA, INC.
PQ SOHO, LLC
PQ SPRING VALLEY, INC.
PQ STUDIO CITY, INC.
PQ THE VILLAGE AT TOPANGA, INC.
PQ TRIBECA, INC.
PQ TYSONS CORNER, INC.
PQ UN, INC.
PQ UNION SQUARE, INC.
PQ UNION STATION, INC.
PQ UPPER WEST, INC.
PQ VILLA MARINA, INC.
PQ WALNUT STREET, INC.
PQ WAYNE, INC.
PQ WEST 72ND, INC.
PQ WEST 84TH, INC.
PQ WESTLAKE, INC.
PQ WILDWOOD, INC.
TUXEDO BAKERY, INC.
WALNUT ST. BAKERY, INC.


By: _____
Name: _____
Title: _____
   of each of the foregoing

[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION AGREEMENT]

**EXHIBIT E**

**FORM OF BILL OF SALE**

[*see* attached]

# BILL OF SALE

This BILL OF SALE (this "Bill of Sale") is entered into as of [_____], 2020, from each of the other undersigned parties identified as a "Seller" on the signature pages hereto (collectively, the "Sellers" and each, a "Seller"), to LPQ USA, LLC, a Delaware limited liability company ("Buyer"). Capitalized terms, used herein and not defined shall have the meaning set forth in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, Buyer and the Sellers have entered into that certain Asset Purchase Agreement, dated as of May 26, 2020 (the "Purchase Agreement"), which provides, among other things, for the sale and assignment of the Purchased Assets by the Sellers to Buyer.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, such parties agree as follows:

1.      **Assignment of Purchased Assets**. In partial consideration for entering into the Purchase Agreement, the Sellers hereby sell, assign, transfer, convey and deliver to Buyer, free and clear of any and all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities) as provided for in the Sale Order, all of the right, title and interest in and to the Purchased Assets, and Buyer hereby accepts such sale, assignment, transfer, conveyance and delivery.

2.      **Further Assurances**. Each Seller, for itself, its successors, and assigns, hereby covenants and agrees (a) to and with Buyer, to warrant and defend the grant, bargain, transfer, sale, assignment, conveyance, and delivery of the Purchased Assets to Buyer and its successors and assigns against all Persons, to the extent set forth in the Purchase Agreement and (b) that, at any time and from time to time after the date hereof, promptly upon the written request of Buyer, it will do, execute, acknowledge, and deliver, or cause to be done, executed, acknowledged, and delivered, each and all of such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may reasonably be required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors, and assigns the Purchased Assets and title thereto and to put Buyer in possession and operating control of the Purchased Assets. To the extent that any of the Purchased Assets are not actually delivered and turned over by a Seller to Buyer at the Closing, such Purchased Assets will be held in trust by such Seller for Buyer and will be turned over and delivered to Buyer at any time and from time to time upon demand therefor. Buyer will maintain the sole and exclusive title to the Purchased Assets and all right, title, and interest therein, and such Seller will have no right, title, or interest in or to any such Purchased Assets, nor will such Seller have any retaining possessory or other Lien thereon.

3.      **Power of Attorney**. Without limiting the foregoing, each Seller hereby constitutes Buyer the true and lawful agent and attorney-in-fact of such Seller, with full power of substitution

and resubstitution, in whole or in part, in the name and stead of such Seller but on behalf and for the benefit of Buyer and its successors and assigns, from time to time:

        a.     to demand, receive, and collect any and all of the Purchased Assets, and to give receipts and releases for and with respect to same, or any part thereof;

        b.     to institute and prosecute, in the name of such Seller or otherwise, all proceedings, at law, in equity, or otherwise, that Buyer or its successors and assigns may deem proper in order to collect or enforce any claim or right of any kind included in the Purchased Assets; and

        c.     to do all things legally permissible or required, or reasonably deemed by Buyer to be required, to recover and collect the Purchased Assets and to use such Seller's name in such manner as Buyer may reasonably deem necessary for the collection and recovery of same.

