## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| PQ New York, Inc., *et al.* [1] | Case No. 20-11266-JTD |
| Debtors. | (Jointly Administered) |

## SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF PQ NEW YORK, INC. AND AFFILIATED DEBTORS DATED SEPTEMBER 18, 2020

| | |
|---|---|
| Mark D. Collins (No. 2981) | Jeffrey R. Waxman (No. 4159) |
| Michael J. Merchant (No. 3854) | Eric J. Monzo (No. 5214) |
| Jason M. Madron (No. 4431) | Brya M. Keilson (No. 4643) |
| Brendan J. Schlauch (No. 6115) | Morris James LLP |
| RICHARDS, LAYTON & FINGER, P.A. | 500 Delaware Avenue, Suite 1500 |
| One Rodney Square | Wilmington, DE 19801 |
| 920 North King Street | Telephone: (302) 651-7700 |
| Wilmington, Delaware 19801 | Email: jwaxman@morrisjames.com |
| Telephone: (302) 651-7700 | Email: emonzo@morrisjames.com |
| Email: collins@rlf.com | Email: bkeilson@morrisjames.com |
| Email: merchant@rlf.com | |
| Email: madron@rlf.com | -and- |
| Email: schlauch@rlf.com | |
| | Robert J. Gayda, Esquire |
| Counsel to the Debtors | Catherine V. LoTempio, Esquire |
| and Debtors in Possession | Seward & Kissel LLP |
| | One Battery Park Plaza |
| | New York, NY 10004 |
| | Telephone: 212-574-1200 |
| | Email: gayda@sewkis.com |
| | Email: lotempio@sewkis.com |
| | |
| | Counsel to the Official Committee of Unsecured Creditors |

---

[1] The last four digits of PQ New York, Inc.'s federal tax identification number are 1022. The mailing address for the debtors is PQ New York, Inc., c/o 33rd Street Bakery, Inc., 43-27 33rd Street, Long Island City, New York 11101. Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at www.donlinrecano.com/pqny.

# TABLE OF CONTENTS

INTRODUCTION....................................................................................................2

**ARTICLE I. DEFINITION AND CONSTRUCTION OF TERMS** ........................2

**ARTICLE II. BACKGROUND** ..........................................................................16

    **2.01   GENERAL BACKGROUND** ................................................16

    **2.02   THE CHAPTER 11 CASES** ..............................................21

**ARTICLE III. CONFIRMATION PROCEDURES** ............................................24

    **3.01   CONFIRMATION PROCEDURES** ...................................24

    **3.02   PROCEDURE FOR OBJECTIONS** .................................25

    **3.03   REQUIREMENTS FOR CONFIRMATION**.......................25

    **3.04   CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**...................25

    **3.05   IMPAIRED CLAIMS OR EQUITY INTERESTS**...........................26

    **3.06   CONFIRMATION WITHOUT NECESSARY ACCEPTANCES; CRAMDOWN** ..............................................27

    **3.07   FEASIBILITY**.......................................................28

    **3.08   BEST INTERESTS TEST AND LIQUIDATION ANALYSIS** ......................28

    **3.09   ACCEPTANCE OF THE PLAN** .......................................29

**ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES** ...........................30

    **4.01   OVERVIEW OF CLASSIFICATION.** ..............................30

    **4.02   IDENTIFICATION AND TREATMENT OF UNCLASSIFIED CLAIMS** ..30

    **4.03   IDENTIFICATION OF CLASSES OF CLAIMS** ...........................32

    **4.04   TREATMENT OF CLASSIFIED CLASSES, RIGHTS TO VOTE, AND ESTIMATED DISTRIBUTIONS**...........................33

    **4.05   ELIMINATION OF CLASSES FOR VOTING PURPOSES** .......................37

    **4.06   CONTROVERSY CONCERNING CLASSIFICATION, IMPAIRMENT OR VOTING RIGHTS**...........................37

**4.07**   **INSURANCE** ...................................................................................37

**ARTICLE V. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ............................................................................................37

**5.01**   **THE PLAN MAY NOT BE ACCEPTED.** ...........................................38

**5.02**   **THE PLAN MAY NOT BE CONFIRMED.** .........................................38

**5.03**   **DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE INCONSISTENT WITH PROJECTIONS.** ...........................38

**5.04**   **OBJECTIONS TO CLASSIFICATION OF CLAIMS.** ....................................38

**5.05**   **FAILURE TO CONSUMMATE THE PLAN.** ......................................39

**5.06**   **ALLOWANCE OF CLAIMS MAY SUBSTANTIALLY DILUTE THE RECOVERY TO HOLDERS OF CLAIMS UNDER THE PLAN.** ................39

**5.07**   **PLAN RELEASES MAY NOT BE APPROVED.** ...............................40

**5.08**   **CERTAIN TAX CONSIDERATIONS.** ................................................40

**ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN** ...................40

**6.01**   **CONTINUED CORPORATE EXISTENCE** ......................................40

**6.02**   **EQUITY** ................................................................................................40

**6.03**   **CAUSES OF ACTION** ........................................................................41

**6.04**   **RELEASE OF LIENS** ..........................................................................41

**6.05**   **VESTING AND SALE OR OTHER DISPOSITION OF ASSETS; REPRESENTATIVE OF THE ESTATE** ..............................................41

**6.06**   **EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS** .............42

**6.07**   **DEEMED SUBSTANTIVE CONSOLIDATION** ...............................42

**6.08**   **RECORDS** ............................................................................................42

**6.09**   **INSURANCE POLICIES** ....................................................................43

**6.10**   **DISSOLUTION OF** CREDITORS' **COMMITTEE** .........................44

**6.11**   **TRANSFER OF PRIVILEGE/NO WAIVER** .....................................44

**6.12**   **TERMINATION OF THE CLAIMS AGENT** .....................................44

**6.13    CLOSING OF CASES OTHER THAN PQ NEW YORK, INC.** ....................44

**6.14    FINAL DECREE** ................................................................45

**ARTICLE VII. EXECUTORY CONTRACTS** ...........................................45

**7.01    ASSUMPTION OF EXECUTORY CONTRACT(S)** ......................................45

**7.02    REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................................45

**7.03    BAR DATE FOR REJECTION DAMAGES** ...................................45

**7.04    PRE-EXISTING OBLIGATIONS TO THE DEBTORS UNDER EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........................46

**ARTICLE VIII. PROVISIONS GOVERNING RESOLUTION OF  CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN** ...........................46

**8.01    CLAIM OBJECTIONS** ..............................................................46

**8.02    DISTRIBUTION PROVISIONS** ......................................................47

**ARTICLE IX. DISCHARGE; RELEASES, INJUNCTION, AND RELATED PROVISIONS** ................................................................49

**9.01    RELEASES BY DEBTORS** ..........................................................49

**9.02    RELEASES BY THIRD PARTIES** ....................................................50

**9.03    EXCULPATION AND LIMITATION OF LIABILITY** ...............................50

**9.04    INJUNCTION** ....................................................................51

**9.05    LIMITED INJUNCTION** ...........................................................52

**ARTICLE X. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE** .............52

**10.01    CONDITIONS PRECEDENT TO CONFIRMATION** ...................................52

**10.02    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** .........................53

**10.03    WAIVER OF CONDITIONS** ........................................................53

**10.04    EFFECT OF FAILURE OF CONDITIONS** .........................................53

**10.05    FILING OF NOTICE OF THE EFFECTIVE DATE.** ...............................53

**ARTICLE XI. MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN** .........54

12062459

**11.01  MODIFICATION AND AMENDMENTS** ........................................................54

**11.02  EFFECT OF CONFIRMATION ON MODIFICATIONS** ...........................54

**11.03  REVOCATION OR WITHDRAWAL OF THE PLAN**................................54

**ARTICLE XII. JURISDICTION** ........................................................................................55

**12.01  BANKRUPTCY COURT JURISDICTION** ........................................55

**12.02  LIMITATION ON JURISDICTION** ..................................................56

**ARTICLE XIII. MISCELLANEOUS**................................................................................57

**13.01  EXEMPTION FROM TAXES** ............................................................57

**13.02  COMPLIANCE WITH TAX REQUIREMENTS** ...........................57

**13.03  DEFENSES AND SETOFF**................................................................58

**13.04  GOVERNING LAW** ..........................................................................58

**13.05  SUCCESSORS AND ASSIGNS** ......................................................58

**13.06  TRANSFER OF CLAIMS AND EQUITY INTERESTS** ...............58

**13.07  POST-EFFECTIVE DATE SERVICE LIST**....................................58

**13.08  NOTICES**............................................................................................59

**13.09  IMMEDIATE BINDING EFFECT**....................................................60

**13.10  SEVERABILITY OF PLAN PROVISIONS** ...................................60

**13.11  EXHIBITS** ..........................................................................................60

**13.12  VOTES SOLICITED IN GOOD FAITH** .........................................60

**13.13  CONFLICTS** ......................................................................................61

**13.14  U.S. TRUSTEE FEES**.......................................................................61

**13.15  IMPLEMENTATION** ........................................................................61

**13.16  NO ADMISSIONS** ............................................................................61

## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES

SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE V OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") together with the official committee of unsecured creditors (the "Creditors' Committee," and together with the Debtors, the "Plan Proponents"), hereby jointly propose this Combined Plan and Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code.

This Combined Plan and Disclosure Statement contemplates the establishment of a liquidating trust by and through which the Liquidating Trustee will marshal the remaining assets of the Debtors' estates, including the proceeds from the sale of substantially all of the assets which was approved by the Bankruptcy Court on June 29, 2020 and consummated on June 30, 2020, review the Claims, and make Distributions from the remaining assets of the estates to Holders of Allowed Claims and Allowed Equity Interests, as set forth herein and consistent with the priority of claim provisions of the Bankruptcy Code.

This Combined Disclosure Statement and Plan contains, among other things, (i) a discussion of the Debtors' history and businesses, (ii) a summary of the events leading to these Chapter 11 Cases, (iii) the Chapter 11 Cases, (iv) risk factors, (v) a summary and analysis of this Plan, and (vi) certain other related matters.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## ARTICLE I.

## DEFINITION AND CONSTRUCTION OF TERMS

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (i) any capitalized term used in this Combined Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (ii) whenever the context requires, each term stated in either the singular or the plural shall include the

12062459

singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter, (iii) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (iv) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (v) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (vi) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (vii) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (viii) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

As used in the Plan, the following terms have the following meanings:

1.1.    "**503(b)(9) Claims**" shall mean Claims arising under section 503(b)(9) of the Bankruptcy Code against one or more of the Debtors that were to be Filed against one or more of the Debtors on or before the General Bar Date.

1.2.    "**Administrative Claim**" shall mean any right to payment constituting a cost or expense of administration of the Chapter 11 Case as it relates to one of the Debtors under section 503(b) and 507(a)(2) of the Bankruptcy Code including, any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred by the Debtors after the Petition Date in connection with the conduct of its business, all compensation and reimbursement of expenses awarded or otherwise approved for payment by Final Order of the Bankruptcy Court under section 330, 503(b) or 1129(a)(4) of the Bankruptcy Code, any fees or charges assessed against the Debtors' Estates under section 1930 of chapter 123 of title 28 of the United States Code, all wages, salaries and health and other benefits on account of services rendered after the Petition Date, all post-Petition Date taxes, and all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date to the Effective Date but not beyond.

1.3.    "**Allowance Date**" means the date that a Claim or Equity Interest becomes Allowed.

1.4.    "**Allowed**" shall mean all or a portion of a Claim against one of the Debtors or an Interest in the Debtors (a) that has been listed by one of the Debtors in its Schedules as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Claim or proof of Interest has been Filed, (b) as to which no Objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any Objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and one or more of the Debtors prior to the Effective Date, or the Liquidating Trustee on behalf of the Debtors Estates after the Effective Date or (iii) pursuant to the

terms of this Plan. For purposes of computing Distributions under this Plan, a Claim or Interest that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim or Interest from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in this Plan. For the avoidance of doubt, any Claim that relates to obligations that were assumed by the Purchaser pursuant to the Purchase Agreement shall not be an Allowed Claim for purposes of this Plan.

1.5.    "**Asset Purchase Agreement**" or "**APA**" shall mean that certain asset purchase agreement by and between the Debtors and the Purchaser dated as of May 26, 2020, including all schedules and exhibits thereto.

1.6.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and their Estates within the meaning of section 541 of the Bankruptcy Code.

1.7.    "**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to this Chapter 11 Case.

1.8.    "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

1.9.    "**Bankruptcy Rules**" shall mean, when referenced generally, (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedures for the United States Bankruptcy Court for the District of Delaware, and (iv) any standing orders governing practice and procedure issues by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 case or proceedings therein, as the case may be; provided, however, when a specific Bankruptcy Rule is referenced (*e.g.,* Bankruptcy Rule 9019), such reference shall be to such Rule under the Federal Rules of Bankruptcy Procedure.

1.10.    "**Bar Date**" shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing proofs of Claim or proofs of Interest against one or more of the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

1.11.    "**Bar Date Order**" shall mean the Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof entered by the Bankruptcy Court on July 23, 2020 [D.I. 486].