Each Seller hereby declares that the foregoing powers are coupled with an interest and are irrevocable by such Seller or by its dissolution or in any other manner or for any reason whatsoever.

       **4.**     **Miscellaneous**. This Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. This Bill of Sale is subject in all respects to the terms of the Purchase Agreement and all of the representations and warranties, covenants and agreements contained in the Purchase Agreement, all of which shall survive the execution and delivery of this Bill of Sale in accordance with the terms of the Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, diminish, enlarge or modify any provision or any of the obligations, agreements, covenants, or representations and warranties of any of the parties to the Purchase Agreement as contained in the Purchase Agreement. If any conflict exists between the terms of this Bill of Sale and the Purchase Agreement, then the terms of the Purchase Agreement shall govern and control. This Bill of Sale may be executed in one or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument. The signature of any party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof. In the event that any signature to this Bill of Sale is delivered by e-mail delivery of a ".pdf" format data file or similar electronic transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such ".pdf" or electronic signature were an original thereof. Once signed, this Bill of Sale may be delivered by ".pdf" format and any reproduction of this Bill of Sale made by reliable means (e.g., portable document format) shall be considered an original.

       **5.**     **Entire Agreement**. This Bill of Sale, the Assignment and Assumption Agreement, the Purchase Agreement and the other Related Agreements contain the entire agreement of the parties hereto with regard to the matters set forth herein.

**[SIGNATURE PAGES TO FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sale or have caused this Bill of Sale to be executed by their duly authorized representatives.

**BUYER:**

LPQ USA, LLC

By: _____
Name: _____
Title: _____

**SELLERS:**

33RD STREET BAKERY, INC.
FLORENCE BAKERY, INC.
LPQ 14TH & K STREET, INC.
LPQ 205 BLEECKER, INC.
LPQ 85 BROAD, INC.
LPQ AVENTURA, INC.
LPQ CABIN JOHN, INC.
LPQ CLAREMONT, INC.
LPQ COCONUT GROVE, INC.
LPQ GARDEN CITY, INC.
LPQ KING & HUDSON, INC.
LPQ N. WELLS ST, INC.
LPQ NAPERVILLE, INC.
LPQ NORTH MICHIGAN, INC.
LPQ PASADENA, INC.
LPQ RESTON, INC.
LPQ SAILBOAT POND, INC.
LPQ SOUTH END AVE, INC.
LPQ SOUTH GAYLEY, INC.
LPQ SOUTH LASALLE, INC.
LPQ TOLUCA LAKE, INC.
LPQ WEST 55TH & 8TH ST, INC.
LPQ WOODBURY, INC.
PQ 17TH STREET, INC.
PQ 44TH & MADISON, INC.
PQ 44TH STREET, INC.
PQ 53RD STREET, INC.
PQ 550 HUDSON, INC.
PQ 55TH & 1ST, INC.
PQ 6TH & OLIVE, INC.
PQ 6TH AVE., INC.

[SIGNATURE PAGE TO BILL OF SALE]