1.12.    "**Business Day**" shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

1.13.    "**Cash**" or "**$**" shall mean legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and cash equivalents. (o) "Causes of Action" shall mean all Claims, causes of action controversies, obligations, suits, judgments, damages,

demands, debts, rights, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code and other similar state law claims and causes of action, liens, indemnities, guaranties, suits, liabilities, judgments, accounts, defenses, offsets, powers, privileges, licenses and franchises of any kind or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, arising in law, equity or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.14.    "**Cause of Action**" shall mean any and all actions, suits, claims for relief, causes of action, including claims arising under chapter 5 of the Bankruptcy Code, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date.

1.15.    "**Chapter 11 Cases**" shall mean the Debtors' chapter 11 cases, which are jointly administered under Case No. 20-11266 (JTD) in the Bankruptcy Court.

1.16.    "**Claim**" or "**Claims**" shall mean a claim or claims against one or more of the Debtors, as such term is defined in section 101(5) of the Bankruptcy Code.

1.17.    "**Claims Agent**" shall mean Donlin, Recano & Company, Inc. or any successor appointed by the Bankruptcy Court.

1.18.    "**Claims Objection Deadline**" shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, *provided however*, that the Liquidating Trustee may file one or more motions with the Bankruptcy Court on notice and an opportunity for a hearing to extend such deadline from time to time.

1.19.    "**Class**" shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article IV of this Plan.

1.20.    "**Combined Disclosure Statement and Plan**" shall mean this entire document and all exhibits, schedules and related documents, whether annexed hereto or Filed in connection herewith, including the Disclosure Statement portions and the Plan portions, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

1.21.    "**Committee Account**" shall mean the a segregated account held by counsel to the Creditors' Committee which to hold the proceeds  of the settlement agreement between the Debtors,

the Creditors' Committee and the Purchaser, a copy of which is attached as an Exhibit A to the Sale Order.

1.22.    "**Confirmation Date**" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

1.23.    "**Confirmation Hearing**" shall mean the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.24.    "**Confirmation Order**" shall mean the order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

1.25.    "**Consummation**" shall mean the occurrence of the Effective Date.

1.26.    "**Contingent**" shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

1.27.    "**Convenience Claim**" means any Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date, where the total amount of the Claim is equal to or less than $2,500, and that is not: (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, or (v) an Intercompany Claim.

1.28.    "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

1.29.    "**Creditors' Committee**" shall mean the official committee of unsecured creditors appointed by the U.S. Trustee.

1.30.    "**Disclosure Statement**" shall mean this entire document and all exhibits, schedules and related documents, whether annexed hereto or Filed in connection herewith, including the Disclosure Statement portions and the Plan portions, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules

1.31.    "**D&O Insurance Policies**" means all insurance policies issued to or providing coverage at any time to any of the Debtors for defense or coverage of liability or alleged liability of any current, future or former directors, managers, officers, and members and all agreements, documents or instruments relating thereto.

1.32.    "**Debtors**" shall mean PQ New York, Inc., PQ Meatpacking District, Inc., 33rd Street Bakery, Inc., PQ Melrose, Inc., Florence Bakery, Inc., PQ 97th Street, Inc., PQ Merrifield, Inc., LPQ 14th & K Street, Inc., PQ Mineral Springs, Inc., LPQ 205 Bleecker, Inc., PQ Alexandria, Inc.    , PQ Montague, Inc., LPQ 85 Broad, Inc., PQ Mt. Vernon, Inc., PQ Americana, Inc., LPQ Aventura, Inc., PQ New Canaan, Inc., LPQ Cabin John, Inc., PQ Bakery, LLC, LPQ Claremont,

12062459

Inc., PQ Newport Beach Bakery, Inc., LPQ Coconut Grove, Inc., PQ Operations, Inc., PQ Battery Park, Inc., LPQ Garden City, Inc., PQ Park & 33rd, Inc., PQ Bethesda, Inc., LPQ King & Hudson, Inc., PQ Park Slope, Inc., LPQ N. Wells St, Inc., PQ Beverly Hills, Inc., PQ Robertson, Inc., LPQ Naperville, Inc. LPQ North Michigan, Inc., PQ Rye, Inc., PQ Blaine Mansion, Inc., LPQ Pasadena, Inc., PQ San Vicente, Inc., LPQ Reston, Inc., PQ Bleecker, Inc., LPQ Sailboat Pond, Inc., PQ Brentwood, Inc., LPQ South End Ave, Inc., PQ Santa Monica, Inc., LPQ South Gayley, Inc., PQ Bryant Park, Inc., PQ Soho, LLC, PQ Calabasas, Inc., PQ Spring Valley, Inc., LPQ South Lasalle, Inc., LPQ Toluca Lake, Inc., PQ Studio City, Inc., LPQ West 55th & 8th St, Inc., PQ Capitol Hill, Inc., LPQ Woodbury, Inc., PQ 17th Street, Inc., PQ Carnegie Hill, Inc., PQ The Village at Topanga, Inc., PQ 44th & Madison, Inc., PQ Tribeca, Inc., PQ Carroll Square, Inc., PQ 44th Street, Inc., PQ Tysons Corner, Inc., PQ Central Park, Inc., PQ UN, Inc., PQ 53rd Street, Inc., PQ Chelsea, Inc., PQ 550 Hudson, Inc., PQ Union Square, Inc., PQ Chevy Chase, Inc., PQ 55th & 1st, Inc., PQ Union Station, Inc., PQ 6th & Olive, Inc., PQ Clarendon, Inc., PQ Upper West, Inc., PQ Culver Plaza, Inc.. PQ 6th Ave., Inc., PQ Villa Marina, Inc., PQ East 65th St, Inc., PQ Walnut Street, Inc., PQ 8th & Walnut, Inc., PQ East 77th, Inc., PQ Wayne, Inc., PQ 8th Street, Inc., PQ East 83rd St, Inc., PQ West 72nd, Inc., PQ 933 Broadway, Inc., PQ West 84th, Inc., PQ Encino Bakery, Inc., PQ Westlake, Inc., PQ First Inc., PQ Wildwood, Inc., PQ French Market, Inc., PQ Georgetown Inc., Tuxedo Bakery, Inc., PQ Gold Coast, Inc., Walnut St. Bakery, Inc., PQ Granary, Inc., PQ Greenwich, Inc., PQ Harbor Point, Inc., PQ Larchmont, Inc., PQ Lexington, Inc., PQ Lincoln Park, Inc., PQ Lincoln Square, Inc., and PQ Manhattan Beach, Inc.

1.33.    "**DIP Credit Agreement**" the underlying secured credit agreement between the Debtors and the Purchaser approved by the Bankruptcy Court on an interim basis on May 28, 2020 [D.I. 42], and on a final basis on June 27, 2020 [D.I. 436].

1.34.    "**DIP Motion**" shall mean the Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Obtain Postpetition Secured Financing, Modifying the Automatic Stay and Granting Related Relief filed on the Petition Date at D.I. 9.

1.35.    "**Disallowed**" shall mean with respect to any Claim or Interest or portion thereof, any Claim against or Interest in one or more of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the Debtors or the Reorganized Debtor, whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, Contingent or unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (vi) is evidenced by a proof of Claim or a proof of Interest which has been File, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (viii) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such

7

Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim or a Disallowed Interest is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

1.36.    "**Disallowed Claim**" shall mean a Claim, or any portion thereof, that is Disallowed.

1.37.    "**Disallowed Interest**" shall mean an Interest, or any portion thereof, that is Disallowed.

1.38.    "**Disbursing Agent**" shall mean the Liquidating Trustee or any third party designated by the Liquidating Trustee to act as Disbursing Agent.

1.39.    "**Disclosure Statement**" shall mean the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

1.40.    "**Disputed**" shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of this Plan.

1.41.    "**Disputed Administrative Claim, Priority Tax Claim, Priority Non-Tax Claims and Secured Claims Reserves**" shall mean the reserves established pursuant to Section 8.02 of this Plan, which reserve shall contain amounts relating to Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.

1.42.    "**Distribution**" shall mean any distribution made pursuant to the Plan by the Liquidating Trustee or another Entity acting as the Disbursing Agent, to the Holders of Allowed Claims.

1.43.    "**Distribution Date**" shall mean the date on which a Distribution is made pursuant to this Plan.

1.44.    "**Distribution Record Date**" shall mean the date established for determining the Holders of Allows Claims or Allowed Interests entitled to Distributions pursuant to the Plan, which shall be the Confirmation Date.

1.45.    "**Effective Date**" shall mean the first Business Day after the later of the date on which (a) all conditions in Article X of this Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

1.46.    "**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.47.    "**Estate**" or "**Estates**" shall mean one or more estate of the Debtors created pursuant to section 541 of the Bankruptcy Code.

1.48.    "**Exculpated Parties**" shall mean as of the Petition Date through the date of the closing of the Chapter 11 Cases (and in the event that the Chapter 11 Cases are closed and

12062459

subsequently reopened, during such time as the Chapter 11 Cases are reopened): (i) the Debtors, (ii) the Debtors' directors and officers, (iii) the Creditors' Committee, (iv) the Liquidating Trustee, and (v) in the case of (i) – (iv), each of their respective Representatives, and in the case of the Creditors' Committee, each of its members (each solely in such capacity); *provided, however,* that with respect to any Person identified herein, such Person shall be considered an Exculpated Party solely to the extent that such Person participated in actions to which section 1125(e) of the Bankruptcy Code applies.

1.49.   "**Executory Contract**" shall mean a contract or lease to which one of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.50.   "**File**," "**Filed**," or "**Filing**" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case; provided, however, that with respect to proofs of Claim and proofs of Interest only, "Filed" shall mean delivered and received in the manner provided by the Bar Date Order or as otherwise established by order of the Bankruptcy Court.

1.51.   "**Final Administrative Claim Bar Date**" means the date that is 30 days after the Effective Date, which shall be the deadline for Filing requests for payment of Administrative Claims that arose after the Petition Date, which does not include Claims arising under Section 503(b)(9) of the Bankruptcy Code or Professional Fee Claims.

1.52.   "**Final Order**" shall mean an unstayed order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or the Liquidating Trustee on behalf of the Estates (on or after the Effective Date), or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under rule 59 or rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

1.53.   "**General Bar Date**" shall mean August 24, 2020 at 5:00 p.m. (Prevailing Eastern Time) for certain Claims arising before the Petition Date, including 503(b)(9) Claims, Secured Claims, General Unsecured Claims, or Priority Non-Tax Claims as established by the Bar Date Order.

1.54.   "**General Unsecured Claim**" shall mean any unsecured Claim against the Debtors that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not: (i) an Administrative Expense Claim, (ii) a Priority

Tax Claim, (iii) a Secured Claim, (iv) a Priority Non-Tax Claim, (v) a Convenience Claim, or (vi) an Intercompany Claim.

1.55.   "**General Unsecured Claim Distribution Fund**" shall mean Cash available for distribution to the Holders of Allowed General Unsecured Claims as determined by the Liquidating Trustee from time to time in accordance with Article VIII of this Plan. At any given point of measurement after the Effective Date, the General Unsecured Claim Distribution Fund shall be the amount of undistributed Cash held by the Liquidating Trust that is not required for (a) the payment of Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims; and (b) the establishment and funding of the Reserves (including any reserves for Disputed Claims and the Liquidating Trust Expense Reserve) in accordance with Section 8.02 of this Plan.

1.56.   "**Governmental Unit**" shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.57.   "**Governmental Unit Bar Date**" shall mean November 23, 2020 at 5:00 p.m. (Prevailing Eastern Time) as established by the Bar Date Order.

1.58.   "**Holder**" or "**Holders**" shall mean the legal or beneficial Holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

1.59.   "**Impaired**" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.60.   "**Impaired Class**" shall mean a Class of Claims or Interests that is Impaired.

1.61.   "**Insider**" shall have the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

1.62.   "**Insurance Policies**" means all insurance policies, including D&O Insurance Policies that have been issued  or provide coverage at any time to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

1.63.   "**Insurer**" means any company or other entity that issued or entered into an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors, successors and/or affiliates of any of the foregoing.

1.64.   "**Intercompany Claim**" shall mean (i) any account reflecting intercompany book entries by one Debtor with respect to another Debtor, or (ii) any Claim that is not reflected in such book entries and is held by a Debtor against the other Debtor, in each case accruing before or after the Petition Date through the Effective Date, including, but not limited to, any Claim for reimbursement, payment as guarantor or surety, or any Claim for contribution or expenses that were allocable between the one or more of the Debtors.

1.65.   "**Interests**" shall mean the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person in the Debtors including all

12062459

capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtor's stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

1.66. "**IRS**" shall mean the Internal Revenue Service.

1.67. "**Liquidating Trust**" shall mean means the trust established under the Plan and the Liquidating Trust Agreement.

1.68. "**Liquidating Trustee**" shall mean the Person appointed pursuant this Plan to serve as the trustee of the Liquidating Trust for the purposes of, among other things, liquidating the Estates' remaining assets, carry out the administration of the Reorganized Debtor and its Estate and to otherwise implement the Plan following the Effective Date. The Liquidating Trustee shall be selected by the Creditors' Committee with the consent of the Debtors, such consent not to be unreasonably withheld.

1.69. "**Liquidating Trust Agreement**" means the trust agreement that establishes the Liquidating Trust and governs the powers, duties, and responsibilities of the Liquidating Trustee. The Liquidating Trust Agreement shall be part of the Plan Supplement.