PQ 8TH & WALNUT, INC.
PQ 8TH STREET, INC.
PQ 933 BROADWAY, INC.
PQ 97TH STREET, INC.
PQ ALEXANDRIA, INC.
PQ AMERICANA, INC.
PQ BAKERY, LLC
PQ BATTERY PARK, INC.
PQ BETHESDA, INC.
PQ BEVERLY HILLS, INC.
PQ BLAINE MANSION, INC.
PQ BLEECKER, INC.
PQ BRENTWOOD, INC.
PQ BRYANT PARK, INC.
PQ CALABASAS, INC.
PQ CAPITOL HILL, INC.
PQ CARNEGIE HILL, INC.
PQ CARROLL SQUARE, INC.
PQ CENTRAL PARK, INC.
PQ CHELSEA, INC.
PQ CHEVY CHASE, INC.
PQ CLARENDON, INC.
PQ CULVER PLAZA, INC.
PQ EAST 65TH ST, INC.
PQ EAST 77TH, INC.
PQ EAST 83RD ST, INC.
PQ ENCINO BAKERY, INC.
PQ FIRST INC.
PQ FRENCH MARKET, INC.
PQ GEORGETOWN, INC.
PQ GOLD COAST, INC.
PQ GRANARY, INC.
PQ GREENWICH, INC.
PQ HARBOR POINT, INC.
PQ LARCHMONT, INC.
PQ LEXINGTON, INC
PQ LINCOLN PARK, INC.
PQ LINCOLN SQUARE, INC.
PQ MANHATTAN BEACH, INC.
PQ MEATPACKING DISTRICT, INC.
PQ MELROSE, INC.
PQ MERRIFIELD, INC.
PQ MINERAL SPRINGS, INC.
PQ MONTAGUE, INC.
PQ MT. VERNON, INC.
PQ NEW CANAAN, INC.

[SIGNATURE PAGE TO BILL OF SALE]

PQ NEW YORK, INC.
PQ NEWPORT BEACH BAKERY, INC.
PQ OPERATIONS, INC.
PQ PARK & 33RD, INC.
PQ PARK SLOPE, INC.
PQ ROBERTSON, INC.
PQ RYE, INC.
PQ SAN VICENTE, INC.
PQ SANTA MONICA, INC.
PQ SOHO, LLC
PQ SPRING VALLEY, INC.
PQ STUDIO CITY, INC.
PQ THE VILLAGE AT TOPANGA, INC.
PQ TRIBECA, INC.
PQ TYSONS CORNER, INC.
PQ UN, INC.
PQ UNION SQUARE, INC.
PQ UNION STATION, INC.
PQ UPPER WEST, INC.
PQ VILLA MARINA, INC.
PQ WALNUT STREET, INC.
PQ WAYNE, INC.
PQ WEST 72ND, INC.
PQ WEST 84TH, INC.
PQ WESTLAKE, INC.
PQ WILDWOOD, INC.
TUXEDO BAKERY, INC.
WALNUT ST. BAKERY, INC.


By: _____
Name: _____
Title: _____
of each of the foregoing

**EXHIBIT F**

**FORM OF DOMAIN NAME ASSIGNMENT**

[*see* attached]

## DOMAIN NAME ASSIGNMENT

This DOMAIN NAME ASSIGNMENT (this "Assignment") is made as of [_____], 2020 from each of the undersigned parties identified as an "Assignor" on the signature pages hereto (collectively, the "Assignors" and each, an "Assignor"),[1] to LPQ USA, LLC, a Delaware limited liability company ("Assignee"). Capitalized terms, used herein and not defined shall have the meaning set forth in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of May 26, 2020 (the "Purchase Agreement"), which provides for, among other things, the assignment of Assignors' domain names to Assignee;

**WHEREAS**, one or more Assignor may be the owner of all right, title and interest in and to the domain name registrations set forth on the attached Schedule 1 (collectively, the "Domain Names"); and

**WHEREAS**, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignors desire to assign, and Assignee desires to acquire, all of the Domain Names.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, such parties agree as follows:

**1.      Assignment**. In partial consideration for Assignee entering into the Purchase Agreement, as provided for in the Sale Order and the Purchase Agreement, each Assignor hereby assigns and transfers to Assignee all legal right, title and interest in and to the Domain Names set forth on Schedule I attached hereto, and all goodwill associated therewith, and Assignee accepts such assignment and transfer.