1.70. "**Liquidating Trust Expenses**" shall mean the reasonable fees, costs and expenses of the Liquidating Trusts' retained professionals, as determined in the reasonable discretion of the Liquidating Trustee. For the avoidance of doubt, U.S. Trustee Fees shall be considered a Trust Expense.

1.71. "**Liquidating Trust Expense Reserve**" shall mean the reserve established pursuant to Section 8.02 of this Plan for payment of (i) the actual and projected costs and expenses of the Liquidating Trust and (ii) actual and projected Liquidating Trust Expenses, which may be replenished or adjusted from time to time for Cash held by the Liquidating Trust, other than funds in the other Reserves.

1.72. "**Local Rules**" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.73. "**Objection(s)**" shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

1.74. "**Ordinary Course Liabilities**" shall mean those obligations incurred in the ordinary course of business by one or more of the Debtors after the Petition Date.

12062459

1.75. "**Person**" shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.76. "**Petition Date**" shall mean May 27, 2020, the date on which the Debtors commenced the Chapter 11 Case in the Bankruptcy Court.

1.77. "**Plan**" shall mean this entire document and all exhibits, schedules and related documents, whether annexed hereto or Filed in connection herewith, including the Disclosure Statement portions and the Plan portions, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

1.78. "**Plan Proponents**" shall mean the Debtors and the Creditors' Committee.

1.79. "**Plan Supplement**" shall mean the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, which shall be in form and substance acceptable to the Plan Proponents, and which shall be Filed in the Chapter 11 Cases, and notice of which shall be served in accordance with the Solicitation Procedures Order, no later than the earlier of seven (7) days prior to (i) the Voting Deadline or (ii) the deadline to object to confirmation of the Plan, or such later date as may be approved by the Bankruptcy Court, as may be amended or supplemented by additional documents Filed in the Chapter 11 Case prior to the Effective Date as amendments to the Plan Supplement.

1.80. "**Preserved Cause of Action**" means those Causes of Action of one or more of the Estates that were not transferred to the Purchaser as part of the Sale pursuant to the Asset Purchase Agreement and the Sale Order.

1.81. "**Priority Non-Tax Claim**" shall mean any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

1.82. "**Priority Tax Claim**" shall mean a Claim or a portion of a Claim for which priority is asserted under section 507(a)(8) of the Bankruptcy Code.

1.83. "**Pro Rata**" shall mean the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

1.84. "**Professional**" shall mean any professional employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328 or 1103, or for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.85. "**Professional Fee Bar Date**" shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be thirty (30) days after the Effective Date.

12062459

1.86.    "**Professional Fee Claims**" shall mean a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and on or before the Effective Date.

1.87.    "**Purchaser**" means LPQ USA, LLC.

1.88.    "**Reorganized Debtor**" shall mean the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.89.    "**Rejection Claim**" shall mean any Claim for amounts due as a result of the rejection by one of the Debtors of any Executory Contract under section 365 of the Bankruptcy Code.

1.90.    "**Rejection Damages Bar Date**" shall mean the deadline by which a counterparty to an Executory Contract of the Debtor rejected under this Plan must File a proof of Claim for damages arising from such rejection, and shall be the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, or (b) 5:00 p.m. (prevailing Eastern time) on the date that is 30 days following service of an order approving rejection of any executory contract or unexpired lease of one of the Debtors.

1.91.    "**Released Causes of Action**" shall mean those causes of action of the Estates that were released pursuant to the Sale Order.

1.92.    "**Released Party**" shall mean each of the following in their respective capacity as such: (a) the Debtors (including the Debtors in their capacity as the Reorganized Debtor); (b) the Estates; (c) the Creditors' Committee, (d) the Purchaser; and with respect to each of the foregoing Persons in clauses (a) through (d), such Person's Representatives, each in their capacities as such.

1.93.    "**Reorganized Debtor**" means Debtor PQ New York, Inc., as it exists after the Effective Date.

1.94.    "**Representatives**" shall mean with respect to an Entity, all of that Entity's current and former managed and controlled affiliates, subsidiaries, officers, directors, managers, managing members, principals, shareholders, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants and other representatives and such Person's respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.95.    "**Reserves**" shall mean, collectively, the Disputed Administrative Claims Reserve, the Disputed Professional Fee Claims Reserve, the Disputed Priority Tax Claims Reserve, the Disputed Priority Non-Tax Claims Reserve, the Disputed Secured Claims Reserves, the Disputed General Unsecured Claims Reserve, the Liquidating Trust Expense Reserve, and any other reserves established by the Liquidating Trustee pursuant to Section 8.02 of the Plan.

1.96.    "**Retained Assets**" shall mean all of the Debtor's Cash and other Assets existing on the Effective Date.

12062459

1.97.   "**Sale**" shall mean the sale of substantially all of the Debtors' Assets to the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

1.98.   "**Sale Documents**" shall mean the Purchase Agreement, the Sale Order, and all documents, instruments, and agreements executed and delivered in connection with the consummation of the transactions contemplated by the Purchase Agreement.

1.99.   "**Sale Motion**" shall mean the Debtors' Motion For Sale of Property Free and Clear of Liens under section 363(f) of the Bankruptcy Code An Order (I) Authorizing and Approving Sale of Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (II) Authorizing and Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (III) Granting Related Relief [D.I. 26].

1.100.   "**Sale Order**" shall mean the Order (I) Authorizing and Approving Sale of Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (II) Authorizing and Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (III) Granting Related Relief, as entered by the Bankruptcy Court on June 29, 2020 [D.I. 435], including the settlement agreement between the Debtors the Purchaser and the Creditors' Committee, as attached as Exhibit A thereto.

1.101.   "**Schedules**" shall mean the schedules of Assets and Liabilities, schedules of Executory Contracts and Statements of Financial Affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time, which were filed on June 10, 2020 [D.I. 108– 317].

1.102.   "**Secured Claim**" shall mean, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of one or more of the Debtors in and to property of the Estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of this Plan (subject to the Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against the one or more of the Debtors pursuant to sections 506(a) and 553 of the Bankruptcy Code.

1.103.   "**Securities Law Claim**" shall mean means any Claim that is subject to subordination under section 510(b) of the Bankruptcy Code, whether or not the subject of an existing lawsuit, (a) arising from rescission of a purchase or sale of any equity securities of the one or more of the Debtors or an affiliate of one or more of the Debtor, (b) for damages arising from the purchase or sale of any such equity security, (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims, or (d) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including, without limitation (i) any

12062459

prepetition indemnification, reimbursement or contribution obligations of the Debtor, pursuant to the one or more of the Debtors' corporate charters, by-laws, agreements entered into any time prior to the Petition Date, or otherwise, and relating to Claims otherwise included in the foregoing clauses (a) through (c), and (ii) Claims based upon allegations that one or more of the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the sale of equity securities, or otherwise subject to section 510(b) of the Bankruptcy Code.

1.104.  **Solicitation Procedures Order**" shall mean this Court's Order approving the Joint Motion of the Plan Proponents (i) Approving on an Interim Basis the Adequacy of Disclosures in the Combined Plan and Disclosure Statement, (ii) Scheduling the Confirmation Hearing and Deadline for Filing Objections, (iii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Combined Plan and Disclosure Statement, and Approving the Form Of Ballot And Solicitation Package, and (iv) Approving the Notice Provisions entered on August 24, 2020 [D.I.. 531].

1.105.  **Subordinated Claim**" shall mean any (a) Penalty Claim, (b) Securities Law Claim, (c) Affiliate Claim, or (d) other Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code or Final Order of the Bankruptcy Court.

1.106.  "**Tax**" or "**Taxes**" shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

1.107.  "**Third Party Release**" shall mean the voluntary releases to be granted pursuant to the Plan as set forth in Section 9.02 hereof.

1.108.  "**Unclaimed Distributions**" shall mean any undeliverable or unclaimed Distributions.

1.109.  "**Unimpaired**" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.110.  "**Unimpaired Class**" shall mean a Class of Claims that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.111.  "**U.S. Trustee**" shall mean the office of the United States Trustee for the District of Delaware.

1.112.  "**U.S. Trustee Fees**" shall mean fees payable pursuant to 28 U.S.C. § 1930.

1.113.  "**Visa/MasterCard Interests**" shall mean the Estates' interests in the claims asserted on behalf of the Debtors in the Visa/MasterCard Action, as set forth in the Sale Order, by and through which the Estates and the Purchaser are each entitled to 50% of all proceeds in excess of Purchaser's out of pocket third party fees and expenses.

12062459

1.114. "**Visa/MasterCard Action**" shall mean the causes of action against Visa and MasterCard, including without limitation that certain consolidated class action entitled In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation (MDL 1720 (MKB) (JO)), pending in the United States District Court for the Eastern District of New York.

1.115. "**Voting Agent**" shall mean Donlin, Recano & Company, Inc. or any successor appointed by the Bankruptcy Court.

1.116. "**Voting Deadline**" shall mean September 18, 2020, at 4:00 p.m. (prevailing Eastern time), the date and time by which ballots to accept or reject the Plan must be received by the Voting Agent in order to be counted, as set forth by the Solicitation Procedures Order.

## ARTICLE II.
## BACKGROUND

### 2.01    General Background

### (a)    The Debtors' History and Organizational Structure and History

The first Le Pain Quotidien was opened by Alain Coumont in Brussels, Belgium in October 1990. Le Pain Quotidien means "the daily bread." As a young chef, Coumont became dissatisfied with the quality of bread available in Brussels, so he began making his own using a four-ingredient blend of organic stone-ground flour, sea salt, water, and a wild yeast leaven. The centerpiece of this first location, in what has become a tradition at Le Pain Quotidien, was a large communal table, which was built from wood salvaged from the floors of retired Belgian trains. Gradually over time, additional items were added to the menu to complement Le Pain Quotidien's signature artisan bread, including pastries, salads, beverages, tartines (traditional, open-faced sandwiches) and specialty retail products.

Within a few months of opening this initial location, ten other Le Pain Quotidien locations had opened. In 1997, the first Le Pain Quotidien location opened in the U.S. with a flagship bakery on Madison Avenue in New York City. At its peak, the Company operated over 290 Le Pain Quotidien locations throughout the world, with the Debtors operating 98 Le Pain Quotidien locations in the U.S.

PQ NY is a wholly-owned subsidiary of PQ Licensing SA ("PQ SA"), a Belgian company that operated 98 restaurants in the United States under the trade name Le Pain Quotidien. The Debtors were headquartered in New York and, prior the COVID-19 outbreak, operated in the New York City metro area, the Mid-Atlantic region, California, Illinois and Florida. Until recently, prior to the Petition Date, the Debtors employed approximately 2,500 people.

On May 22, 2020, the Brussels Enterprise Court officially opened a judicial reorganization procedure regarding PQ SA, which suspended the ability of creditors to enforce claims against PQ SA through an initial period expiring on July 8, 2020.

12062459

(b)    **Restructuring Initiatives**

In 2018, the Debtors generated sales of $175 million and EBITDA of $4.4 million.  The Debtors, however, experienced eroding same stores sales in the following year, resulting in $153 million in sales and negative $16.8 million in EBITDA for 2019 in addition to suffering from the negative impact of expensive leases and underperforming store locations.  Absent a "right-sizing" of the Debtors' business and implementation of certain operational and restructuring initiatives, the Debtors' business forecasts indicated a continuing negative EBITDA trend through 2023. These forecasts, however, were further reduced by the unforeseen and unquantifiable and devastating economic effects that the recent COVID-19 outbreak caused to the restaurant industry.

A number of factors contributed to the Debtors' declining numbers prior to the pandemic. First, the Debtors experienced significant pressure from increased competition in the Debtors' primary markets.  Prior to the Petition Date, approximately ninety-six (96) percent of the Debtors' sales were concentrated in three (3) regions, with fifty-six (56) percent of sales allocated to the New York City metro area.  In 2017 alone, there were 593 additional restaurant openings in the New York City metro area.  This growth was met with a movement away from the Debtors' casual "dine-in" concept, with delivery and to-go sales serving as the primary driver of growth in the restaurant industry.  The traditional dining concept historically embraced by the Debtors was under pressure, as consumers displayed a preference for new dining formats that offer more convenience. Indeed, consumers had gravitated more towards the "grab n' go" concept, which provided for quicker transactions by using a simplified menu and a greater level of self-service that offered guests greater control over their dining experience.

The Debtors' business also suffered historically from a lack of investment at the store level, leaving locations in need of remodeling to keep up with industry trends or in need of certain amenities.  This lack of investment also contributed to a lagging digital platform.  The restaurant industry has expanded quickly into various digital channels, which include, among other things, interactive websites and mobile phone apps, which can be used by the consumer to promote expediency and convenience in today's busy world.

The Debtors also suffered from significant turnover at the corporate level, with the majority of the Debtors' U.S. management team coming on board within the last two (2) years. Additionally, the Debtors experienced internal challenges due to changes implemented around the supply chain and with respect to store staffing strategies.

During the second half of 2019, the Debtors began pursuing a series of initiatives intended to address the operational issues facing the Debtors' business.  The Debtors attempted to address consumer demand for greater convenience by shifting more towards a "Grab N' Go" restaurant concept.  The "Grab N' Go" concept focuses on a limited service model that provides prepackaged items for faster and easier transactions.  In early 2019, the Debtors launched a comprehensive "Grab N' Go" offering through a concept pilot program launched in the New York City metro market, with the goal of doubling "Grab N' Go" sales over an 18-month period.  The Debtors' efforts included a focus on a wider and better suited product range, updated presentation and labelling and a revamped look and feel to the Debtors' "Grab N' Go" cases.  The Debtors ultimately planned to expand the "Grab N' Go" store model to other key markets.  These efforts

12062459

also focused on a more simplified offerings menu intended to lower operating expenses, while retaining the Debtors' overall food philosophy.