**2.      Registration Transfer**. Each Assignor shall take all steps as may be necessary to effect such assignment and transfer in accordance with the domain name transfer procedures of the applicable registrar(s) for the Domain Names, including (without limitation) executing applicable domain name registrar transfer agreements or documents. Each Assignor agrees to cooperate with Assignee to initiate the transfer process in relation to the Domain Names electronically from such Assignor's account to Assignee's account within ten (10) days after the date of this Assignment. Each Assignor further agrees to complete, execute, notarize (as necessary) and deliver at any future date any additional documents that are reasonably necessary to perfect Assignee's ownership of the Domain Names, including (without limitation) any transfer

---

[1] Note to Draft:  If it is clear from the Sellers' records that only one Seller has registered the domain name (s) (e.g., PQ New York, Inc.), then Assignor may be limited to such Seller.

documents required by a domain name registrar or where electronic transfer is not possible. If, due to applicable registrar rules or regulations, a domain name registration cannot be assigned, the parties agree to discuss a reasonable resolution. Until such reasonable resolution is reached, the applicable Assignor shall maintain such domain name registration in full force and effect for the benefit of Assignee.

**3.  Power of Attorney**. Each Assignor hereby constitutes Buyer the true and lawful agent and attorney-in-fact of such Assignor, with full power of substitution and resubstitution, in whole or in part, in the name and stead of such Assignor but on behalf and for the benefit of Buyer and its successors and assigns, from time to time to give effect to do all things legally permissible or required, or reasonably deemed by Buyer to be required, to transfer the Domain Names to the Buyer.  Each Assignor hereby declares that the foregoing powers are coupled with an interest and are irrevocable by such Assignor or by its dissolution or in any other manner or for any reason whatsoever. Buyer expressly does not, and should not be deemed to, assume under this instrument any liabilities, obligations, or commitments of any Seller.

**4.  Miscellaneous**.  This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.  This Assignment is subject in all respects to the terms of the Purchase Agreement and all of the representations and warranties, covenants and agreements contained in the Purchase Agreement, all of which shall survive the execution and delivery of this Assignment in accordance with the terms of the Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, diminish, enlarge or modify any provision or any of the obligations, agreements, covenants, or representations and warranties of any of the parties to the Purchase Agreement as contained in the Purchase Agreement. If any conflict exists between the terms of this Assignment and the Purchase Agreement, then the terms of the Purchase Agreement shall govern and control. This Assignment may be executed in one or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument. The signature of any party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof. In the event that any signature to this Assignment is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file or similar electronic transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" or electronic signature were an original thereof. Once signed, this Assignment may be delivered by facsimile or ".pdf" format and any reproduction of this Assignment made by reliable means (e.g., portable document format) shall be considered an original.

**5.  Entire Agreement**. This Assignment, the Purchase Agreement and the other Related Agreements contain the entire agreement of the parties with regard to the matters set forth herein.

**[SIGNATURE PAGES TO FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or have caused this Agreement to be executed by their duly authorized representatives.

**ASSIGNEE:**

LPQ USA, LLC

By: _____
Name: _____
Title: _____

**ASSIGNORS:**

33RD STREET BAKERY, INC.
FLORENCE BAKERY, INC.
LPQ 14TH & K STREET, INC.
LPQ 205 BLEECKER, INC.
LPQ 85 BROAD, INC.
LPQ AVENTURA, INC.
LPQ CABIN JOHN, INC.
LPQ CLAREMONT, INC.
LPQ COCONUT GROVE, INC.
LPQ GARDEN CITY, INC.
LPQ KING & HUDSON, INC.
LPQ N. WELLS ST, INC.
LPQ NAPERVILLE, INC.
LPQ NORTH MICHIGAN, INC.
LPQ PASADENA, INC.
LPQ RESTON, INC.
LPQ SAILBOAT POND, INC.
LPQ SOUTH END AVE, INC.
LPQ SOUTH GAYLEY, INC.
LPQ SOUTH LASALLE, INC.
LPQ TOLUCA LAKE, INC.
LPQ WEST 55TH & 8TH ST, INC.
LPQ WOODBURY, INC.
PQ 17TH STREET, INC.
PQ 44TH & MADISON, INC.
PQ 44TH STREET, INC.
PQ 53RD STREET, INC.
PQ 550 HUDSON, INC.
PQ 55TH & 1ST, INC.
PQ 6TH & OLIVE, INC.
PQ 6TH AVE., INC.