The Debtors also shifted their investment strategy towards a remodeling of their existing locations, rather than focusing on new store openings. Indeed, the Debtors decided not to open any new store locations in 2019 unless required by the terms of a lease. The Debtors' focus, instead, shifted towards a large-scale remodeling program. In addition to expanding the "Grab N' Go" component of their business, the Debtors' remodeling efforts focused on making Le Pain Quotidien a "home away from home", giving their restaurants a brighter and refreshed image. This shift in strategy also led to greater investment in key amenities and overall store maintenance.

The Company's operational initiatives also included a greater investment and focus on their digital footprint. These efforts included the development and implementation of (i) an in-store innovation lab offering, among other conveniences, self-ordering, customization, and checkout; (ii) a newly designed U.S. website; and (iii) a best-in-class mobile phone app. Whereas the Company's digital footprint had previously been almost non-existent, these advancements provided the Debtors' consumers with certain conveniences for which they have been accustomed to in the market place (e.g., "order ahead" and "pay in store" features). The enhanced digital platform also enabled the Debtors to streamline their marketing efforts by growing their loyalty database and targeting their consumer based on behavioral and order data.

The Company also heightened the focus on its cost structure by developing a framework for better tracking and monitoring its general and administrative expenses. As part of this focus, the Company developed systems for mapping and budgeting its expenses in an effort to control costs. These cost control measures included an analysis of restaurant labor productivity to offset pressures caused by increases to the minimum wage. The Company also sought to address productivity through improvements to the store level management structure, performance forecasting and accountability, kitchen efficiency and upgraded equipment.

(c)    **Effects of COVID-19 on Restaurant Industry**

The COVID-19 pandemic significantly and very adversely affected the U.S. food and restaurant industry in March 2020, as state, city and local officials began to order the closure of restaurants or limit their mode of operations. These efforts began on or about March 15, 2020, with the State of Ohio ordering the closure of all bars and restaurants – within the following week thirty-eight (38) states and numerous major cities (including Los Angeles and New York City) had made similar pronouncements. The government closures mostly affected "dine-in" food service in an effort to promote "social distancing" and combat the spread of COVID-19, while permitting the continuation of takeout and delivery food services. Many restaurants, including the Debtors, were ill-equipped to deal with the significant decline in traffic and takeout/delivery-only model and were therefore forced to layoff portions of their workforce and/or close altogether.

While the Debtors' restructuring plans contemplated closing certain underperforming locations, as of March 20, 2020, the Debtors were forced to close all but five of their locations due to the COVID-19 pandemic. The Debtors initially attempted to operate a limited number of remaining locations on a takeout-only basis, but these efforts quickly proved unprofitable. Accordingly, by March 22, 2020, the Debtors had shuttered all of their restaurant locations and

terminated all but a handful of their employees that would be necessary to oversee the sale of the business (or an orderly wind down if not possible) through a bankruptcy proceeding.

(d)    **Restructuring Initiatives**

In addition to the operational initiatives discussed above, in September 2019, the Company began evaluating potential strategic and restructuring alternatives with regards to its European and U.S. businesses. In connection with this evaluation, the Debtors engaged PricewaterhouseCoopers LLP and Richards, Layton & Finger, P.A. to assist them in exploring and evaluating various strategic alternatives. The Debtors also retained RCS Real Estate Advisors on a prepetition basis to assist them in evaluating their lease portfolio.

With the assistance of their professionals, the Debtors performed a "four-wall" analysis of the Debtors' lease portfolio. In connection with this analysis, the Debtors identified under-performing stores and developed and assessed the impact of operating with a reduced portfolio of restaurant locations on a go-forward basis. The Debtors also began considering both in- and out-of-court restructuring alternatives for addressing the costs associated with the Debtors' underperforming leases. It became apparent over time, however, that a bankruptcy filing would be necessary given (i) the difficulty in renegotiating lease terms outside of bankruptcy; (ii) the ongoing funding needs of the underperforming restaurants; and (iii) the realization that an out-of-court transaction would require significant funding from a potential purchaser or investor. Accordingly, in February 2020, the Debtors began planning for a potential in-court restructuring.

(e)    **The Debtors' Marketing Efforts**

Notwithstanding the closures due to the COVID-19 outbreak, the Company continued its efforts to maximize value both in Europe and in the U.S. In connection with such efforts, on March 31, 2020, the Debtors retained SSG Advisors, LLC ("SSG") to provide investment banking services in connection with the Debtors' last-ditch effort to avoid a complete liquidation and locate a potential going-concern acquisition partner.[2] The Debtors and SSG conducted a marketing process for the U.S. assets contemporaneous with the restructuring efforts being undertaken in Europe. PQ SA's ownership of the Le Pain Quotidien intellectual property meant that any purchaser of the Debtors' assets would need a license in order to operate under the trademark in the U.S.

As part of its marketing efforts, SSG circulated an initial teaser to 204 prospective purchasers, which included strategic and financial parties in the U.S. and Europe. The Debtors received responses from forty-three (43) of these parties, who executed non-disclosure agreements and were provided with a confidential information memorandum (CIM) and access to an electronic data room. Notwithstanding the complications created by COVID-19, the marketing process generated a robust response. While parties were unable to conduct physical or virtual site visits, SSG was able to provide prospective purchasers with information responsive to due diligence

---

[2] In support of this effort, PQ SA agreed to provide PQ NY with up to $4.533 in unsecured financing (the "PQ SA Loan"), which was used to, among other things, satisfy outstanding payroll claims, sale and use tax claims, supplier claims subject to either the United States Perishable Agricultural Commodities Act (PACA) or the United States Packers and Stockyards Act (PASA), and other outstanding amounts (including SSG's initial investment banking fee).

12062459

requests and to coordinate calls between parties and the Debtors' management. The Debtors and SSG worked closely with PQ SA's insolvency professionals and, as a result, were able to coordinate discussions with parties that were interested in acquiring a license to operate Le Pain Quotidien restaurants in the U.S. The Debtors ultimately received term sheets from four (4) parties, including a non-binding term sheet from Aurify Brands, an affiliate of the Purchaser, dated April 30, 2020.

The Debtors' lack of liquidity presented the largest obstacle in pursuing any transaction, given that the Debtors had exhausted the PQ SA Loan and shuttered all operations due to the COVID-19 outbreak. Accordingly, any purchaser would also need to finance the postpetition administrative costs associated with consummating the transaction. Aurify Brands was cognizant of this issue and structured its bid to provide the Debtors with much-needed liquidity, without which the Debtors would have filed for chapter 7 liquidation weeks ago.

On May 13, 2020, after Aurify Brands, successfully bid for the Company's U.S. franchising rights in the Belgian insolvency proceeding,[3] and in furtherance of their sale discussions, the Debtors and the Purchaser into a secured promissory note, whereby the Purchaser agreed to provide the Debtors with $122,000 (which was subsequently increased to $522,000) in bridge financing. The secured promissory note was used to fund the Debtors' limited ongoing costs and to prepare for the commencement of the Chapter 11 Cases, including the documentation of definitive sale documents and a related debtor-in-possession credit agreement pursuant to which the Purchaser would finance the Chapter 11 Cases.

The secured promissory note allowed the Debtors and the Purchaser to continue their extensive negotiations and enter into an asset purchase agreement, dated as of May 26, 2020, whereby the Purchaser agreed to acquire substantially all of the Debtors' assets for aggregate consideration of $3 million, plus the Adequate Assurance Deposit Amount (as defined in the APA), the assumption of certain liabilities, and the payment of all cure amounts. Further, he APA contemplated the assumption and assignment of at least thirty-five (35) of the Debtors' leases, thereby providing for a reopening of certain of the Debtors' restaurants and the potential re-hiring of a number of former employees.

A critical piece of the overall transaction was the Purchaser's willingness to provide a $3 million DIP credit facility pursuant to a senior secured super-priority debtor-in-possession credit and security agreement, dated May 26, 2020, that provided working capital and general corporate purposes, including the funding of postpetition operations and other chapter 11 related expenses, including professional fees. The DIP Credit Agreement also provided for a roll-up of the prepetition bridge loan. The Debtors' obligations under the credit agreement were secured by liens on substantially all of the Debtors' assets pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code (subject only to Prior Liens and the Carve-Out (as such terms are defined therein)). Other than the bridge loan, the Debtors did not have any prepetition secured borrowed debt, so the Purchaser did not need to prime any parties in connection with the DIP Credit

---

[3] On May 13, 2020, the Debtors and Purchaser entered into a term sheet that provided the Purchaser with the exclusive right to move forward with the documentation of a US master franchise agreement, which divested PQ SA of its U.S. operations and permitted LPQ US to operate under the Le Pain Quotidien brand in the U.S.

12062459

Agreement. The DIP Credit Agreement also provided the Purchaser with a super-priority administrative claim under section 364(c)(1) of the Bankruptcy Code. Pursuant to the terms of the APA, the outstanding DIP Obligations (as defined therein) could be used to credit bid against the purchase price at closing pursuant to section 363(k) of the Bankruptcy Code.

Prior to entering into the credit agreement, the Debtors' Board consulted with SSG regarding potential financing alternatives. The Board quickly concluded, however, that there were no other financing alternatives (including through PQ SA or any other third party capital provider), particularly given that the Debtors were not operating and due to the composition of their assets (leases and miscellaneous equipment that do not provide much security to a lender).

### 2.02   The Chapter 11 Cases

#### (a)   The Debtors' Bankruptcy Filings and First Day Motions.

On the Petition Date, each of the Debtors filed a voluntary chapter 11 bankruptcy petition. Substantially contemporaneously with the filing the petitions, the Debtors filed a number of "first day" motions, including  (i) an application for an order approving the retention of Donlin, Recano & Company, Inc. as claims and noticing agent pursuant to section 156(c) of the Judicial Code and Local Rule 2002-1(f); (ii) a motion for an order authorizing the continued use of the Debtor's cash management system, including authorizing the Debtors to maintain existing bank accounts and business forms; (iii) a motion for an order authorizing the Debtors to provide adequate assurance of future payment to utility companies pursuant to section 366(b) of the Bankruptcy Code; (iv) a motion for an order authorizing the Debtors to maintain their existing insurance coverage; (v) a motion for an order authorizing the Debtors to pay certain tax claims that were due and owing as of the Petition Date Substantially contemporaneously with the petitions, the Debtors also filed a motion to reject certain leases of nonresidential real property effective as of the Petition Date, as identified on Schedule 2.6(c) of the Asset Purchase Agreement, that the Purchaser identified for immediate rejection, and for which the Debtors unconditionally surrendered possession of the premises to the landlord on or prior to the Petition Date (collectively, the "First Day Motions"). On May 28, 2020, the Court granted each of the First Day Motions on an interim basis, and each of the First Day Motions was subsequently approved on a final basis on June 25, 2020.

#### (b)   Motions for Postpetition Financing and Approval of the Sale of Substantially All of the Debtors' Assets

As set forth in Section 2.01(e) herein, a critical piece of the Debtors' prepetition sale efforts was identifying and entering into an asset purchase agreement with a purchaser who would be willing to provide pre- and postpetition financing to the Debtors.  Substantially contemporaneously with the filing of the petitions, the Debtors filed the DIP Motion, by and through which they sought approval of the DIP Credit Agreement to provide the Debtors with working capital for general corporate purposes and to fund the Debtors chapter 11 related expenses, including professional fees. The DIP Credit Agreement also provided for a roll-up of the prepetition bridge loan. By the DIP Motion, the Debtors sought entry of interim and final Orders authorizing the Debtors to borrow funds under the DIP Credit Agreement in an aggregate principal amount of up to $3 million, pursuant to the terms and conditions of the DIP Credit Agreement, therein. Among other things, the DIP Credit Agreement provided that the Debtors

could borrow up to $2,522,000 (inclusive of rolling up the bridge loan) on an interim basis; modifying the automatic stay to the extent necessary to grant the Lender security interests, liens, and secured claims as provided for in the DIP Credit Agreement; with the balance to be considered at a final hearing.  By the DIP Motion, the Purchaser, would be secured by substantially all of the Debtors' assets, subject to a carve-out.  On May 28, 2020, the Bankruptcy Court approved the DIP Motion on an interim basis.

Substantially contemporaneously with the filing of the DIP Motion, the Debtors filed the Sale Motion, by and through which the Debtors sought approval of the Asset Purchase Agreement through a private sale, that would, among other things, provide for the reopening of no less than thirty-five (35) of the Debtors' restaurants and the potential rehiring of employees at each such location.

As set forth in the Sale Motion, the Debtors believed that the proposed sale, including the timing for the sale, would provide a significant benefit to the Debtors' vendors, landlords, former employees (to the extent re-hired as a result of the Sale), and a loyal customer base.  Despite that representation, and having entered into the DIP Credit Agreement and form of Asset Purchase Agreement prior to bankruptcy, the Debtors negotiated a 'fiduciary out' in the APA that provided that, if a buyer emerge that was willing to submit a higher and better offer for the Debtors' assets, the Debtors have would be able to pursue the highest and best value for the Debtors' assets.