**[SIGNATURE PAGE TO DOMAIN NAME ASSIGNMENT]**

PQ 8TH & WALNUT, INC.
PQ 8TH STREET, INC.
PQ 933 BROADWAY, INC.
PQ 97TH STREET, INC.
PQ ALEXANDRIA, INC.
PQ AMERICANA, INC.
PQ BAKERY, LLC
PQ BATTERY PARK, INC.
PQ BETHESDA, INC.
PQ BEVERLY HILLS, INC.
PQ BLAINE MANSION, INC.
PQ BLEECKER, INC.
PQ BRENTWOOD, INC.
PQ BRYANT PARK, INC.
PQ CALABASAS, INC.
PQ CAPITOL HILL, INC.
PQ CARNEGIE HILL, INC.
PQ CARROLL SQUARE, INC.
PQ CENTRAL PARK, INC.
PQ CHELSEA, INC.
PQ CHEVY CHASE, INC.
PQ CLARENDON, INC.
PQ CULVER PLAZA, INC.
PQ EAST 65TH ST, INC.
PQ EAST 77TH, INC.
PQ EAST 83RD ST, INC.
PQ ENCINO BAKERY, INC.
PQ FIRST INC.
PQ FRENCH MARKET, INC.
PQ GEORGETOWN, INC.
PQ GOLD COAST, INC.
PQ GRANARY, INC.
PQ GREENWICH, INC.
PQ HARBOR POINT, INC.
PQ LARCHMONT, INC.
PQ LEXINGTON, INC
PQ LINCOLN PARK, INC.
PQ LINCOLN SQUARE, INC.
PQ MANHATTAN BEACH, INC.
PQ MEATPACKING DISTRICT, INC.
PQ MELROSE, INC.
PQ MERRIFIELD, INC.
PQ MINERAL SPRINGS, INC.
PQ MONTAGUE, INC.
PQ MT. VERNON, INC.
PQ NEW CANAAN, INC.

[SIGNATURE PAGE TO DOMAIN NAME ASSIGNMENT]

PQ NEW YORK, INC.
PQ NEWPORT BEACH BAKERY, INC.
PQ OPERATIONS, INC.
PQ PARK & 33RD, INC.
PQ PARK SLOPE, INC.
PQ ROBERTSON, INC.
PQ RYE, INC.
PQ SAN VICENTE, INC.
PQ SANTA MONICA, INC.
PQ SOHO, LLC
PQ SPRING VALLEY, INC.
PQ STUDIO CITY, INC.
PQ THE VILLAGE AT TOPANGA, INC.
PQ TRIBECA, INC.
PQ TYSONS CORNER, INC.
PQ UN, INC.
PQ UNION SQUARE, INC.
PQ UNION STATION, INC.
PQ UPPER WEST, INC.
PQ VILLA MARINA, INC.
PQ WALNUT STREET, INC.
PQ WAYNE, INC.
PQ WEST 72ND, INC.
PQ WEST 84TH, INC.
PQ WESTLAKE, INC.
PQ WILDWOOD, INC.
TUXEDO BAKERY, INC.
WALNUT ST. BAKERY, INC.


By: _____
Name: _____
Title: _____
    of each of the foregoing

[SIGNATURE PAGE TO DOMAIN NAME ASSIGNMENT]

**Schedule 1:**

**Domain Names**

| Domain Name | Registrar | Renewal Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**EXHIBIT G**

**DIP BUDGET**

(*see* attached)