(c)     **Appointment of the Creditors' Committee**

On June 11, 2020, the Office of the U.S. Trustee appointed the Creditors' Committee consisting of three members:  (i) Natanel Marciano; (ii) The Havi Group, LP; and (iii) Kettle Cuisine Inc.  The Creditors' Committee selected Seward & Kissel LLP and Morris James LLP its legal as counsel.

(d)     **Settlement Agreement Between the Debtors, the Purchaser and the Creditors' Committee**

After the appointment of the Creditors' Committee, the Debtors, the Creditors' Committee and the Purchaser negotiated a settlement agreement by and through which the parties agreed, among other things, as follows:[4]

> The Creditors' Committee agreed to support the (i) sale of the Debtors' assets to Purchaser, including object or otherwise challenge the Purchaser's ability to credit bid its secured claims arising from the DIP Credit Agreement, including roll-up amounts, and (ii) entry of a final Order approving the DIP Financing Motion, include, among other things, (1) the roll-up; (2) the releases contained in Paragraph G(5) of the Interim Order; (3) Section 506(c) surcharge waiver; and (4) recovery of the DIP Lender's

---

[4]     This is a summary of the settlement agreement, the complete terms of the settlement are attached as Exhibit A to the Sale Order.  All capitalized terms not otherwise defined herein shall have the meaning ascribed to that term in the Sale Order, including the settlement agreement.

12062459

fees, costs and expenses in connection with the DIP Financing in the event that Purchaser is not the successful bidder for the Debtors' assets.

The Purchased Actions only includes (i) claims and causes of action, including avoidance actions, against go-forward vendors and landlords and contract counterparties; (ii) claims and causes of action against [PQ SA] and its Related Parties (as defined in the Asset Purchase Agreement), including but not limited to affiliates, subsidiaries, shareholders, directors, and any parties entitled to indemnity from [PQ SA] or related parties, provided, however, that this excludes solely any claims against the Debtors' current and former directors and officers that were not affiliated with [PQ SA] or its non-Debtor Related Parties or did not act as a director or officer of [PQ SA] or its non-Debtor Related Parties and are not entitled to indemnification, reimbursement, contribution, or any similar right from [PQ SA] or its non-Debtor Related Parties on account of such claims; (iii) fifty percent (50%) of all proceeds of the Debtors' rights in the Visa/MasterCard Action, after deducting the Purchaser's out of pocket third party fees and expenses; and (iv) claims and causes of action regarding insurance claims and related proceeds (as set forth in the Asset Purchase Agreement). All other Estate litigation claims and causes of action shall remain in the Estates.

At Closing, [PQ SA] and its Related Parties (as defined in the APA) that have or may have claims against Debtors shall be deemed to have waived any right to receive a distribution on account of such claims, including the claim of [PQ SA] as described in the Motion of the Debtors For Entry of Interim and Final Orders approving the DIP Financing Motion in the approximate amount of $69,163,755; it being the intention of the parties that only non-affiliated parties will participate as unsecured creditors for the purposes of distribution. [PQ SA] and its Related Parties agree that they shall support any plan of reorganization that complies with the terms of this Settlement Agreement so long as such plan of reorganization does not impose any additional obligations on [PQ SA] or its Related Parties.

At closing, the Purchaser would pay additional cash consideration of $300,000 into the Committee Account, and such funds and all other cash that is deposited into the Committee Account, including the funds allocated to the [Creditors' Committee] professionals as identified below, shall remain the property of the Debtors' estates and be subject to the exclusive jurisdiction of the Bankruptcy Court.

The budget for the [Creditors' Committee'] professionals was increased from $125,000 to $250,000, and the incremental $125,000 was to be deposited into the Committee Account, and shall be considered property of the Debtors' Estates and subject to the exclusive jurisdiction of the Bankruptcy Court. Any funds held by the Debtors on account of the "UCC

professional fees" line item in the budget shall be transferred to the Committee Account;

All unused budget items, except for amounts designated to be spent under the "Occupancy" line item of the Budget, remain in the Estates; and

Finally, the parties agreed that, after closing, the Debtors and the [Creditors' Committee] would confer regarding an exit from chapter 11 exit, including a wind-down budget if such budget is necessary. Funds held in the Committee Account would not be released from the Committee Account absent (i) agreement by the Debtors and the [Creditors' Committee] or (ii) an order of the Court.

On June 29, 2020, the Bankruptcy Court entered the Sale Order, approving the sale of substantially all of the Debtors' assets pursuant to the Asset Purchase Agreement, including the Settlement Agreement, and the Final Order approving the DIP Financing Motion.  On June 30, 2020, the sale of substantially all of the Debtors' assets was consummated.

This Plan is the product of the Debtors and the Creditors' Committee's efforts on with respect to a process for the Debtors to exit from chapter 11 that maximizes the value of the Debtors' estates.

## ARTICLE III.

## CONFIRMATION PROCEDURES

### 3.01    Confirmation Procedures

On August 24, 2020, the Court entered the Solicitation Procedures Order [D.I. 531].  Among other things, the Solicitation Procedures Order, approved the adequacy of disclosures in the Plan on an interim basis and set certain deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan and a hearing to consider approval of the Plan.  The Confirmation Hearing has been scheduled for **September 28, 2020 at 11:00 a.m.** (prevailing eastern time) at the Bankruptcy Court, 824 North Market Street, 5th  Floor, Courtroom 5, Wilmington, Delaware 19801[5] to consider (a) final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

---

[5]     Because of restrictions due to COVID-19, it is currently unclear whether the hearing to consider confirmation will be in person or via Zoom and CourtCall.  One week prior to the hearing to consider confirmation of the Plan, the Debtors' Claims agent will post on the Debtors' website whether the hearing will be in person. https://www.donlinrecano.com/Clients/pqny/Index.

12062459

### 3.02    Procedure for Objections

Any objection to final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Plan must be made in writing and Filed with the Bankruptcy Court and served on the following parties so as to be actually received on or before **September 23, 2020 at 4:00 p.m. (prevailing Eastern time)** upon (a) (a) counsel to the Debtors: Mark D. Collins, Esquire and Jason M. Madron, Esquire at collins@rlf.com and madron@rlf.com**,** respectively  (b) counsel to the Creditors' Committee, Robert J. Gayda, Esquire and Jeffrey R. Waxman, Esquire at gayda@sewkis.com and jwaxman@morrisjames.com**,** respectively; and (c) counsel to the Office of the United States Trustee, Timothy Fox, Jr., Esquire at timothy.fox@usdoj.gov.  Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### 3.03    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by all Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### 3.04    Classification of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Plan Proponents also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Plan Proponents believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The Plan Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the

Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Plan Proponents' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Plan Proponents' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponents believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 3.05    Impaired Claims or Equity Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under

12062459

section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, only Holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims in Class 5 and Holders of Interests in Class 6 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 (CONVENIENCE CLASS CLAIMS) AND 4 (GENERAL UNSECURED CLAIMS).

### 3.06    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 5 and 6 are deemed to reject the Plan, the Plan Proponents will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Plan Proponents believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 5 and 6, respectively, will receive or retain any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponents believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Plan Proponents believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a) <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured

27

claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) <u>Equity Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. As discussed above, the Plan Proponents believe that the Distributions provided under the Plan satisfy the absolute priority rule, where required

## 3.07    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' Assets have principally been liquidated and the Plan provides for the distribution of all of the Cash proceeds of the Debtors' Assets to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Plan Proponents have analyzed the ability of the Liquidating Trust to meet its obligations under the Plan. Based on the Plan Proponents' analysis, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Plan Proponents believes that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## 3.08    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative

12062459

claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class. See Liquidation Analysis attached as Exhibit A to this Disclosure Statement and Plan.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Plan Proponents believes that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in chapter 7.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Plan Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the chapter 7 case. Conversion also would likely delay the liquidation process and ultimately distribution of whatever value remains in the Estates.

Accordingly, the Plan Proponents believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Case was converted to a chapter 7 case, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

### 3.09    Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT AT (866) 751-6312 OR YOU CAN GO TO THE DEBTORS' WEBSITE AT HTTPS://WWW.DONLINRECANO.COM/CLIENTS/PQNY/INDEX.. THE VOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

12062459

# ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS AND EXPECTED RECOVERIES

### 4.01   Overview of Classification.

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Equity Interest is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim or Equity Interest qualifies within the description of that Class; and (ii) the Claim or Equity Interest has not been paid, released, or otherwise compromised before the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Compensation Claims, and Priority Tax Claims are not classified under the Plan and are excluded from the following Classes.

### 4.02   Identification and Treatment of Unclassified Claims

(a)   Administrative Claims. On the Effective Date, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim: (a) Cash equal to the amount of such Allowed Administrative Claim; or (b) such other treatment as to which the Debtor or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(i) Final Administrative Claim Bar Date. Holders of Administrative Claims accruing after the Petition Date, other than Professional Fee Claims and claims arising under section 503(b)(9) of the Bankruptcy Code, shall File with the Claims Agent and serve on the Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Claim Bar Date. Any such Claim not Filed by the Final Administrative Claim Bar Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Final Administrative Claim Bar Date and shall constitute notice of such Bar Date. The Liquidating Trustee shall have one hundred and eighty (180) days (or such longer period as may be allowed by order of the Bankruptcy Court on motion of the Liquidating Trustee) following the Final Administrative Claim Bar Date to review and object to Administrative Claims.

(ii) Bar Date for Applications for Professional Fees. Professional Fee Claims are Administrative Claims and all applications for allowance and payment of Professional Fee Claims shall be Filed with the Bankruptcy Court on or before the Professional Fee Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and

30

2002(f) shall set forth the Professional Fee Bar Date and shall constitute notice of such Bar Date.

(iii) <u>Section 503(b)(9) Claims</u>.  For the avoidance of doubt, (i) the deadline for Filing requests for payment of 503(b)(9) Claims was the General Bar Date and (ii) the deadline for Filing requests for payment of Administrative Claims that arose between the Petition Date through and the Effective Date is the Final Administrative Claim Bar Date, and neither deadline is extended by Plan nor the Confirmation Order.

(b)     <u>U.S. Trustee Fees</u>. All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtor on or before the Effective Date. From and after the Effective Date, the Liquidating Trust shall be responsible for payment of the fees assessed against the Reorganized Debtor's Estate until such time as the Chapter 11 Case is closed, dismissed or converted. Notwithstanding anything to the contrary in this Plan, the U.S. Trustee shall not be required to File a proof of Claim for administrative expenses.

(c)     <u>Priority Tax Claims</u>. On the Effective Date, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which the Debtor or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

(d)     <u>Ordinary Course Liabilities</u>.  All Ordinary Course Liabilities are deemed to be Allowed Claims to the extent set forth in the Approved Budget.  Holders of Administrative Claims on account of Ordinary Course Liabilities are not required to file or serve any request for payment of the Ordinary Course Liability.  The Debtors shall continue to pay each Ordinary Course Liability accrued prior to the Effective Date, pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability, and the Approved Budget.  To the extent that a holder of an Administrative Claim, on account of Ordinary Course Liability which accrued prior to the Effective Date, did not submit an invoice for the Ordinary Course Liability to the Debtors prior to the Effective Date, the holder must submit the invoice to the Reorganized Debtor in the ordinary course of business pursuant to the terms and conditions of the particular transaction giving rise to the Ordinary Course Liability.  The Liquidating Trustee shall remit payment on any undisputed Ordinary Course Liability within fifteen (15) days of receipt of the invoice.  The Liquidating Trustee shall pay each Ordinary Course Liability accrued after the Effective Date, pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability.

(d)     <u>Administrative and Priority Claim Reserve.</u>  As set forth in Section 8.02 of this Plan, upon the Effective Date, the Liquidating Trustee shall establish reserves in cash, in an amount sufficient for the payment of all Administrative Claims, Priority Tax Claims, Ordinary Course Liability Claims.

### 4.03    Identification of Classes of Claims

(a)    <u>Treatment of Secured Claims (Class 1)</u>. Each Holder of an Allowed Class 1 Claim, at the option of the Plan Proponents or the Liquidating Trustee, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Plan Proponents and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. Such Claims are therefore unimpaired and not entitled to vote.

(b)    <u>Treatment of Priority Non-Tax Claims (Class 2)</u>. Each holder of an Allowed Priority Unsecured Non-Tax Claim against the Debtor shall receive, from the Consideration, on the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Unsecured Non-Tax Claim, either Cash equal to the full unpaid amount of such Allowed Priority Unsecured Non-Tax Claim, or such other treatment as the Debtor, the Plan Sponsor and the holder of such Allowed Priority Unsecured Non-Tax Claim shall have agreed.  Such Claims are therefore unimpaired and not entitled to vote.

(c)    <u>Treatment of Unsecured Convenience Claims (Class 3)</u>.  Convenience Class Claims are unsecured claims in an amount of less than $2,500.  Other than those claims that are the subject of an objection on the Effective Date, all Class 3 Claims will be automatically deemed Allowed on the Effective Date in the greater of lesser of (i) the Claim amount, as filed or scheduled, or (ii) $2,500, and Holders of such Claims shall receive a 5% distribution in full and complete satisfaction of such Claims from the Liquidating Trust on the Effective Date or as soon thereafter as practicable.  Class 3 Unsecured Convenience Claims are impaired and entitled to vote.