**PQNY Cash Budget**

| Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
|---|---|---|---|---|---|---|---|---|---|
| Period Ending | | 5/31/2020 | 6/7/2020 | 6/14/2020 | 6/21/2020 | 6/28/2020 | 7/5/2020 | 7/12/2020 | Total |
| *in $ 000's* | | | | | | | | | |
| **Receipts** | a | - | - | - | - | - | - | - | - |
| | | | | | | | | | |
| **Disbursements** | | | | | | | | | |
| Store Payroll | b | - | - | - | - | - | - | - | - |
| Non-Store Payroll | c | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (140) |
| **Total Labor** | | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (140) |
| | | | | | | | | | |
| Occupancy | d | - | (32) | - | - | | - | - | (32) |
| Suppliers | e | - | - | - | - | - | - | - | - |
| Other vendor payments | f | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (35) |
| Sales Taxes | g | (33) | - | - | - | - | - | | (33) |
| IT | h | - | (30) | - | - | - | (30) | - | (60) |
| Insurance | j | (210) | - | - | - | - | - | - | (210) |
| Bank Fees | k | - | - | (15) | - | - | - | (15) | (30) |
| **Operating Disbursements** | | (248) | (35) | (20) | (5) | (5) | (35) | (20) | (400) |
| | | | | | | | | | |
| **Net Cash from Operations** | | (268) | (55) | (40) | (25) | (25) | (55) | (40) | (508) |
| | | | | | | | | | |
| **Restructuring Expenses** | | | | | | | | | |
| Board Fees | | (2) | (18) | - | - | | (18) | - | (38) |
| RLF | l | (85) | (85) | (85) | (85) | (85) | (85) | (85) | (595) |
| PwC | l | (70) | (70) | (70) | (70) | (70) | (65) | (60) | (475) |
| SSG | l | - | (30) | - | - | (200) | - | | (230) |
| Claims Agent | l | (20) | (20) | (20) | (20) | (20) | (20) | (15) | (135) |
| UST fees | | - | - | - | - | - | (125) | (50) | (175) |
| UCC professional fees | l | - | - | (25) | (25) | (25) | (25) | (25) | (125) |
| **Total Restructuring Expenses** | | (177) | (223) | (200) | (200) | (400) | (338) | (235) | (1,773) |
| | | | | | | | | | |
| **Net Cash Flow** | | (445) | (278) | (240) | (225) | (425) | (393) | (275) | (2,313) |
| | | | | | | | | | |
| Beginning Cash Balance | | 30 | 335 | 457 | 567 | 842 | 895 | 502 | 30 |
| DIP Draw | | 750 | 400 | 350 | 500 | 478 | - | - | 2,478 |
| **Ending Cash Balance** | | 335 | 457 | 567 | 842 | 895 | 502 | 227 | 195 |
| | | | | | | | | | |
| **DIP Loan Rollforward** | | | | | | | | | |
| Beginning Balance | | 522 | 1,272 | 1,672 | 2,022 | 2,522 | 3,000 | 3,000 | 522 |
| DIP Draw | | 750 | 400 | 350 | 500 | 478 | - | - | 2,478 |
| **Ending Balance** | | 1,272 | 1,672 | 2,022 | 2,522 | 3,000 | 3,000 | 3,000 | 3,000 |

a  Assumes no collection of cash receipts during this period.

b  Assumes no store operations during this period.

c  Assumes current 6-8 G&A headcount remain as independent contractors only during this period.

d  Assumes all payment of post petition rent / utilities / commercial real estate taxes and other store level related expenses are to be paid by the Buyer pursuant to the APA.  A utility deposit in the amount of $32k
   will be posted pursuant to the utility motion.  This deposit is not an acquired asset in the Aurify APA, and any unapplied funds will be available for creditors.

e  Estimated PACA/PASA payments have already been made.  Assumes no payment of additional vendor costs (pre or post petition) during this period.

f  Estimate of miscellaneous weekly expenditures.

g  Represents payment of unpaid sales taxes. Timing of payment uncertain due to payment method delays due to COVID-19.

h  Represents monthly IT costs to facilitate remote general ledger and VPN access.

j  Represents funding estimate for monthly premium payments.

k  Represents monthly bank charges.

l  Represent amounts funded on a weekly basis into the professional fee escrow account approved by financing orders setting forth the extent of each professional's maximum recovery from the escrow account.