(d)    <u>Treatment of General Unsecured Claims (Class 4)</u>.  After satisfaction in full of all Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Non-Tax Claims, and the Distribution on account of the Convenience Class Claims, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of any beneficial interest in the funds remaining in the Liquidating Trust or such other treatment as may be agreed upon by such Holder and the Liquidating Trustee. The Liquidating Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claims on each Distribution Date (or the date on which such Claim becomes an Allowed General Unsecured Claim) on a Pro Rata basis, provided, however, that the Liquidating Trustee shall have no obligation to make a Distribution to Holders of Allowed General Unsecured Claims where the Liquidating Trustee determines that to make such a Distribution would prevent the Liquidating Trustee from having sufficient funds to pay Allowed Administrative Claims, and the actual and necessary costs and expenses of the Estates and the Liquidating Trust, including Liquidating Trust Expenses.  Pursuant to the settlement between the Purchaser, the Creditors' Committee, a copy of which is attached as an exhibit to the Sale Order, PQ SA waived its rights to any distribution on account of its Claim. <u>See</u> supra, Section 2.02(d).

General Unsecured Claims of more than $2,500 are presumed to be Class 4 Claims but, pursuant to the Solicitation Procedures Order Holders of Class 4 Claims (i.e., General Unsecured Claims of more than $2,500) <u>may</u> elect to be treated as a Class 3 Claim for voting purposes and

12062459

substantive treatment under the Plan. PLEASE NOTE: such election will affect the treatment of the Claim, as set forth in the Plan, including (i) so long as the Claim is not subject to a pending objection on the Effective Date, it will be Allowed in the amount of $2,500 on the Effective Date, and (ii) the Holder of the Claim will receive a distribution in full and complete satisfaction on account of such Claim on the Effective Date or as shortly thereafter as it practicable. In the event that a Class 3 Claim, including a Class 4 Claim that elects to be treated as a Class 3 Claim, is the subject of any objection on the Effective Date, the Holder of the Claim will receive a distribution in full and complete satisfaction on account of such Claim on once such objection has been resolved. **Any election to by a holder of a Class 4 Claim to be treated as a Class 3 Convenience Claim will be irrevocable after September 18, 2020.**

Class 4 General Unsecured Claims are impaired and entitled to vote.

(e)     Treatment of Intercompany Claims (Class 5). Holders of Allowed Intercompany Claims in Class 5 are deemed to have rejected this Combined Plan and Disclosure Statement and therefore, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement. Class 5 Intercompany Impaired, deemed to reject Plan, and are not entitled to vote.

(f)     Treatment of Equity Interests (Class 6). On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest Class 6 Equity Interests are impaired, and deemed to reject Plan, and are not entitled to vote.

### 4.04     Treatment of Classified Classes, Rights to Vote, and Estimated Distributions

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the amount of proofs of claims that are filed after the Bar Date, and the amount of Claims that exist after the claims reconciliation process, as well as the Debtors' recoveries from the Visa/MasterCard Action. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by Creditors. The projected recoveries are based on information available to the Plan Proponents as of the date hereof and reflect the Plan Proponents' best estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Plan Proponents make no representation as to the accuracy of these recovery estimates. The Plan Proponents expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered). A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class/Designation | Plan Treatment | Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| Class 1: Secured Claims | Each Holder of an Allowed Class 1 Claim, at the option of the Plan Proponents or the Liquidating Trustee, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Plan Proponents and the Holder of such Secured Claim have agreed upon in writing. | Unimpaired; **Not entitled to vote;** Deemed to accept Plan | Approx. $450,000[6] Recovery: 100% |
| Class 2: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim at the option of the Plan Proponents or the Liquidating Trustee, as applicable, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Plan Proponents and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | Unimpaired; **Not entitled to vote;** Deemed to accept Plan | Approx. $80,000 Recovery: 100% |

---

[6]  Approximately $450,000 of Claims purporting to be secured have been filed.  The Debtors do not believe that there are any Secured Claims.

12062459

| Class 3: Convenience Class of Unsecured Claims | After satisfaction in full of all Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Non-Tax Claims, each Holder of an Allowed Convenience Claim Unsecured Claim shall receive 5% of their Allowed Claim from funds remaining in the Liquidating Trust. All Class 3 proofs of claim, including any Class 4 Claims whose Holders elect to participate in Class 3, will be deemed Allowed on the Effective Date, unless the Claim is the subject of an objection on the Effective Date. In the event that a Class 3 Claim, including a Class 4 Claim that elects to be treated as a Class 3 Claim, is the subject of any objection on the Effective Date, the Holder of the Claim will receive a distribution in full and complete satisfaction on account of such Claim on once such objection has been resolved. That is, those Claims will **not** be subject to objections, and will be Allowed in the amount set forth in the Debtors' Schedules or the proof of Claim, up to a Claim amount of $2,500, would be and satisfied in full by a payment of 5% of the claim, from the Liquidating Trust as soon after the Effective Date as is practicable. | Impaired; **Entitled to vote** | Approx. $96,000[7]<br><br>Recovery: 5% |

---

[7] This total amount of Convenience Class Claims may change depending upon how many Class 4 Claims, elect to be treated as Class 3 Claims.

12062459

| Class 4: General Unsecured Claims | After satisfaction in full of all Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Non-Tax Claims, and the Distribution on account of the Convenience Class Claims, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of any beneficial interest in the funds remaining in the Liquidating Trust or such other treatment as may be agreed upon by such Holder and the Liquidating Trustee. The Liquidating Trustee shall make one or more Distributions on account of such Allowed General Unsecured Claims to each Holder of such Allowed General Unsecured Claim on each Distribution Date (or the date on which such Claim becomes an Allowed General Unsecured Claim) on a Pro Rata basis, provided, however, that the Liquidating Trustee shall have no obligation to make a Distribution to Holders of Allowed General Unsecured Claims where the Liquidating Trustee determines that to make such a Distribution would prevent the Liquidating Trustee from having sufficient funds to pay Allowed Administrative Claims, and the actual and necessary costs and expenses of the Estates and the Liquidating Trust, including Liquidating Trust Expenses. Note that any Holder of a Class 4 Claim can elect to have its Class 4 Claim treated as a Class 3 Claim, as set forth herein. NOTE: any Class 4 Claim for which an election to Class 3 is made, will be subject to the limitation that all Convenience Claims are limited to $2,500. | Impaired; **Entitled to vote** | Approx. $35,000,000<br><br>Estimated Recovery: 2% - 5% |

| Class 5: Intercompany Claims | Holders of Allowed Intercompany Claims in Class 5 are deemed to have rejected this Combined Plan and Disclosure Statement and therefore, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement. | Impaired; Deemed to reject Plan and **Not entitled to vote** | Approx. $69,200,000 Recovery: 0% |
| --- | --- | --- | --- |
| Class 6: Equity Interests | On the Effective Date, all Interests shall be deemed canceled, extinguished and of no further force or effect, and the Holders of Interests shall not be entitled to receive or retain any property on account of such Interest | Impaired; Deemed to reject Plan and **Not entitled to vote** | Recovery: 0% |

### 4.05    Elimination of Classes for Voting Purposes

Any Class of Claims or Equity Interests that is not occupied as of the date of the commencement of the Confirmation Hearing shall be deemed deleted from the Plan for purposes of voting on acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

### 4.06    Controversy Concerning Classification, Impairment or Voting Rights

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy. Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes (i) the amount of any contingent or unliquidated Claim the fixing or liquidation of, as the case may be, would unduly delay the administration of the Chapter 11 Cases and (ii) any right to payment arising from an equitable remedy for breach of performance.

### 4.07    Insurance

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an Insurance Policy, such Claim shall first be paid from proceeds of such Insurance Policy to the extent such proceeds are available, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE V.

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER

INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 5.01    The Plan May Not Be Accepted.

The Debtor can make no assurances that the requisite acceptances to the Plan will be received, and the Debtor may need to obtain acceptances to an alternative plan of liquidation for the Debtor, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

### 5.02    The Plan May Not Be Confirmed.

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

### 5.03    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 5.04    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the

12062459

Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, it would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 5.05    Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### 5.06    Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan.

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors, including with respect to the Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of General Unsecured Claims under the Plan.

### 5.07    Plan Releases May Not Be Approved.

There can be no assurance that the releases, as provided in Article IX of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

### 5.08    Certain Tax Considerations.

There are a number of material income tax considerations, risks and uncertainties associated with the plan of liquidation of the Debtor described in this Combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### ARTICLE VI.

### MEANS FOR IMPLEMENTATION OF THE PLAN

### 6.01    Continued Corporate Existence

(a)    On the Effective Date or as soon as reasonably practicable thereafter, each of the Debtors, other than PQ New York, Inc., will each be deemed dissolved and no longer in existence, and the Organizational Documents for PQ New York, Inc., shall be amended consistent with the Restated Organizational Documents.  The Restated Organizational Documents shall be filed with the Plan Supplement.

(b)    Except as otherwise provided in the Plan, the Reorganized Debtor will continue to exist after the Effective Date as a corporate entity, with all of the powers of a corporation under applicable law in the jurisdiction in which the Debtors is incorporated.

(c)    The Liquidating Trustee will take all steps necessary to change the name of "PQ New York, Inc." to "Daily Bread Winddown, LLC" as of the Effective Date or as soon as reasonably practicable thereafter.

### 6.02    Equity

(a)    **Cancellation of Equity Interests.**  On the Effective Date, all existing Equity Interests of each of the Debtors shall be retired, cancelled, extinguished and/or discharged in accordance with the terms of the Plan.  Except as otherwise provided in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the

Debtors giving rise to any Claim or Equity Interest shall be cancelled as to the Debtors and the Reorganized Debtor shall not have any continuing obligations thereunder, and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged.

(b)    **Issuance of New Equity.**  On the Effective Date, 100 shares of new equity of the Reorganized Debtor shall be issued to the Liquidating Trustee, free and clear of all Liens, Claims, Interests, and encumbrances of any kind, except as otherwise provided in the Plan.  All the shares of the new equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assignable.  On the Effective Date, none of the new equity will be listed on a national securities exchange.  The Liquidating Trustee may take all necessary actions, if applicable, after the Effective Date to suspend any requirement to (i) be a reporting company under the Securities Exchange Act, and (ii) file reports with the Securities and Exchange Commission or any other entity or party.

### 6.03    Causes of Action

On the Effective Date, all Released Causes of Action shall be deemed waived, discharged, forgiven, and forever compromised, and all other Causes of Action shall be vested in and retained by the Liquidating Trust.  Following the Effective Date, except as otherwise expressly provided herein, the Liquidating Trustee may assert, compromise or dispose of the Preserved Causes of Action without further notice to Creditors or Interest Holders or authorization of the Bankruptcy Court.

### 6.04    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens against the property of any Estates will be fully released, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against any net proceeds of sales of such assets.  For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

### 6.05    Vesting and Sale or Other Disposition of Assets; Representative of the Estate

Except as otherwise provided in this Plan, on the Effective Date, all property of the Debtors' Estates, shall vest in the Liquidating Trust, free and clear of all Claims, liens, charges, other encumbrances, Interests or other interests.  On and after the Effective Date, the Liquidating Trustee may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy

Code or Bankruptcy Rules, other than those restrictions imposed by the Plan or the Confirmation Order. The Liquidating Trustee, on and after the Effective Date, may conduct any sales or liquidations of assets on any terms it deems appropriate, without further order of the Bankruptcy Court, except as otherwise provided in the Plan or the Confirmation Order.

### 6.06    Effectuating Documents; Further Transactions

On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the transactions contemplated thereby, in each case, in the name of and on behalf of the Reorganized Debtor and the Liquidating Trust, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

### 6.07    Deemed Substantive Consolidation

The Plan contemplates and is predicated upon the deemed substantive consolidation of the Estates for voting, confirmation, and Distribution purposes. Accordingly, on the Effective Date, each Claim filed or to be filed against any Debtor shall be deemed filed only against PQ New York, Inc., and shall be deemed a single Claim against and a single obligation of PQ New York, Inc., for Distribution purposes, which shall be paid from the Liquidating Trust. This deemed substantive consolidation of the Estates for Distribution purposes means that the specific Debtor against which a creditor Holds or asserts a Claim will have no effect on the distribution (if any) provided to such creditor under the Plan.

The Plan also provides for the deemed substantive consolidation of the Estates for voting purposes, including tabulating votes to accept or reject the Plan. Accordingly, the Debtors will tabulate each Ballot as a vote to accept or reject the Plan as to each Debtor.

Absent the consent of affected creditors, the Debtors will bear the burden at the Confirmation Hearing of establishing a *prima facie* case for the deemed substantive consolidation of their respective Estates. Accordingly, the Debtors will, to the extent necessary, adduce evidence at the Confirmation Hearing to justify the deemed substantive consolidation in accordance with the standards established by applicable case law. Such evidence may include, without limitation, evidence indicating that creditors have dealt with the Debtors as a single, consolidated enterprise, both before and after the Petition Date, the sale of all of the Debtors' assets without allocation pursuant to the Debtors, the Debtors' central management, and the Debtors' prepetition employed an integrated cash management system of bank accounts. Further, efforts to deconsolidate the Debtors' respective assets and liabilities would be burdensome and divert professional resources that are more profitably directed elsewhere, all without meaningfully affecting the distributions to be received under the Plan.

### 6.08    Records

For a period of twelve (12) months following the Effective Date (the "Retention Period"), the Liquidating Trustee shall preserve and maintain all of the Debtors' documents and records in

the ordinary course of business and according to practices and terms that it deems reasonable and appropriate. Following the Retention Period, the Liquidating Trustee may, from time to time upon ten (10) days' notice to the Post-Effective Date Service List, as described in section 13.07, and without approval of the Bankruptcy Court, destroy any documents and records of the Debtors. The notice shall provide a reasonable description of the documents and records proposed to be destroyed. In the event any party objections to the proposed destruction of the Debtors' documents and records, it shall provide the Liquidating Trustee with a written agreement and assurance, each of which is reasonably acceptable to the Liquidating Trustee, providing for the reimbursement and payment of all costs and expenses associated with the continued maintenance of such documents and records by the Liquidating Trustee. Such costs and expenses shall include, but not be limited to, payroll related expenses, third party fees and expenses, storage device costs, copying fees, the fees and expenses of counsel to address any subpoenas or document production demands, and, if such extended maintenance precludes entry of the final decree, any fees (including U.S. Trustee fees) associated with such delay.

### 6.09    Insurance Policies

(a)    **Insurance Policies Remain In Force.**  Up to and including their policy expiration date(s), any and all Insurance Policies in effect as of the Effective Date shall remain in full force and effect according to their terms and the coverage obligations of the Insurers and third party administrators under such Insurance Policies shall continue following the Effective Date (including any obligations to pay, defend and process insured claims). Further all rights and obligations of the Debtors and their estates shall remain in full force and effect according to their terms and the coverage obligations under the Insurance Policies.

(b)    **D&O Insurance Policies; Employment Practice Liability Policies; Similar Policies.**  Nothing contained in this Plan shall affect or impair the rights of any non-Debtor insured persons covered under any D&O Insurance Policy, employment practices or similar liability Insurance Policies (including, without limitation, policies for the benefit of the Debtors' directors, officers, employees, members, managers, or similar persons who served in such capacity either before or after the Petition Date).

(c)    **Modification of the Automatic Stay.**  The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed modified without further order of this Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or any injunctions set forth in the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Liquidating Trust, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Liquidating Trust, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the

Liquidating Trust, as applicable) under the applicable Insurance Policies, in such order as the applicable Insurer may determine.

(d)     **Right to Seek Relief.**  Nothing herein shall prevent any Insurer from filing a motion to seek, after notice and an opportunity for hearing, to cancel any Insurance Policy(ies), or take any other actions relating to the Insurance Policy(ies), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

### 6.10    Dissolution of Creditors' Committee

Following the Effective Date, the Creditors' Committee shall continue in existence and have standing and capacity to (i) prepare and prosecute applications for the payment of fees and reimbursement of expenses incurred by the Creditors' Committee or its respective Professionals. Following the completion of the foregoing, the Creditors' Committee shall be dissolved and the members of the Creditors' Committee shall be released and discharged from any further authority, duties, responsibilities, and obligations related to, or arising from, the Chapter 11 Cases.

### 6.11    Transfer of Privilege/No Waiver

On the Effective Date, all of the Debtors' evidentiary privileges, including the attorney/client privilege, shall be deemed transferred to the Reorganized Debtor and the Liquidating Trust.  The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.  Upon such transfer, the Debtors and the Estates shall have no other further rights or obligations with respect thereto.  Nothing herein shall be deemed a waiver of the Debtors' or the Estates' rights of privilege.

### 6.12    Termination of the Claims Agent

At any time following the Effective Date, the Liquidating Trustee shall be authorized to terminate the services of the Claims Agent by providing thirty (30) days written notice without need for order of the Bankruptcy Court or any other party.  Following termination, the Claims Agent shall provide the Liquidating Trustee and the Bankruptcy Court with a copy of the claims register and a copy of all filed proofs of Claim.  No later than thirty (30) days after its termination, the Claims Agent shall provide the Liquidating Trustee with a final invoice, and unless the Liquidating Trustee has any issues with respect to the Claims Agent's fees or expenses, the Liquidating Trustee will be authorized to remit payment of the final invoice within fifteen (15) days of receipt.  The Bankruptcy Court will retain jurisdiction to hear any dispute in the event that the Liquidating Trustee and Claims Agent cannot agree upon the amount of fees and expenses sought by the Claims Agent.

### 6.13    Closing of Cases other than PQ New York, Inc.

Upon the occurrence of the Effective Date, the Liquidating Trustee shall file a certification of counsel seeking entry of an Order authorizing the Clerk of the Bankruptcy Court to close all of the Bankruptcy Cases, other than the Bankruptcy Case of PQ New York, Inc., without need for further notice or Order of the Court.

44

### 6.14 Final Decree

At any time following the Effective Date, the Liquidating Trustee shall be authorized to file a motion for entry of a final decree closing the Chapter 11 Case of PQ New York, Inc.

## ARTICLE VII.

## EXECUTORY CONTRACTS

### 7.01 Assumption of Executory Contract(s)

The Debtors may amend the Schedule of Assumed Contracts and Unexpired Leases at any time prior to the Effective Date. On the Effective Date, all Executory Contracts identified on the Schedule of Assumed Contracts and Unexpired Leases, to be filed with the Plan Supplement, shall be deemed assumed by the Reorganized Debtor. Entry of the Confirmation Order shall constitute approval of the assumption of such Executory Contracts under sections 365 and 1123 of the Bankruptcy Code.

### 7.02 Rejection of Executory Contracts and Unexpired Leases

(a) Except for any Executory Contracts or Unexpired Leases of the Debtors: (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to, and remains pending as of, Confirmation; (iii) that were previously assumed and assigned to the Purchaser; or (iv) that are listed on the Schedule of Assumed Contracts and Unexpired Leases, each Executory Contract and Unexpired Lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Nothing herein is intended to affect the validity of contracts and leases entered into by the Debtors on or after the Petition Date, or the rights of the Debtors thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms.

(b) The Insurance Policies shall not be considered Executory Contracts for purposes of subsection (a), above. As discussed in section 6.09, the Insurance Policies shall remain in full force and effect following the Effective Date.

### 7.03 Bar Date for Rejection Damages

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, Estates, or the Reorganized Debtor, unless a Proof of Claim is filed with the Bankruptcy Court by no later than 30 days after the Effective Date.

12062459

### 7.04    Pre-Existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. Notwithstanding any applicable non-bankruptcy law to the contrary, the Plan Proponents expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods or services previously purchased by the contracting Debtors from counterparties to rejected Executory Contracts or Unexpired Leases.

## ARTICLE VIII.

## PROVISIONS GOVERNING RESOLUTION OF <br> CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN

### 8.01    Claim Objections

(a)    **Right to Object to Claims.** Notwithstanding anything to the contrary herein, notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, except insofar as a Claim is Allowed under the Plan on and after the Effective Date, the Liquidating Trustee will have the authority, but not the obligation, to do any of the following with respect to any Claims or Interests: (1) file, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court. The Liquidating Trustee shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim. Notwithstanding the foregoing, other than those Convenience Claims for which an objection is pending on the Effective Date, all Convenience Claims shall be allowed as set forth in the Schedules or the Proof of Claim filed by the Holder of the Convenience Claim. In the event that there is a pending objection to a Convenience Claim on the Effective Date, the Liquidating Trustee may pursue or settle such objection.

(b)    **Claim Objection Deadline.** Objections to Claims must be filed with the Bankruptcy Court, and a copy of the objection must be served on the subject Creditor before the expiration of the Claim Objection Deadline; otherwise such Claims shall be deemed Allowed in accordance with section 502 of the Bankruptcy Code. The objection shall notify the Creditor of the deadline for responding to such objection.

(c)    **Claim Estimation.** Pursuant to section 502(c) of the Bankruptcy Code, the Liquidating Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

12062459

### 8.02   Distribution Provisions

(a)   **Distributions to be Made**.  The Liquidating Trustee shall be responsible for making distributions required to be made under the Plan.

(b)   **Distributions on Account of Convenience Claims.**  On the Effective Date, as set forth herein, the Liquidating Trustee shall make a distribution on account of all Convenience Claims, including General Unsecured Claims that elected to be treated as a Convenience Claim. In the event that any objection to a Convenience Claim is pending on the Effective Date, the Liquidating Trustee shall remit payment in full and complete satisfaction of such Claim(s) once those Claims are Allowed in whole or part.

(c)   **Establishment of Reserves.**  On the Effective Date, the Liquidating Trustee shall establish and maintain a Reserve of Cash from the Debtors' Assets as the Liquidating Trustee deems reasonably necessary to satisfy Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.  Further, upon the Professional Fee Bar Date, the Liquidating Trustee shall establish a Reserve in an amount that the Liquidating Trustee deems reasonably necessary to satisfy all Professional Fee Claims.

(d)   **Distribution Record Date.**  As of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date, the transfer registers for Claims shall be closed.  The Liquidating Trustee shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

(e)   **No Liability.**  The Liquidating Trustee shall only be required to act and make distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality or willful misconduct, the Liquidating Trustee shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

(f)   **Distributions on Account of Disputed Claims.**  Except as otherwise provided in a Final Order or as agreed by the relevant parties, distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Liquidating Trustee at such periodic intervals as the Reorganized Debtor determines to be reasonably prudent.

(g)   **No Distributions Pending Allowance.**  Notwithstanding anything herein to the contrary: (a) no distribution shall be made with respect to any Disputed Claim until such

Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidating Trustee no distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

(h)     **Distributions in Cash.**  Any required Cash payments to the Holders of Allowed Claims or Interests shall be made by the Liquidating Trustee: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire transfer from a domestic bank, and (b) by first-class mail (or by other equivalent or superior means as determined by the Liquidating Trustee).

(i)     **Timing of Distributions.**  Except as specifically set forth in the Plan, the Liquidating Trustee may determine, in its discretion, the appropriate timing, amount, and cadence for distributions.

(j)     **Unclaimed Distributions.**  Any entity which fails to claim any Cash within 90 days from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan, and the Liquidating Trustee shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the source of such distribution (*i.e.,* the Liquidating Trustee or the Distribution Reserve) free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived and forever barred against the all of the Debtors, the Estates, the Reorganized Debtor, and the Liquidating Trustee, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against the any of the foregoing or to any Holder of a Claim to whom distributions are made.

(k)     **Delivery of Distributions and Undeliverable Distributions to Holders of Claims.**  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Liquidating Trustee, as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtors after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtors have not received a written notice of a change of address prior to the Effective Date.

(l)     **Undeliverable Distributions.**  The Liquidating Trustee shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein.  The Liquidating Trustee in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions.   Any distributions returned to the Liquidating Trustee as undeliverable or otherwise shall remain in the possession of the Liquidating Trust, until such time as a distribution becomes deliverable, and no further distributions shall be made to such Holder unless such Holder notifies the Liquidating Trustee of its then current address. Any Holder of an Allowed Claim or Interest entitled to a distribution of property under this Plan

48

that does not assert a claim pursuant to the Plan for an undeliverable distribution, or notify the Liquidating Trustee of such Holder's then current address, within 30 days of such distribution shall have its claim for such undeliverable distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors, the Estates, the Reorganized Debtor, and/or the Liquidating Trustee or their respective property, and such distribution shall be deemed unclaimed property under Section 8.02(j).

(m)      **De Minimis Distributions.**  If any interim distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may withhold such distribution until a final distribution is made to such Holder.  If any final distribution under the Plan to the Holder of an Allowed Claim would be less than $20.00, the Liquidating Trustee may cancel such distribution.  Any unclaimed distributions pursuant to this Section shall be treated as unclaimed property under Section 8.02(j) of the Plan.

(n)      **Remainder Amounts after final Distribution.**  After final Distributions have been made in accordance with the terms of the Plan, if the aggregate amount of Unclaimed Distributions and Undeliverable Distributions is less than $5,000, the Liquidating Trustee may donate such amount to Delaware Pro Se Bankruptcy Foundation.

## ARTICLE IX.

## RELEASES, INJUNCTION, AND RELATED PROVISIONS

**9.01    Releases by Debtors**

**As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties in facilitating the administration of the Chapter 11 Cases and other actions contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed forever released and discharged by the Debtors and Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan, the Disclosure Statement, or related agreements, instruments or other documents, including any rights or remedies under section 506 of the Bankruptcy Code, other than Claims or liabilities to the extent arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, actual fraud or willful misconduct, as determined by a Final Order.**

### 9.02    Releases by Third Parties

To the extent allowed by applicable law, on, and as of, the Effective Date and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Released Parties shall be forever released from any and all claims, obligations, actions, suits, rights, debts, accounts, causes of action, remedies, avoidance actions, agreements, promises, damages, judgments, demands, defenses, and liabilities throughout the world under any law or court ruling through the Effective Date (including all claims based on or arising out of facts or circumstances that existed as of or prior to the Effective Date, including claims based on negligence or strict liability, and further including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise) which the Debtors, their Estates, the Reorganized Debtor, Creditors or other persons receiving or who are entitled to receive distributions under the Plan may have against any of them in any way related to the Chapter 11 Cases, the Debtors (or their predecessors), or any of their operations or businesses; provided however that the foregoing release is granted only by the (a) Creditors who are unimpaired, (b) Creditors who returned a Ballot and did not check the opt-out box on the Ballot, and (c) Creditors or potential Creditors (including those who were listed on the Schedules of Assets and Liabilities) who were sent a solicitation package but did not vote and did not return a Ballot with the opt-out box checked; provided further, however that the release provided in this Section shall not apply to any Creditor in category (c) above if the solicitation package was returned to the Debtors as undelivered, and that such Creditor did not otherwise file a Ballot; and provided further, however, that the release provided in this Section shall not extend to any claims by any Governmental Unit with respect to criminal liability under applicable law, willful misconduct or bad faith under applicable law, or ultra vires acts under applicable law.

### 9.03    Exculpation and Limitation of Liability

(a)    The Exculpated Parties will neither have nor incur any liability to any entity for any claims or causes of action arising on or after the Petition Date and prior to closing of the Chapter 11 Cases (and in the event that the Chapter 11 Cases are closed and subsequently reopened, during such time as the Chapter 11 Cases are reopened), for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases, (ii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, (iii) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, or (iv) the approval of the Disclosure Statement or confirmation or consummation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties will each be entitled to rely upon the advice of counsel concerning their duties pursuant to, or in connection with, the above referenced documents, actions or inactions

(b)     The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 9.04    Injunction

(a)     FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

(b)     FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN SECTIONS 9.01 THROUGH 9.03 (INCLUSIVE), THE APPLICABLE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED UNDER THIS PLAN.

(c)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN OR THAT ARE SUBJECT TO THE EXCULPATORY PROVISIONS OF SECTION 9.03, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, OR SETTLED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

12062459

(d)     THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL SUCH CLAIMS AND INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

(e)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED, AND ALL INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.

(f)     ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### 9.05   Limited Injunction

UNLESS AGREED IN WRITING OTHERWISE BY THE LIQUIDATING TRUSTEE, ALL LITIGATION AND/OR ANY CONTINUATION OF LITIGATION TO WHICH ONE OR MORE OF THE DEBTORS ARE A PARTY (TO THE EXTENT NOT RELEASED OR DISCHARGED HEREUNDER), SHALL BE ENJOINED FOR A PERIOD OF SIX (6) MONTHS FOLLOWING THE EFFECTIVE DATE.

## ARTICLE X.

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

### 10.01   Conditions Precedent to Confirmation

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03:

(a)     The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Plan Proponents, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(b)     The Plan, the Confirmation Order, and documents in the Plan Supplement shall be in a form and substance reasonably acceptable to the Plan Proponents.

12062459

**10.02    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Section 10.03.

(a)    The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Plan Proponents confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(b)    All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(c)    No order of a court shall have been entered and remain in effect restraining the Debtors from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(d)    The Restated Organizational Documents shall have been filed with the applicable governmental authorities.

(e)    All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance, acceptable to the Debtors.

**10.03    Waiver of Conditions**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived at any time by each of the Plan Proponents.

**10.04    Effect of Failure of Conditions**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, the Creditors' Committee, any Creditors  or Interest Holders or any other entity in any respect.

**10.05    Filing of Notice of the Effective Date.**

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtors shall file a notice of the Effective Date with the Bankruptcy Court.

12062459

## ARTICLE XI.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN

### 11.01    Modification and Amendments

Except as otherwise specifically provided herein, the Plan Proponents reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and Bankruptcy Rules and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponents expressly reserve their rights to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; provided, however, that any alterations, amendments or modifications to the Plan, the Disclosure Statement and Confirmation Order must be consistent in all respects with the Settlements.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article and with the consent of both of the Plan Proponents.  In addition, prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Allowed Claims or Interests.

### 11.02    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the commencement of the solicitation of votes on the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 11.03    Revocation or Withdrawal of the Plan

The Plan Proponents reserve the right to revoke or withdraw the Plan before the Effective Date.  If the Plan Proponents revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests or Claims by any Debtor against any other entity; (b) prejudice in any manner the rights of such Debtor, the Creditors' Committee, the Holder of any Claim or Interest or any other entity; or (c) constitute an admission,

acknowledgement, offer or undertaking of any sort by such Debtor, the Creditors' Committee or any other entity.

**ARTICLE XII.**

**<u>JURISDICTION</u>**

**12.01   Bankruptcy Court Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over the Chapter 11 Case to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

(a)      To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b)      To ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)      To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)      To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(e)      To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any Plan Documents or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

(f)      To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtors, the Estates, the Liquidating Trustee, or the Reorganized Debtor;

(g)      To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtors, or the Estates that may be pending on the Effective Date or that may be brought by the Debtors or the Reorganized Debtor, or any other related proceedings by the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing;

(h)      To decide or resolve any and all applications for compensation;

12062459

(i)        To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

(j)        To decide issues concerning the federal or state tax liability of the Debtors which may arise in connection with the confirmation or consummation of the Plan or any Plan Documents;

(k)        To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

(l)        To enter an order closing the Chapter 11 Cases when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

**12.02   Limitation on Jurisdiction**

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334, as well as the applicable circumstances that continue jurisdiction for defense and enforcement of the Plan and Plan Documents.  For the avoidance of doubt, however, such jurisdiction shall be deemed, by the entry of the Confirmation Order, to:

(a)        Permit entry of a final judgment by the Bankruptcy Court in any core proceeding referenced in 28 U.S.C. § 157(b) and to hear and resolve such proceedings in accordance with 28 U.S.C. § 157(c) and any and all related proceedings, including, without limitation, (i) all proceedings concerning disputes with, or Causes of Action or Claims against, any Person that the Debtors, the Estates, or the Liquidating Trust or any of their successors or assigns, may have, and (ii) any and all Causes of Action or other Claims against any Person for harm to or with respect to (x) any Estate Property, including conversion of Estate Property, or (y) any Estate Property liened or transferred by the Debtors to any other Person;

(b)        Include jurisdiction over the recovery of any Estate Property (or property transferred by the Debtors with Bankruptcy Court approval) from any Person wrongly asserting ownership, possession or control of the same, whether pursuant to sections 542, 543, 549, and/or 550 of the Bankruptcy Code or otherwise, as well as to punish any violation of the automatic stay under section 362 of the Bankruptcy Code or any other legal rights of the Debtors or the Estates under or related to the Bankruptcy Code; and

(c)        Permit the taking of any default judgment against any Person who has submitted himself or herself to the jurisdiction of the Bankruptcy Court.

12062459

# ARTICLE XIII.

## MISCELLANEOUS

### 13.01   Exemption from Taxes

(a)      The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; and (b) the creation, execution and delivery of agreements or other documents creating or evidencing the formation of the Liquidating Trust and any right or interest in the Liquidating Trust. Pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

### 13.02   Compliance with Tax Requirements

Notwithstanding anything to the contrary in this Plan, the Reorganized Debtor shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate. The Reorganized Debtor shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements, including, without limitation, applying a portion of any distribution of Cash to be made under the Plan to pay applicable withholding Taxes. Any amounts withheld pursuant to the immediately preceding sentence will be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such distribution. The Liquidating Trustee shall have the right, but not the obligation, to not make a distribution until the applicable recipient has made arrangements satisfactory to the Liquidating Trustee for the payment of any Tax obligations. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, will apply to any interest on such Claim after the Petition Date. The Liquidating Trustee shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the Liquidating Trustee as a condition precedent to being sent a distribution. If a Holder of an Allowed Claim does not provide the Liquidating Trustee with an executed Form W-9, Form W-8 or other requested tax form within 90 days after the date of the Liquidating Trustee's initial request, the Liquidating Trustee may, in its sole discretion (a) make such distribution net of applicable withholding or (b) reserve such distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any distribution under the Plan, (ii) any such distribution shall revert to the source of such distribution (*i.e.,* the Liquidating Trustee or the Distribution Reserve), for distribution on account of other Allowed Claims and (iii) the Claim of the Holder originally entitled to such distribution shall be irrevocably waived and forever barred without further order of the Bankruptcy Court. The Liquidating Trustee reserves the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

12062459

### 13.03   Defenses and Setoff

Nothing contained in this Plan shall constitute a waiver or release by the Debtors, their estates, the Reorganized Debtor or the Liquidating Trustee of any right rights in respect of legal and equitable objections, defenses, setoffs, or recoupment.  To the extent permitted by applicable law, the Liquidating Trustee may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtors, the Estates the Reorganized Debtor or the Liquidating Trustee may have against the Holder of such Claim or Interest.

### 13.04   Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

### 13.05   Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan or any Plan Document shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 13.06   Transfer of Claims and Equity Interests

Any transfer of a Claim shall be in accordance with Bankruptcy Rule 3001(e) and the terms of this Section.  Notice of any such transfer shall be forwarded to counsel for the Debtors and the Liquidating Trustee.  Both the transferee and transferor shall execute any notice, and the signatures of the parties shall be acknowledged before a notary public.  The notice must clearly describe the interest in the Claim to be transferred.  No transfer of a partial interest shall be allowed.  All transfers must be of one hundred percent (100%) of the transferor's interest in the Claim.

### 13.07   Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list.  With the exception of the Debtors and the U.S. Trustee, any Person desiring to remain on the Debtor's Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Debtors' Bankruptcy Rule 2002 service list.**

**13.08   Notices**

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Creditors' Committee, and the U.S. Trustee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

(i)      if to the Debtors:

Jason M. Madron, Esquire
Richards, Layton & Finger, P.A.
Email: madron@rlf.com


(ii)     if to the Liquidating Trustee:

Edward T. Gavin, CTP
Jeremy Van Etten
Gavin/Solmonese LLC
Email: ted.gavin@gavinsolmonese.com
Email: jeremy.vanetten@gavinsolmonese.com

With a copy to

Counsel for the Liquidating Trustee

Robert J. Gayda, Esquire
Catherine LoTempio, Esquire
Seward & Kissel LLP
Email: **gayda@sewkis.com**
Email: lotempio@sewkis.com

-and-

Jeffrey R. Waxman, Esquire
Brya M. Keilson, Esquire
Morris James LLP
Email: jwaxman@morrisjames.com
Email::eilson@morrisjames.com

(iii)    If to the U.S. Trustee:

Office of the U.S. Trustee
**TIMOTHY.FOX@USDOJ.GOV**

59

12062459

### 13.09    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 7062 and/or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtor, any and all Holders of Claims and Interests (irrespective of whether such Claims or Interests are Allowed or Disallowed or were voted to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with one or more of the Debtors.

### 13.10    Severability of Plan Provisions

If, before the Effective Date of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted so long as such term or provision is acceptable to the Plan Proponents.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (iii) non-severable and mutually dependent.

### 13.11    Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, to the extent not inconsistent with the Plan.  The Plan Proponents reserve the right to amend the Exhibits and schedules to the Plan any time prior to Confirmation.

### 13.12    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Plan Proponents will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non- bankruptcy law, and pursuant to section 1125(e), the Plan Proponents and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, including, if applicable, in the offer, issuance, sale and purchase of any Plan securities (if any) provided under the Plan, and, therefore, will have no

liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

### 13.13  Conflicts

If there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document, as applicable, shall govern and control.  If any provision of this Plan (including a Plan Supplement) conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

### 13.14  U.S. Trustee Fees

The Debtors will pay pre-confirmation fees owed to the U.S. Trustee on or before the Effective Date of the Plan.  After the Effective Date, the Liquidating Trustee will file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports in a format prescribed by the U.S. Trustee, and the Liquidating Trustee will pay post-Effective Date quarterly fees to the U.S. Trustee until a final decree is entered or the case is converted or dismissed as provided in 28 U.S.C. § 1930(a)(6).

### 13.15  Implementation

The Debtors shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Plan and the Plan Documents, without further order from the Bankruptcy Court.

### 13.16  No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors, the Estates, or the Creditors' Committee with respect to any

12062459

matter set forth herein, including, without limitation, liability on any Claim or Equity Interest or the propriety of the classification of any Claim or Equity Interest.

Dated:  September 18, 2020

| | |
|---|---|
| Mark D. Collins (No. 2981) | Jeffrey R. Waxman (No. 4159) |
| Michael J. Merchant (No. 3854) | Eric J. Monzo (No. 5214) |
| Jason M. Madron (No. 4431) | Brya M. Keilson (No. 4643) |
| Brendan J. Schlauch (No. 6115) | Morris James LLP |
| RICHARDS, LAYTON & FINGER, P.A. | 500 Delaware Avenue, Suite 1500 |
| | Wilmington, DE 19801 |
| One Rodney Square | Telephone: (302) 651-7700 |
| 920 North King Street | Email: jwaxman@morrisjames.com |
| Wilmington, Delaware 19801 | Email: emonzo@morrisjames.com |
| Telephone: (302) 651-7700 | Email: bkeilson@morrisjames.com |
| Email: collins@rlf.com | |
| Email: merchant@rlf.com | -and- |
| Email: madron@rlf.com | |
| Email: schlauch@rlf.com | Robert J. Gayda, Esquire |
| | Catherine V. LoTempio, Esquire |
| Counsel to the Debtors | Seward & Kissel LLP |
| and Debtors in Possession | One Battery Park Plaza |
| | New York, NY 10004 |
| | Telephone: 212-574-1200 |
| | Email: gayda@sewkis.com |
| | Email: lotempio@sewkis.com |
| | |
| | Counsel to the Official Committee of Unsecured Creditors |

12062459